**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ITT EDUCATIONAL SERVICES, INC. SECURITIES LITIGATION | ) Civil Action No. 13-cv-1620-JPO<br>) **CLASS ACTION**<br>) **JURY TRIAL DEMANDED** |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT



**TABLE OF CONTENTS**

Page(s)

I.   NATURE AND SUMMARY OF THE ACTION ................................................................ 2

II.   JURISDICTION AND VENUE ................................................................ 15

III.   PARTIES ................................................................ 16

IV.   CLASS ACTION ALLEGATIONS ................................................................ 20

V.   CONFIDENTIAL SOURCES ................................................................ 21

VI.   SUBSTANTIVE ALLEGATIONS ................................................................ 23

    A.   ITT and the For-Profit College Industry ................................................................ 23

        1.   High Tuition Costs Force Students to Seek Private Student Loans .......... 24

        2.   High Tuition Does Not Equate to Quality Education ............................... 24

        3.   Student Loan Default Rates at ITT are Among the Highest in the For-Profit Industry ................................................................ 26

        4.   ITT Manipulated Student-Loan Defaults Through Default Management ................................................................ 28

    B.   ITT's Depended on Government Aid and Private Lenders to Finance Students' Tuition ................................................................ 29

        1.   ITT Enters into Risk Sharing Agreements with Third-Party Lenders as the Economy Deteriorates and the Market for Private Student Loans Shrinks ................................................................ 30

            a.   The 2007 RSA ................................................................ 30

            a.   The 2009 RSA ................................................................ 30

            a.   The 2010 PEAKS Program ................................................................ 30

        2.   As the PEAKS Trust Expires, Defendants Continue to Assure Investors that a New RSA is Being Negotiated and Omit to Disclose that Securing a Lender for a New RSA Was Unlikely .............. 36

    C.   Defendants Regularly Discussed ITT's Financial Performance and Student Lending at Monthly Operational Review Meetings ............................. 41

    D.   Defendants Ignore Relevant GAAP Principles and Fail to Account Properly for ITT's Risks under the RSAs ................................................................ 42

    E.   Defendants Ignore Relevant SEC Regulations ................................................................ 48

    F.   ITT's Lending Practices and Accounting Methods Subject It to Extensive Scrutiny from Regulators and the Senate HELP Committee ............................... 51

i

VII.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS................................ 54

VIII.   THE TRUTH BEGINS TO EMERGE ........................................................ 98

IX.     ADDITIONAL SCIENTER ALLEGATIONS.................................................. 106

        A.      The Facts Give Rise to a Strong Inference that Defendants Acted with
                Scienter ......................................................................... 106

                1.      The Individual Defendants Had Extensive Accounting Knowledge
                        and were Familiar with GAAP ............................................. 107

                2.      Defendants Closely Monitored Student-Loan Default Rates as well
                        as Ongoing Economic Conditions and Therefore Knew or
                        Recklessly Disregarded that ITT's Obligations Under the RSAs
                        Would Be Triggered and the Company Would Be Unable to
                        Secure a Lender for a New Third Party Lending Program .................... 109

                3.      Defendants Had the Motive and Opportunity to Commit Fraud ........... 111

                4.      Insider Trading Sales by Modany and Fitzpatrick During the Class
                        Period Were Highly Unusual in Scope and Timing, and Raise a
                        Strong Inference that They Had Knowledge of the Company's
                        Actual Risk Under the RSAs ............................................... 112

                5.      Modany and Fitzpatrick Were Micromanagers ..................................... 114

X.      LOSS CAUSATION........................................................................ 115

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE - FRAUD ON THE
        MARKET DOCTRINE ..................................................................... 118

XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE – AFFILIATED UTE
        DOCTRINE ............................................................................. 119

XIII.   NO SAFE HARBOR ....................................................................... 120

XIV.    COUNT I: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
        AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL
        DEFENDANTS .......................................................................... 121

XV.     COUNT II: FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
        ACT AGAINST THE INDIVIDUAL DEFENDANTS ................................. 123

XVI.    PRAYER FOR RELIEF .................................................................. 124

XVII.   JURY TRIAL DEMANDED............................................................... 124

The ITT Institutional Investor Group, consisting of the Plumbers and Pipefitters National Pension Fund and the Metropolitan Water Reclamation District Retirement Fund, as Court-appointed Lead Plaintiffs (collectively "Lead Plaintiffs"), brings this federal securities law class action on behalf of all purchasers of common stock of ITT Educational Services, Inc. ("ITT" or the "Company") between April 24, 2008 and February 25, 2013, inclusive (the "Class Period"). Lead Plaintiffs' allegations against Defendants are based on personal knowledge as to their own acts, and on information and belief as to all other matters, based upon the investigation conducted by and under the supervision of Lead Plaintiffs' counsel.  The investigation of Lead Plaintiffs' counsel is predicated upon, among other things, a review and analysis of (1) ITT's public filings with the U.S. Securities and Exchange Commission ("SEC"); (2) press releases, news articles and other public statements issued by or concerning ITT and its industry; (3) securities analysts' reports, industry reports, and investor earnings calls transcripts; (4) court records, including, but not limited to, the pleadings filed in *Sallie Mae, Inc. v. ITT Educational Services, Inc.*, Case No. 2012-19327 (Fairfax, Virginia Dec. 26, 2012); (5) analyses of ITT executives' trading in ITT; (6) the results of a two year in-depth investigation by the U.S. Senate Health, Education, Labor, and Pensions Committee ("HELP Committee") published in a Senate Report titled *For Profit Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, and exhibits thereto ("Senate Report" or "Senate HELP Committee Report"); (7) statements from confidential witnesses; and (8) consultation with experts.  Lead Plaintiffs believe that additional substantial evidentiary support will exist for their allegations after a reasonable opportunity for discovery.  On behalf of themselves and the Class they seek to represent, Lead Plaintiffs allege as follows:

## I.    NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action brought on behalf of all persons who purchased or otherwise acquired the publicly-traded common stock of ITT (the "Class") during the Class Period, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against ITT and certain of its officers and directors.

2.      This action alleges that for almost five years, Defendants made false and misleading statements, concealed the truth and omitted material information that they had a duty to disclose to investors concerning: (1) the Company's exposure under guarantees entered into with third-party lenders to obtain financing for ITT's students; (2) the substantial material risk of increasing bad debt expenses as a result of increases in student loan defaults; (3) the Company's insufficient reserves for its obligations under both its off-balance sheet financing and direct student-lending programs; and (4) the Company's knowledge or reckless disregard of the unwillingness of third-party lenders to engage in a third party lending program with ITT. Defendants concealed the true nature of the Company's exposure to mounting student loan defaults while at the same time assuring investors throughout the Class Period that the Company's liabilities were not material and that the Company had been "ultraconservative" in booking reserves, all in an effort to inflate the Company's bottom line and Defendants' profits. As ITT's financial health deteriorated, ITT omitted from its public disclosures that it was highly unlikely that the Company would be able to secure a new third-party private lender to finance private student-loans, leaving it with no option but to engage in increased direct student lending, which it was forced to do, wreaking havoc on ITT's financials—causing bad debt expenses to skyrocket, earnings to plummet, and profits to drop.

3.      Specifically, throughout the Class Period, the Company was exposed to a massive risk that was material to ITT's bottom line and for which it was woefully under-reserved. Defendants hid this truth from investors by, among other things, ignoring basic and applicable accounting rules and SEC regulations and omitting to disclose to investors that by engaging in increased direct student-lending the Company's bad debt expenses and reserves would in fact increase, thereby drastically reducing the Company's free cash flow – the market's primary metric for valuing any company.  In doing so, Defendants were able to inflate the Company's balance sheet, by severely understating the Company's liabilities and materially overstating its financial health and earnings.  As a result of Defendants' false and misleading statements and omissions, Defendants caused the Company's shares to trade at artificially inflated prices.  When the truth about Defendants' false and misleading statements and omissions came to light through a series of partial disclosures, ITT's stock price declined dramatically, causing injury to Lead Plaintiffs and the Class.

4.      ITT is a "for-profit" provider of postsecondary degree programs in the United States.  The Company offers undergraduate and graduate degree programs to over 60,000 students through 149 locations in 39 states.  Headquartered in Carmel, Indiana, ITT, according to its website, "provides accredited, technology-oriented undergraduate and graduate degree programs through its ITT Technical Institutes and Daniel Webster College to help students develop skills and knowledge they need to pursue career opportunities in a variety of fields."

5.      Whereas public or non-profit colleges and universities operate independently of an ownership structure and are free to focus on providing quality education to students, for-profit institutions, like ITT, must provide an adequate financial return to their shareholders, making profit, rather than quality education, an absolute priority.  As a result, tuition at for-profit schools

is much higher than tuition elsewhere.  ITT's profit-centric approach is demonstrated by the fact that in 2009-2010, for-profit institutions spent $3,017 per student on instructional costs versus $15,321 per student on average at private non-profit colleges, while average tuition costs at for-profit colleges was $31,000, compared with $26,600 for non-profit colleges.

6.     Within this expensive, profit-above-all-else industry, ITT is at the top of the list, ranking as one of the most expensive for-profit institutions – and therefore one of the most profitable in the country.

7.     Because of the high tuition costs at for-profit schools like ITT, many students are forced to take out private and government funded student loans in order to attend.  Prior to the Class Period, ITT depended heavily on state and federal government student aid and private lending to fund its student's tuition payments.  However, as the Class Period began, government funded student aid dropped and private student lenders were no longer interested in providing loans to students given the higher risk inherent in those loans.  As described in a January 23, 2008 article featured on *Inside Higher Ed* titled "Credit Crunch Takes a Toll" several lenders, including Sallie Mae, Inc. ("Sallie Mae") "have found themselves unable to find investors willing to buy their portfolios of riskier loans" which are made to "students from lower income backgrounds who attend higher-cost institutions, and those with poor credit scores."[1]  As a result, private lenders, led by Sallie Mae largely ceased their private student lending to for-profit institutions.

8.     With some of the highest tuition in the country the availability of private student loans was crucial to ITT's business model.  For without access to private student loan lenders,

---

[1] Available at http://www.insidehighered.com/news/2008/01/23/credit (access January 14, 2014).

ITT would face huge declines in student enrollment and a direct threat to its primary revenue stream.

9.     To continue its growth in revenue, earnings and cash flows in the face of a shrinking market, starting in 2007, ITT's Chief Executive Officer ("CEO"), Kevin M. Modany ("Modany"), and its Chief Financial Officer ("CFO"), Daniel Fitzpatrick ("Fitzpatrick"), resorted to a series of off-balance sheet financing programs that propped up ITT's declining enrollment rates while partially limiting ITT's business model from direct exposure to potential losses borne from student loan defaults.

10.     Specifically, in 2007, 2009 and 2010, ITT secured a series of risk sharing agreements ("RSAs") with third-party lenders.  The Company used the agreements to incentivize private lenders to continue lending to ITT students despite the acknowledged risks associated with the rising national student loan default rates.   Pursuant to each RSA, the third-party lenders established and funded dedicated trusts that, as far as the market was aware, provided capital for loans to ITT students and were independent of ITT's balance sheet.  To induce lenders to provide loans to its students, ITT provided substantial repayment guarantees to the trusts to ensure that lenders would be repaid in the event that student loan default rates exceeded a certain specified percentage.

11.     Generally Accepted Accounting Principles ("GAAP") standards unambiguously required ITT to establish adequate reserves and to record adequate liabilities to cover the expected and probable losses incurred under each RSA for which ITT assumed the risk for the guaranteed promissory payments.  However, Defendants knowingly or recklessly ignored these basic accounting principles and failed to adequately reserve for the Company's exposures under each RSA.  Because the recording of such reserves reduces a company's reported earnings and

free cash flow, Defendants' decision not to timely record adequate reserves caused ITT to grossly overstate its financial results and conceal the true extent of the risks that it faced under the RSAs.

12.     Moreover, Defendants were well aware of the rapidly and aggressively rising student-loan default rates associated with ITT's student lending.  In the three years leading up to the start of the Class Period, ITT's student loan default rates had increased more than _25%_ growing from 21.1% in 2005 to 26.3% in 2008.  These student loan default rates were closely monitored by Defendants, especially Modany and Fitzpatrick, who have strong accounting and finance backgrounds and are known throughout the Company for their focus on financial metrics.

13.     The RSAs were all short-term agreements with set terms for expiration.   As student loan default rates increased, thereby increasing ITT's financial obligations to cover the losses on the RSA trusts, ITT struggled to find lenders to renew or replace expiring RSAs.  The Company disclosed in its annual reports filed on Form 10-K that the inability to identify a lender for a new RSA could result in a "student population decrease . . . which could have a material adverse effect on our results of operations and cash flows," however it omitted to disclose that it knew or recklessly disregarded this risk would actually materialize because lenders were not willing to enter into a new RSA with ITT given its high rate of student-loan defaults and the inherent risk associated with lending to ITT students.  Even as the final RSA was set to expire in 2012, the Company continued to assure investors that it was well reserved for losses being incurred by the trusts and that it was working on securing a new $100 million credit facility.

14.     Without a new RSA, ITT would be forced to increase its direct lending to students, and Defendants knew what this meant for the Company's financials.  Without an RSA to protect

the Company, all of ITT's outstanding loan obligations would be forced back onto its books, and its liabilities would skyrocket as students continued to default on their loans, as would the Company's debt expenses and its reserves. Importantly, this meant that ITT's earnings would plummet and ITT's true business model and precarious financial condition would be exposed to the market.

15.     Defendants, particularly Modany and Fitzpatrick, who had strong backgrounds in accounting and finance and were known for their interest in financial metrics, were intimately involved with the creation of the RSAs, with tracking the student-loan default rates and the status of ITT's student lending throughout the Class Period, and therefore knew or recklessly disregarded that (1) the Company's guarantees under the RSAs would be triggered due to high student-loan default rates and (2) that it was substantially likely that the Company would be unable to find a lender willing to enter into a new RSA after the expiration of the PEAKS Program. According to Confidential Witness ("CW") #7, a specialized group within ITT, the Default Management Group, was tasked with tracking student default rates and ensuring that ITT was fully aware of its student lending liabilities. The Group operated out of headquarters and was headed by Greg Wallis, who reported directly to and met regularly with Modany and Fitzpatrick.

16.     The figures and data tracked by the Default Management Group were regularly brought to Modany and Fitzpatrick's attention, most notably at the Company's monthly "Operational Review" ("OR") meetings, which, according to CW#7, were chaired by Modany and attended by Fitzpatrick and all other senior executives, including Vice Presidents of the Company. CW#5 explained that department heads and other senior personnel regularly attended these meetings and provided presentations on a full range of issues, including such issues as

student lending, company finances and student loan default management. Each meeting was accompanied by a clearly defined agenda that was provided to all participants. According to CW#7, several agendas noted that a representative from the Default Management Group would be presenting to Modany and Fitzpatrick during the OR meeting. Yet, even though Defendants were made well aware of the state of the Company's finances and student lending through these OR meetings, they continued to under-reserve for the massive risk the Company guaranteed under the RSAs all the while assuring investors throughout the Class Period that ITT's liabilities under the RSAs were not material and that the Company was being extremely conservative in booking reserves.

17. In reality, the Company was woefully under-reserving and using improper accounting tactics to inflate its balance sheet and overstate its financial health. Modany and Fitzpatrick were aware of and understood the applicable GAAP provisions, as both are Certified Public Accountants ("CPA") with years of accounting and finance experience. Modany has been the CFO of three Companies, including ITT. He has a bachelor's degree in Accounting with an additional program focus in Finance. Prior to becoming ITT's CEO, he held numerous accounting and finance-oriented positions within the Company including CFO, Director of Finance, and Chief Operations Officer ("COO"). Before his employment at ITT, Modany was the CFO and COO of Cerebellum Software Co., a software development and professional services company. Modany was also the CFO, Executive Vice President, Director of Finance, and Controller of a food distribution and retail merchandising company known as Consolidated Products System, Inc. Modany began his career at Arthur Anderson in the audit/financial consulting division where he "served as the S[enior] Auditor In-Charge for the two largest audit

engagements of the Pittsburgh office."[2]  Likewise, Fitzpatrick also has extensive experience in the field of accounting and finance.  In addition to being the CFO at ITT, Fitzpatrick has been the Company's Principal Accounting Officer since 2005.  Prior to joining ITT, he was a Senior Vice President and Controller at Education Management Company.  Like Modany, Fitzpatrick worked at Arthur Andersen early in his career as a senior manager, providing audits, accounting, and business advisory services.[3]  Moreover, during the Class Period Fitzpatrick engaged in correspondence with the SEC regarding the application of GAAP's complex and technical variable interest entity rules to the PEAKS Trust and the 2009 RSA.  Given Modany and Fitzpatrick's extensive professional experience in accounting and finance, including with a major public accounting firm working on audits, it is not plausible that the Individual Defendants misunderstood or were unaware of the relevant GAAP provisions.

18.    The truth regarding ITT's risks, significant liabilities under the RSAs, the impending bad debt expense increase, the inadequate loss reserves and the need to increase its direct lending programs began to be revealed in or around the summer of 2012.  On July 26, 2012, with the expiration of the 2010 RSA (the "PEAKS Program") and ITT's inability to secure lenders to fund a new RSA (which it had known about for some time), ITT issued a press release in which the Company announced that it had increased lending to students directly and was therefore increasing its bad debt expense.  Up to this point, much of ITT's exposure to losses arising from student loans issued under the RSAs had been kept off ITT's balance sheet.  The July 26 press release was the first time the Company revealed that its liability under the RSAs was substantially higher than it had previously represented.  Moreover, on July 26, 2012, the

---

[2]    *See* Executive Profile of Kevin M. Modany, *available at* http://investing.businessweek.com/research/stocks/people/person.asp?personId=4095864&ticker=ESI.

[3]    *See* Executive Profile of Daniel Fitzpatrick *available at* http://investing.businessweek.com/research/stocks/people/person.asp?personId=11733274&ticker=ESI.

Company also finally disclosed that it had not secured a new RSA and was therefore increasing its use of "internal financing" (i.e., direct student lending) to enrolled students.  In reaction to these disclosures, ITT's stock price fell more than 15%, or $7.64 per share, to close at $42.78 per share, representing a market capitalization loss of approximately $180 million.

19.    A few days after ITT's press release, and at some point on July 30, 2012, the United States Senate Health, Education, Labor, and Pensions Committee ("Senate HELP Committee") published a comprehensive report that summarized a two year in-depth Senate investigation ("Senate Report" of "Senate HELP Committee Report") focusing exclusively on the for-profit educational industry.  The report was a scathing indictment of the industry, and included this critical summary of ITT:

> ***ITT is one of the most expensive companies examined by the committee,*** *and it is not clear that the value of the education justifies the cost.*  ***The cost of attending ITT is so high that the company has created its own loan program to enable students to borrow money in excess of Federal lending limits***.  While the retention rates for both the Associates and Bachelor's program are slightly better than average, ***the company has a high rate of student loan default***, with 26 percent of students defaulting within 3 years of entering repayment.  ***This likely reflects the high cost of the programs offered, and an inability on the part of some students to find jobs that allow them to repay the debt they incur***.  ***The company makes this work*** by utilizing some of the most disturbing recruiting tactics among the companies examined, and ***by taking very creative approaches to complying with the 90/10 limitation on revenue received from Federal financial aid programs.  Meanwhile, the company devotes the largest share of revenue to profit of any company analyzed at 37 percent.  Taken together, these issues cast serious doubt on the notion that ITT's students are receiving an education that affords them adequate value relative to the cost***, and calls into question the $1.1 billion investment American taxpayers made in the company in 2010.  (emphasis added)

20.     As the market absorbed and digested the significance of the Senate Report and ITT's true business model, the Company's stock declined sharply, closing at $39.99 on July 30, 2012, a 7.92% drop from the prior trading day's closing of $43.43.  On July 31, 2012 ITT closed at $38.82, representing a drop of 2.93% from the prior day's close.  Between the close of the stock price on July 27, 2012 at $43.43 and the closing stock price on July 31, 2012 at $38.82, ITT's stock fell a total of 10.61% representing a total market capitalization drop of approximately $107.5 million.

21.     Less than three months later, on October 25, 2012, before the market opened, ITT continued to reveal in piecemeal fashion the true nature of ITT's financial health and business model when it disclosed that the Company's revenues for the third quarter of 2012 were down 12.7% as a result of sharp decreases in student enrollment.  In the 8-K filed the same day, ITT reported that its bad debt expense had increased by 350 basis points.  This unprecedented increase in bad debt expense shocked the market.  One analyst's evaluation put it very clearly:

> Investors should be increasingly concerned about the company's ability to meet is rapidly growing financial obligations (RSA's PEAKS, credit facility) over the next 3 years.  As the company's earnings base retrenches, we think ESI's [ITT's Trading Symbol] ability to generate cash on a sustained basis will be severely limited in the absence of some sort of third party financing for its students.

PAA Research LLC Analyst Report, October 25, 2012.

22.     Following the disclosure of the Company's increased bad debt expense as a result of its recently disclosed substantial increase in direct student-lending and the materialization of the risk of exposure to student lending losses, the price of ITT stock dropped $2.42 per share, to close at $22.69 per share on October 25, 2012, representing a market capitalization loss of approximately $56.4 million.

23.     An analyst from JP Morgan made a similar observation to the PAA Analyst, noting that "FCF [free cash flow] almost fully disappeared . . . coming down from $272mln in the first three quarters of 2011 to $4mln in the first three quarters of 2012.  ESI's free cash conversion ratio . . . has declined from 120% in 4Q11 to 41% in 3Q12, reflecting the challenges of generating cash flow from accounting earnings in the absence of a third party financing vehicle for student funding." JP Morgan Analyst Report, *Challenging 3q12, More Uncertainty About Institutional Loans and Timing of Start Inflection*, October 26, 2012.

24.     As a result of the market's further analysis and interpretation of the Company's announcement of its increased exposure to bad debt as a result of mounting student loan defaults, ITT stock dropped $1.20 per share, to close at $21.49 per share on October 26, 2012, representing a market capitalization loss of approximately $28 million.   Following the disclosures of October 25th and 26th 2012, ITT incurred a market capitalization loss of $84.4 million.

25.     Months later, on January 4, 2013, the Company disclosed its true obligations under the 2007 RSA when it announced that it had settled an action brought by Sallie Mae, arising out of the Company's guarantee obligations under the 2007 RSA, for $46 million – nearly double the $26 million Sallie Mae originally sought—and significantly more than shareholders were led to expect based on the Company's prior statements.  According to ITT's 2012 Form 10-K, the settlement was intended to "absolve [the Company] from any further obligations with respect to our guarantee under the 2007 RSA."  Also in connection with the settlement, the Company took a $13.2 million after-tax charge for the 2007 RSA and an additional $71.1 million charge to establish a reserve related to the 2009 and 2010 RSAs.  The charge and reserves more fully revealed the massive risk ITT faced under all three RSAs.  According to an analyst at PAA

Research LLC ("PAA"), the Company's failure to account for its actual liability under the 2007 RSA alone caused it to effectively overstate its earnings by *$0.06 to $0.08 per share every quarter for the previous two years.*   *See* Bradley Saffalow, *ESI: The True Nature of ESI's Educational Outcomes Finally Coming to Light, Liquidity Position Looks Tenuous, Taking Price Target to $10*, Jan. 6, 2013.

26.     An analyst at Wells Fargo further commented that "while the precise nature of the settlement is unclear, if we assume the full $46 million represents excess default payments owed by ESI, it suggests that additional liability per participating student (over and above the discount already taken) could be *as high as $1,000.   This amount applied to the 2009 RSA and PEAKS loan recipients suggests additional worst-case liability as high as $270 million.*"

27.     Following the disclosure of the Sallie Mae settlement and the implicit admission by the Company that it was at risk of such expanded liabilities under all of its lending programs, both on and off balance sheet, the price of ITT stock dropped $3.72 per share, or 19.2%, to close at $15.57 per share on January 7, 2013, representing a market capitalization loss of approximately $86.77 million.

28.     Finally, on February 22, 2013, the Company disclosed that it had received a subpoena from the SEC on February 8, 2013, which requested the production of documents and communications that, among other things, "relate to our actions and accounting with; (a) agreements that we entered into with the 2009 Entity to create the 2009 Loan Program, including, without limitation, the 2009 RSA; and (b) agreements that we entered into to create the PEAKS Program."   The Company also disclosed that on October 30, 2012, it had received a CID from the Massachusetts Attorney General ("MAG") in connection with the MAG's investigation into whether ITT was violating Massachusetts law by "engaging in unfair or

deceptive practices in connection with marketing and advertising job placement and student outcomes, the recruitment of students, and the financing of education."

29.     Following these disclosures the Company's stock declined $3.10 per share, or 16.6%, to close at $15.53 per share on February 25, 2013, representing a market capitalization loss of approximately $72.45 million.

30.     The true facts, which were known by the Defendants but concealed or omitted from the investing public during the Class Period, were:

      a.    the Company had enormous liability for its guarantee under the RSAs;

      b.    the Company repeatedly downplayed its risk associated with the RSAs and assured investors that it had properly recorded reserves to meet its liabilities;

      c.    the Company was improperly accounting for the RSAs;

      d.    the Company faced a strong likelihood that it would have to increase its bad debt expense and related allowance for doubtful accounts as loan defaults increased;

      e.    the Company was unable to secure a new lender for additional third-party lending programs after the expiration of the PEAKS Program; and

      f.    that by failing to record adequate liabilities under the RSAs and its direct financing, the Company misrepresented and overstated its earnings, misguided market participants about its potential free cash flow generation, which became impaired upon the revelation of increased bad debt expenses and charge-offs, and understated its liabilities throughout the Class Period.

31.     As a result of Defendants' materially false and misleading statements and omissions and improper accounting practices, ITT common stock traded at artificially inflated levels during the Class Period.  However, as the truth about ITT's inadequate reserves and improper accounting practices and their effects on the Company's financial health was gradually revealed to investors, the Company's share price dramatically declined, causing Lead Plaintiffs and members of the Class to suffer significant losses and damages.

## II.     JURISDICTION AND VENUE

32.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC 17 C.P.R. § 240.10b-5.

33.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 [15 U.S.C. § 78(a)].

34.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  ITT maintains offices in this District and many of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District. Moreover, ITT's common stock is traded on the New York Stock Exchange ("NYSE").

35.     Additionally, no fewer than four market analysts located within this District, including Barclays Capital, J.P. Morgan Securities, Morgan Stanley Investment Research, and Oppenheimer & Co., Inc., provide extensive coverage of the Company, the statements made by the Defendants, and ITT's financial performance.

36.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**III.    PARTIES**

37.    Lead Plaintiff Plumbers and Pipefitters National Pension Fund is a Taft-Hartley, multiemployer defined benefit pension plan, with its primary place of business being located at 103 Oronoco Street Alexandria, Virginia 22314.  The Plumbers and Pipefitters National Pension Fund was established in 1968 and administers benefits for thousands of participants and beneficiaries.  Lead Plaintiff has approximately $5 billion in assets under management.  As set forth in the attached Certification, the Plumbers and Pipefitters National Pension Fund purchased shares of ITT common stock on the open market during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

38.    Lead Plaintiff Metropolitan Water Reclamation District Retirement Fund ("Metropolitan Water Fund") is a single employer benefit plan that was established in 1931 by an act of the Illinois General Assembly, with its primary place of business at 111 E. Erie Street Chicago, Illinois 60611.   Lead Plaintiff has approximately $1.17 billion in assets under management.  As set forth in the attached Certification, Metropolitan Water Fund purchased ITT common stock on the open market during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

39.    Defendant ITT is a for-profit college focused on providing technology oriented undergraduate and graduate degree programs through its ITT Technical Institutes and Daniel Webster College.  The Company enrolls over 60,000 students and has 149 locations, including

147 campuses and two learning sites, located in 39 states.   The Company also offers online programs to students located in 48 states.   ITT is incorporated in Delaware and headquartered in Carmel, Indiana.   The Company conducts substantial business in New York, and has campuses in Albany, Syracuse, and Buffalo.   ITT's common stock trades under the ticker symbol "ESI" on the NYSE, which is an efficient market.

40.     Defendant Kevin M. Modany is, and at all relevant times was, CEO and Chairman of the Board of ITT.   Modany has been a Director of the Company since July 2006.   From June 2002 until December 2002, Modany was ITT's Director of Finance.   He was a Senior Vice President at ITT from July 2002 until April 2005.   He also served as the Company's CFO from January 2003 until June 2005.   Modany was the COO of the Company from April 2005 through April 2007.   Just prior to becoming CEO, Modany served as ITT's President from April 2005 through March 2009.   Prior to his employment at ITT Modany was the CFO and COO of Cerebellum Software Co., a software development and professional services company.   He was also the CFO, Executive Vice President, Director of Finance, and Controller of Consolidated Product System, Inc., a food distribution and retail merchandising Company.   Modany began his career at Arthur Andersen in the audit/financial consulting division.   Modany has a bachelor's degree in Accounting from Robert Morris University and is a CPA, previously licensed in Pennsylvania.   Throughout the Class Period, Modany spoke frequently to investors at industry conferences and on quarterly earnings calls.   Further, Modany possessed the power and authority to control the contents of the Company's filings with the SEC.   He signed and certified the accuracy of ITT's Forms 10-K for the fiscal years ended 2008, 2009, 2010, 2011, and 2012, and certified the accuracy of the Company's Form 10-Q for every quarterly period from March 2008 to September 30, 2012.   In fiscal year 2012, Modany's total compensation was $8,763,384.

17

During the Class Period, Modany made over $1.6 million on his sales of stock Company pursuant to 10b5-1 Plans.

41.     Defendant Daniel M. Fitzpatrick ("Fitzpatrick") is, and at all relevant times was, CFO and Executive Vice President of ITT.  He has been the Company's Principal Accounting Officer since 2005.  Fitzpatrick is a CPA, previously licensed in Pennsylvania.  Prior to his employment at ITT, Fitzpatrick was a Senior Vice President and Controller at Education Management Corporation and a senior manager at Arthur Andersen.  Throughout the Class Period, Fitzpatrick spoke frequently to investors during quarterly earnings  calls, and signed and certified the accuracy of ITT's Form 10-K for the fiscal years ended 2008, 2009, 2010, 2011, and 2012, as well as the Company's Form 10-Q for each quarterly period from March 2008 to September 2012.  Fitzpatrick possessed the power and authority to control the contents of the Company's public filings with the SEC.  Fitzpatrick also signed correspondence with the SEC in June, July, and August 2010.   In fiscal year 2012, Fitzpatrick's total compensation was $1,898,591.  During the Class Period, Fitzpatrick made over $425,000 on his sales of Compapny stock pursuant to 10b5-1 Plans.

42.     Defendants Modany and Fitzpatrick are, at times, collectively referred to as the "Individual Defendants."

43.     Defendants ITT, Modany, and Fitzpatrick are collectively referred to as "Defendants."

44.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and

forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, including Greg Wallis, attendance at management, sales and Board of Directors meetings and committees thereof, including Monthly OR meetings, and via reports and other information provided to them in connection therewith.

45. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications and earnings calls, as alleged herein are the collective actions of the narrowly defined group of defendants defined above as the Individual Defendants. Each of the Individual Defendants as officers of ITT, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and each was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. The Individual Defendants were both involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

46. As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on the New York Stock Exchange, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects,

and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.  CLASS ACTION ALLEGATIONS

47.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired the common stock of ITT during the Class Period (the "Class").  Excluded from the Class are: Defendants and their immediate families and their legal representatives, heirs, successors or assigns, and the directors and officers of the Company as well as their immediate families, legal representatives, heirs, successors or assigns.

48.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class period, ITT's shares of common stock were traded on the NYSE.  As of January 1, 2013, ITT had 23,348,995 shares of common stock outstanding.  While the exact number of class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe there are thousands of members of the proposed class.

49.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.    Whether Defendants violated the Exchange Act;

      b.    Whether Defendants omitted and/or misrepresented material facts;

c.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.      Whether the price of ITT common stock was artificially inflated; and

f.      The extent of damage sustained by class members and the appropriate measure of damages.

50.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' violations of the securities law complained of herein.

51.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     CONFIDENTIAL SOURCES

53.     Confidential Witness ("CW") #1 was an Executive Administrative Assistant in the Human Resources Department at the Company's headquarters in Carmel, Indiana from 2008 through 2012.  CW#1 reported to Nina Esbin, the Senior Vice President of Human Resources.

Esbin reported to Clark D. Elwood, the Company's Executive Vice President and Chief Administrative Office since 2009 and Chief Legal Officer since 2010. At the time of CW#1's departure, CW#1 estimated that there were 250 employees encompassing all areas of the Company who worked at headquarters. CW#1 interacted with Modany on a regular basis because she frequently went to his office to work with and provide information to his secretary.

54.     CW#2 worked at ITT Technical Institute's campus in Clovis, California, which is considered the "Fresno Campus" from 2008 until June 2013. From 2010 to early 2013, CW#2 was the campus Registrar. In early 2013, CW#2 was promoted to a campus director position. She reported to the campus president, Allison Hawkins.

55.     CW#3 worked as a Benefits Administrator at ITT's headquarters in Carmel, Indiana from 2002 until 2011. CW#3 reported to Paula Rabb, Director, Compensation, Benefits and HRIS. Rabb reported to Clark D. Elwood.

56.     CW#4 worked as an Associate Dean at an ITT Technical Institute's Campus in Knoxville, Tennessee from 2008-2011. Throughout CW#4's tenure at ITT, there was significant turnover at the executive level. At the time of CW#4's departure, Bradley Parish was the Campus Director to whom she reported.

57.     CW#5 worked as the Vice President of Learning Technologies at ITT's Headquarters from July 2011 through February 2013. Throughout his tenure he reported to Martin Van Buren, ITT's Executive Vice President and Chief Information Officer.

58.     CW#6 was the Manager of Corporate Communications for ITT Educational Services from May 2009 until her promotion to Director of Communication in February 2012. In her new role, she was responsible for government and investor communications and alumni and community relations. She reported to Glen Tanner, Chief Marketing Officer until August

2012, and then to Jeffrey Cooper, Senior Vice President of Compliance.  Both Tanner and Cooper reported directly to Modany.  CW#6 left the Company in April 2013.

59.    CW#7 worked for ITT for approximately nine years.  He first worked in the Milwaukee area as a college president and then as a Regional Vice President.  He later became Vice President of Student Services and then Executive Vice President of Student Services.  He moved from the Milwaukee area to Indianapolis in 2011 and spent his last two years with the Company working out of headquarters in Carmel, Indiana.  CW#7 reported directly to Eugene Feichtner who was the Executive Vice President and President of ITT Technical Institute. Feichtner reported directly to Modany.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    ITT and the For-Profit College Industry

60.    Founded in 1946, ITT is a for-profit college focused on providing technology oriented undergraduate and graduate degree programs through its ITT Technical Institutes and Daniel Webster College.  The Company has been publicly traded since its 1994 initial public offering ("IPO"), and trades under the ticker symbol "ESI" on the NYSE.

61.    Whereas public or non-profit colleges and universities operate independently of an ownership structure and are free to focus on providing quality education to students, for-profit institutions, like ITT,  are businesses and are driven by the need to provide an adequate financial return for their stakeholders, making profit, rather than quality education, an absolute priority.

62.    ITT and other for-profit institutions rely primarily on exorbitant tuition rates to generate these large revenues and large shareholder returns.  As a result, tuition at for-profit colleges is substantially greater than tuition at non-profit and private institutions.  According to the Senate Report, a bachelor's degree at a for-profit college like ITT costs on average 20% more

than a bachelor's degree at a public university.  The cost of an associate's degree from a for-profit college is four times higher than the cost of the same degree from a community college.

63.     ITT is no exception.  As one of the most profitable for-profit institutions in the Country, ITT's tuition rates are among the highest in the for-profit education industry.  A Bachelor's of Business Administration at ITT's Indianapolis, Indiana campus costs $93,624— 30% higher than a comparable program at other for-profit colleges.

64.     This high cost of tuition is critical to ITT's business model.  In 2012, ITT reported that 98% of its revenue came from tuition payments during 2010-2012.

**1.     High Tuition Costs Force Students to Seek Private Student Loans**

65.     While high tuition benefits for-profit institutions, it burdens their students—most of whom are forced to rely largely on student-loans to finance their education.  Ninety-six percent of for-profit students take out student loans to pay for their education, compared to 13% of students at community colleges, 48% of students at four-year non-profit public universities, and 57% of students at four-year private schools.   For-profit students are also forced to borrow more money than students at public non-profit and private universities.  The average independent student at a for-profit college graduates with a median debt of $32,700, compared to a median debt of $20,000 for independent students at public colleges, and $24,600 for independent students at private non-profit colleges.

**2.     High Tuition Does Not Equate to Quality Education**

66.     The high cost of tuition is not indicative of high quality education, however. Because for-profit colleges are driven by the bottom line, they invest excessive amounts of money in activities that they believe will increase profit, such as marketing, recruiting, and incentive executive compensation, while investing relatively little in instruction and student

services, such as tutoring, counseling, and job placement.  For example, in 2009-2010, for-profit institutions spent $3,017 per student on instructional costs versus $15,321 at private non-profit colleges.  In terms of money directed towards research costs, for-profit schools spent $8 per student whereas private, non-profit colleges spent nearly $5,900.

67.     Again, ITT is no exception.  For example, in 2009, ITT allocated $741 million, or 56%, of its total revenue to marketing recruiting and profit.  ITT also devotes a significant portion of its revenue to executive compensation.  In 2012, Modany received $8,763,384 in total compensation—ten times as much as the President of Harvard University.  That same year Fitzpatrick received $1,898,591 in total compensation. In 2011 and 2010, Modany received over $6.4 and $6.7 million in compensation respectively.  In those same years, Fitzpatrick received over $1.5 and $1.4 million in compensation respectively.

68.     Because for-profit colleges severely under-invest in their students, they are plagued with poor student performance, including high drop-out rates, low post-graduate employment rates, and high rates of student loan defaults.  At ITT, *more than half* of the students who enrolled during 2008-2009 withdrew by the middle of 2009—before completing their program of study.

69.      For students who complete their degrees, unemployment and underemployment are significant risks.  According to a National Center for Education Statistics study, 23% of students who attended for-profit colleges in 2008 and 2009 were unemployed.  Moreover, many for-profit students who do find employment post-graduation are significantly underemployed, although for-profit institutions attempt to camouflage this fact by using flexible and creative definitions to determine whether a student is employed in his or her field of study or a "related field."  At ITT, work in a "related field" is defined as requiring only "20-49% of time spent on

the job using the skills taught in core classes."  Using this definition, the ITT FAQs in the ITT Employment Classification Handbook concludes that working at Blockbuster or an electronics department that sells video games could count as working in a "related field" for students who graduated with a digital entertainment and game design degree."  The disingenuous classification of a student, who took on significant debt to earn a degree, as successfully placed when he or she takes a retail job requiring no specialized skills leads to extremely misleading and untrustworthy employment data and statistics.

### 3. Student Loan Default Rates at ITT are Among the Highest in the For-Profit Industry

70.     The costs of withdrawal, unemployment, and underemployment are substantial for for-profit students.  The vast majority of for-profit students finance their education through student loans with the expectation that they are investing in a degree that will ultimately bring them job stability and a higher income.   However, because for-profit colleges refuse to adequately invest in resources designed to retain students and help students find gainful employment after graduation, many for-profit students see no return on their investment in their education.   Instead, they find themselves in low paying jobs, with no means to pay back their student loans.  As a result, for-profit students default on their student loans at an alarming rate. Although for-profit students make up only 13% of student borrowers, they account for 47% of student-loan defaults.

71.     According to the Senate Report, at least 22% of students enrolled at for-profit colleges will default on their loans within three years of entering repayment.  At ITT, that number is even higher, increasing from 21.1% for students entering repayment in 2005 to 26.3%

for students entering repayment in 2008.[4]  And this figured continued to grow.  As disclosed in ITT's 2012 Form 10-K, filed on February 22, 2013, the Company's three-year default rate for students entering repayment in 2009 was 34.2%,[5] reflecting a 30% increase in defaults over the life of the Class Period.

72.     The default rate is established by tracking an institution's cohort default rate ("CDR").  An institution's cohort default rate is the percentage of the institution's former student borrowers who entered repayment on a Federal student loan during the relevant cohort year who defaulted before the end of the next government fiscal year.  For example, a student who leaves school in August 2010 would enter repayment, after a six month grace period, in February 2011.  This student would be included when calculating the school's 2011 cohort default rate.  If the student defaults any time before the start of fiscal year 2014, the student would be counted as a "defaulter" for purposes of calculating the institution's three-year cohort default rate.

73.     Importantly, the Higher Education Act provides that colleges lose access to Federal aid money if more than 25% of students default on student loans within 2 years of entering repayment. The regulation applies to all colleges and universities, whether public, non-profit, or for-profit.  The Higher Education Opportunity Act amended the law so that starting this year colleges will be required to demonstrate that no more than 30% of students default on federal student loans within 3 years of entering repayment on their loans.  According to the DOE, this change was made "because there are more borrowers who default beyond the two-year window, and the three-year rate captures a more accurate picture of how many borrowers ultimately default on their federal student loans. ***In particular, for-profit colleges demonstrate a***

---

[4] Repayment typically begins six months after a student graduates or withdraws.

[5] According to ITT's Form 10-Q for the first quarter of 2013, the Department of Education adjusted this number to 32.9% as "a result of uncorrected data adjustments."

*large increase in borrowers who defaulted during year three.*"  *See* United States Department of Education Press Release *First Official Three-Year Student Loan Default Rates Published* (Sept. 28, 2012) (emphasis added).  Although penalties did not start applying until this year, the DOE has published the three-year default rates since 2009.

74.    Moreover, while the DOE only tracks default rates for the first two and three years after repayment, it publishes a Budget Lifetime Default rate that measures the amount of <u>dollars</u> (as opposed to the number of students) the DOE expects to default over the life of the loan.  In 2010, the DOE estimated that 46.3% of all dollars lent to for-profit students who entered repayment in 2008 will default over the life of the loan.

### 4.    ITT Manipulated Student-Loan Defaults Through Default Management

75.    Because continued financial aid eligibility hinges on default rates, ITT closely tracks and manipulates its reportable default rates through practices known as "default management."  Using default management tactics, ITT can push students who are likely to default shortly after entering repayment outside of the 2-year, now 3-year, statutory window that the DOE monitors, by placing those students into temporary deferments or forbearances.

76.    Fitzpatrick was particularly involved in ITT's default management program.  On a 2009 quarterly earnings call on February 3, 2010, he acknowledged that when ITT "provide[s] default management services . . . we are able to mitigate losses."  In this regard, ITT contracts with the General Revenue Corporation ("GRC") to "cure" students who are approaching default.  Under the contract and the amendments thereto, signed by Fitzpatrick, ITT pays GRC a fee for every student borrower who enters repayment and a performance bonus for each borrower "cured" by GRC.  A student is "cured" if they are placed into deferment or forbearance. In 2009, 65.8% of students were "cured."   In 2010, 78% of students were "cured."   Fitzpatrick's

28

involvement in ITT's default management demonstrates that he closely tracked and/or was aware of ITT's cohort default rates.

77.    Aggressive default management tactics, like those utilized by ITT, undermine the validity of an institution's reported default rate, and manipulate the true number of students who end up defaulting on their loans.  This allows schools that would otherwise face penalties—including loss of access to Federal financial aid—to continue to provide subpar education to students and at extraordinary expense.

78.    Further, ITT's aggressive default management tactics demonstrate that the Company's default rates were closely tracked and monitored to ensure that the Company remained eligible for federal financial aid—one of its vital revenue streams.

**B.    ITT's Depended on Government Aid and Private Lenders to Finance Students' Tuition**

79.    Almost all of ITT's revenue is generated through tuition payments.  While a portion of students' tuition is paid through financial aid provided by federal or state governments in the form of Stafford Loans or Pell Grants, such aid is often insufficient to fully cover ITT's high tuition costs.  Before the start of the Class Period, ITT relied on direct financing – in the form of scholarships, tuition grants and discounts – and indirect financing, i.e., private lenders, to help cover the gap in funding

80.    However, by the start of the Class Period, private lenders became increasingly reluctant to loan to for-profit students, as their investors were no longer interested in investing in portfolios of riskier loans, including for-profit student loan debt.  By January 2008 several private lenders, led by Sallie Mae, announced that they would severely restrict or cut back entirely on private loans to for-profit students.  This reduction in private lending posed a direct threat to ITT's key revenue stream and profitability.

81.     In the absence of private lenders, ITT would have been forced to provide all tuition financing directly, which would have drastically increased its bad debt expenses, related allowance for doubtful accounts, reserves, and liabilities, and would have materially reduced its cash flow and profits.  This was not an option for Defendants.

1.      **ITT Enters into Risk Sharing Agreements with Third-Party Lenders as the Economy Deteriorates and the Market for Private Student Loans Shrinks**

82.     In response to the near elimination of private lending, and to maintain strong earnings, revenue, and cash flows, Defendants, using their expertise in accounting, created  a series of three risk sharing agreements ("RSAs") between 2007 and 2010 (collectively "the RSAs"), under which ITT could seemingly rest assured that it would not be liable for students' loan defaults.  Under each of the RSAs, which are described in detail in paragraphs 83-95 below, a third-party lender agreed to make private student loans to ITT's students through a purportedly independent trust.  In return, under the 2007 and 2009 RSAs, ITT guaranteed the repayment of any private loans that the trust charged off due to increasing student-loan defaults above a certain percentage, which percentage was undisclosed to investors and which ITT should have been adequately reserving for.   Under the 2010 RSA, ITT guaranteed the repayment of any private student loans that the lender charged off above a certain undisclosed percentage as well as repayment of certain fees.

a.      **The 2007 RSA**

83.     On or about July 17, 2007, ITT entered into the first agreement, the 2007 RSA, with Sallie Mae.  Under the agreement, Sallie Mae made private education loans to ITT students while ITT received the benefit of those loans in cash-flow and revenue.

84.     Under the 2007 RSA, ITT guaranteed the repayment of any private education loans that Sallie Mae charged off above 24%[6] of the total dollar volume of private education loans made under the agreement.  The 2007 RSA was terminated on February 22, 2008, but ITT's obligations under the 2007 RSA remained in effect until all private education loans under the agreement were paid in full or charged off.  According to ITT's 2011 Form 10-K,  filed on February 24, 2012, the total original principal amount of private education loans made under the 2007 RSA, net of amounts refunded under those loans, was approximately $180 million.  The 2007 RSA can be depicted as follows:



85.     During the Class Period, ITT repeatedly assured investors that the recorded liability reserve related to the guarantee under the 2007 RSA was not material.  However, in September 2010, Sallie Mae notified ITT that the charge-offs under the 2007 RSA were approaching the 24% threshold.  By February 2011, charge-offs had exceeded the 24% threshold, and as alleged in *Sallie Mae, Inc. v. ITT Educational, Inc.*, Case No. 2012-1937, Sallie Mae submitted its first set of claims to ITT for over $1.5 million on March 1, 2011.  By December 2012, ITT owed Sallie Mae over $14 million in guarantee payments.  *See* Case No. 2012-1937 ¶¶

---

[6] The 24% threshold level was never disclosed to investors.  Lead Plaintffs' counsel discovered the 24% figure in the complaint filed in *Sallie Mae, Inc. v. ITT Educational, Inc.*, Case No. 2012-1937, at ¶ 11 (Fairfax County, Va., Dec. 26, 2012).

16-42. Although Modany and Fitzpatrick knew or recklessly disregarded that defaults under the 2007 RSA were increasing during the Class Period and that payments were due to Sallie Mae, they did not cause the Company to adjust its accounting for the risk and record the liabilities incurred under the 2007 RSA or the 2009 and 2010 RSAs for that matter, even though at this time both the national student loan default rate and the default rate of ITT's student were rapidly increasing.

### b. The 2009 RSA

86.    In February 2009, ITT entered into another RSA, the 2009 RSA, with Student CU Connect CUSO, LLC ("CUSO"), an unaffiliated third-party and Delaware registered company. The CUSO loan program was developed and administered by the Rochdale Group, Inc. of Overland Park, Kansas and was funded by seven participating credit unions.[7]

87.    The participating credit unions made a three-year commitment to fund a pre-specified amount of loans to ITT students each calendar quarter and made a capital contribution to CUSO. ITT received the benefit of the cash-flow and revenue from those loans. In return, ITT guaranteed the repayment of the principal amount (including capitalized origination fees) on the loans and any accrued interest payable on any private education loans charged off above a certain percentage of the loans made based on the annual dollar volume. Again, the threshold percentage at which the loan guarantee would be triggered remained undisclosed to investors. Importantly, the terms of the 2009 RSA require ITT to maintain cash in a restricted account as collateral for ITT's guarantee in an amount equal to an undisclosed percentage of the outstanding balance of the private education loans disbursed to ITT students under the 2009 RSA. ITT's

---

[7] The seven credit unions were Eli Lilly FCU (which was the originating entity), Bellco Credit Union in Greenwood Village, Colorado; CommunityAmerica Credit Union in Lenexa, Kansas; Workers' Credit Union in Fitchburg, Massachusetts; Directors Credit Union in Toledo, Ohio; Veridian Credit Union in Waterloo, Iowa; and Credit Union of America in Wichita, Kansas.

guarantee for the 2009 RSA remains in effect until all private education loans made under the RSA are repaid in full or charged off.  In addition, the 2009 RSA requires that ITT comply with certain covenants which include the maintenance of certain financial ratios that are measured on a quarterly basis.  The 2009 RSA can be depicted as follows:



88.     According to ITT's 2010 Form 10-K, filed on February 18, 2011, the total initial principal amount of private education loans under the 2009 RSA was approximately $141 million.  ITT also made interest bearing advances to CUSO under the 2009 RSA to fund the origination of additional private education loans. The advances were recorded as a note receivable (the "Revolving Note") on ITT's consolidated balance sheet.  During the Class Period, ITT assured investors that its recorded liabilities under the 2009 RSA were not material, representing that it did "not anticipate the amount of private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee."

c.      **The 2010 PEAKS Program**

89.      In 2010, ITT entered into the third RSA, also known as the Program for Education and Access to Knowledge for Students, the 2010 RSA or PEAKS.  Under the PEAKS Program, Liberty Bank, N.A., of Twinsburg, Ohio ("Liberty") originated $346 million of private educational loans.  The loans were transferred to the PEAKS Trust 2009-1 (the "PEAKS Trust"), which was owned by Access Group Inc. ("Access"). The PEAKS Trust issued asset-backed notes classified as Senior Credit Obligations in the amount of $300 million (the "Senior Debt") to undisclosed Wall Street investors.  The Senior Debt, which matures in January 2020, bears interest at LIBOR plus an undisclosed applicable margin. The PEAKS Trust is required to maintain assets having an aggregate value that exceeds a specified undisclosed percentage of the outstanding balance of the Senior Debt.

90.      Deutsche Bank performed the securitization of the student loans originated by Liberty.  ITT received $246.7 million of proceeds, and the remaining funds either remained in the PEAKS Trust to fund a required reserve ($36 million) or were used to pay transaction costs to Liberty and Deutsche Bank ($17.3 million).

91.      Additionally, under the PEAKS Program, ITT transferred to the PEAKS Trust a portion of the amount of each private student loan disbursed to it, in exchange for a $95.9 million subordinated note (the "Subordinated Note") issued by the PEAKS Trust to ITT. The Subordinated Note is non-interest bearing and was recorded by ITT on a discounted basis. The principal on the Subordinated Note is due following the repayment of the Senior Debt.  The structure of the PEAKS Program can be depicted as follows:



92.     Under the PEAKS Program, ITT guaranteed payment of principal, interest, and certain call premiums on the Senior Debt, and administrative fees and expenses of the PEAKS trust.  ITT also guaranteed the maintenance of the undisclosed required ratio of assets of the PEAKS Trust to the outstanding Senior Debt.  Some or all of the holders of the Senior Debt could require ITT to purchase their Senior Debt in certain undisclosed limited circumstances pertaining to ITT's continued eligibility to participate in the Title IV programs.

93.     Collections from the student loans are used to pay administrative expenses relating to the PEAKS Trust, the financing and servicing of the loans, and then the interest on and the principal of the Senior Debt, and to reimburse ITT for any payments it is required to make pursuant to its guarantee, and to pay the Subordinated Note. Any remaining collections are paid to the PEAKS Trust and distributed to Access, the trust owner.

94.     In its 2010 Form 10-K, ITT represented that its recorded liability for the guarantee obligations under the PEAKS Program was not material.  Additionally, during the Class Period, ITT remained steadfast in its position that it was not required under GAAP to include the assets

and liabilities from the PEAKS Program or the 2009 RSA in its consolidated balance sheets because it was "not the primary beneficiary" of the PEAKS Trusts or the 2009 RSA and therefore was not required under ASC 810 to include the financial results of the PEAKS Trust or the 2009 RSA in the Company's condensed consolidated statements."  The Company continues to assert that it is not required to consolidate the PEAKS Trust of the 2009 RSA.

95.    The total amount of loans covered by the RSAs that have been disclosed by ITT to date is in the hundreds of millions of dollars.

      **2.**      **As the PEAKS Trust Expires, Defendants Continue to Assure Investors that a New RSA is Being Negotiated and Omit to Disclose that Securing a Lender for a New RSA Was Unlikely**

96.    As the PEAKS Trust was expiring, Defendants continued to assure the market throughout 2011 and 2012, that a new RSA was in the works and that the Company was searching for a new lender.

97.    On February 28, 2012, Blum Capital, which owned 17.1% of ITT's outstanding shares at the time and held a seat on the board, filed SEC Form SC 13D/A in which it disclosed among other things that it might assist ITT in locating new financing and/or credit sources.

98.    Yet, with ITT's obligations and exposure to the mounting losses under the existing RSA's piling up, Defendants were well aware of the difficulties ITT would face in getting lenders to agree to a new RSA or other third party lending program.  Defendants also knew of the financial strain the Company would face by not entering into a new RSA.  In order to maintain its high student enrollment figures, the Company would have no choice but to increase its direct financing of student loans. Such a drastic move would dictate that ITT's bad debt expenses, related allowance for doubtful accounts, liabilities and other reserves would increase materially and substantially, adversely impacting the Company's profits and earnings,

as well as its ability to generate free cash flow.  This would in turn negatively impact the Company's equity value in the marketplace.  Although Defendants disclosed some of the potential risks associated with direct lending in their SEC filings, they omitted to disclose that they knew or recklessly disregarded the high possibility that these risks would actually materialize because it was highly unlikely ITT would be able to secure a lender for a new third-party loan program given the Company's high rate of student-loan defaults and the inherent risks associated with lending to ITT's high credit risk students.

99.     As a result, Defendants omitted these truths from their public statements and instead continued to assure investors that a new credit facility was in the works, as follows:

a.  The Company's 2010 10-K filed on February 18, 2011, stated "[w]e are pursuing arrangements with unaffiliated lenders for them to provide private education loans to our students and their parents who qualify."

b.  On a April 21, 2011 quarterly earnings call, Fitzpatrick stated "[d]uring the first quarter of 2011 we made positive progress in our efforts to negotiate an additional third party private loan program for our students similar to the PEAKS Program."  On the same call Modany stated "[w]e are in the midst of negotiations with various parties relative to another program, or however you want to look at it, reloading the current program from the third-party providers.  Those discussions are ongoing, positive conversations there, and *we feel confident relative to the level of investor interest that we're seeing*

*there that they are interested parties to put together a third party loan program similar to the PEAKS program.*

c. Defendants continued to omit that ITT was unable to find a willing lender to enter into a new RSA, stating in a July 21, 2011 earnings that they were **"*cautiously optimistic*"** about arranging new financing. Modany told analysts **"*we continued our efforts to negotiate an additional third-party private education loan program for our student that is similar to the PEAKS program*.** We are cautiously optimistic regarding the prospects of a new third-party private education loan program being offered to our students in the third quarter of 2011." Fitzpatrick echoed this statement, telling analysts that the Company was "cautiously optimistic we'll get another one [RSA] in place."

d. During the October 20, 2011 earnings call for the third quarter of 2011, Defendants disclosed that their attempts to finalize a new-third party education loan program in the third quarter of 2011 "were impacted by a material disruption in the debt market" but that "**_discussions continue_** on pricing and execution of a new third-party private education loan program." Modany also stated "if private lending comes through, and again, **_we're making progress there_** and hoping spreads come a little back down to earth."

e. Also during the October 20, 2011 earnings call, Defendants were asked whether they would increase direct lending if a new RSA was

not secured.  Modany responded: "Well, yeah.  Let me be very, very clear, so nobody gets confused.  That's the assumption.  That doesn't mean that's what we'll be doing, and I've tried to point that out in the comments that we've included fairly conservative scenarios."

f.  The Company's 2011 10-K filed on February 24, 2012, stated "[w]e are pursuing arrangements with unaffiliated lenders for them to provide private education loans to our students and their parents who qualify."

g.  Defendants continued to omit the true difficulties of obtaining a new third party lender in an April 26, 2012 earnings call, noting "[i]n the first quarter of 2012, *we made additional progress* in our efforts to facilitate the availability of new third-party private education loan programs to our students to help them meet their gap financing needs."  Modany expressed even greater optimism than he had in previous quarters, even though he was aware or recklessly disregarded that it was highly unlikely any lender would actually agree to participate in a new third party financing program "***we have made progress this quarter towards working out with third parties private lending options for our students***.  And there were a number of variables we were still working on.  We've certainly reduced those numbers *and I would say the confidence level, in terms of our perspective on the ability to get a private lending program has certainly increased since the last time we talked."*  Modany

continued, ***"[s]o we're cautiously optimistic.  I used the same terms last time, but a little more positively inclined than we were last time. I will say that much."***

h.  The false assurances and material omissions continued on a July 26, 2012 earnings call, with Modany stating "[d]uring the second quarter of 2012, we made additional progress in our efforts to facilitate the availability of new third-party private education loan programs to our students to help them meet their gap financing needs.  ***On July 13, 2012, we came to a preliminary understanding for the creation of a new $100 million third-party private loan program to be offered to our students."***  Modany explained that "[w]ith regard to the loan program, basically what we have is we've executed a term sheet.  The term sheet includes a number of, if not all of, the material provisions of an agreement, so we've spend [sic] a lot of time on this negotiating all the details of the transaction that previously we would not have had document and again, executed a term sheet.  ***So I think we've made substantial progress there***."  Modany told analysts that the Company was "***hopeful that the program actually will go into place in 2012, not 2013***.  Obviously there's work to be done to dot a few Is and cross a few Ts.  But we have had a substantial amount of work that has gone into identifying all the material terms of the arrangement.  So again, hopeful that we'll see that happen in 2012."

i. The Company's 2012 2Q 10-Q filed the next day on July 27, 2012, stated **"[w]e are pursuing arrangements with unaffiliated lenders** for them to provide private education loans to our students and their parents who qualify."

j. Defendants again omitted their inability to secure a new third-party lender during an October 25, 2012 earnings call, explaining **"conversations are ongoing** with regard to the creation of a new third-party private student loan program for our students." The Company's 2012 3Q 10-Q filed on October 29, 2012, stated **"we are evaluating programs with unaffiliated lenders** for them to provide private education loans to our students and their parents who qualify."

**C.      Defendants Regularly Discussed ITT's Financial Performance and Student Lending at Monthly Operational Review Meetings**

100.    Each month, Modany held Operational Review ("OR") meetings at headquarters. The OR meetings were intended to keep the senior executives, specifically Modany and Fitzpatrick, updated on Company trends and developments.

101.    According to CW#5, the OR meetings lasted one to two days, and were very organized and structured.  Senior executives remained present for the full two days of meetings, but department heads (either Vice Presidents or Directors) were only present during their scheduled presentation time and only presented on issues specifically pertaining to their department.  CW#6 and CW#7 corroborated CW#5's description of the OR meeting structure, and CW#7 added that each meeting was accompanied by a clearly defined agenda which was provided to all participants and noted who was scheduled to meet with Modany and Fitzpatrick.

102.     One group that regularly presented at the OR meetings was the Default
Management Group—the Group responsible for tracking and monitoring ITT's student loan-
default rates.  According to CW #7, the Group was headed by Greg Wallis, who reported directly
to Modany.  CW#7 recalls a representative from the Default Management Group being listed on
the written agenda to present at the OR meetings on several occasions during the Class Period.
As a result of the presentations given at each OR meeting, and in particular the presentations
given by the Default Management Group, Modany and Fitzpatrick, as well as ITT's entire
executive team, were well aware of the Company's high student-loan default rate, and the
attendant need to increase the Company's allowance for doubtful accounts during the Class
Period.

**D.     Defendants Ignore Relevant GAAP Principles and Fail to Account Properly for ITT's Risks under the RSAs**

103.     The RSAs enhanced ITT's revenues, profits, and cash flows throughout the Class
Period, but they also exposed the Company to substantial risk.[8]  However, Defendants failed to
account properly for the Company's massive exposure under the RSAs during the Class Period,
even though they knew or recklessly disregarded that their obligations under the RSAs would be
triggered given that the economy was deteriorating, unemployment was increasing, and students
were defaulting on their loans at incredibly high rates.

104.     GAAP clearly requires all guarantors to record a liability at the inception of the
guarantee for the obligation the guarantor has undertaken.  Financial Accounting Services Board

---

[8] Because the RSAs were funded by private lenders, the cash flows from the RSAs also positively affected the
calculation required by the DOE under its 90/10 Rule. Under the 90/10 Rule: "…a proprietary institution may be
sanctioned if, on a cash accounting basis, the institution derives more than 90% of its applicable revenue in a fiscal
year from Title IV [Federal financial aid] Programs."   Because the RSAs were funded by private lenders, the
revenue derived from them went towards ITT's "10%" rather than the "90%."

Interpretation No. 45 ("FIN 45") states[9] "[a]t the **inception** of a guarantee, the guarantor shall recognize in its statement of financial position a liability for that guarantee."[10] (emphasis added). The liability is to be recorded at its fair value. Further, the **total loss contingency** relating to the guarantee of indebtedness must be disclosed even when the possibility of loss is remote. Under FIN 45 the "recognition of a liability for the obligations undertaken upon issuing a guarantee results in a more representationally faithful depiction of the guarantor's assets and liabilities." The objective of the guarantee accounting standards "is to achieve transparency in a guarantor's financial reporting about the obligations and risks arising from issuing guarantees."

105.   Accordingly, under GAAP, Defendants were required to record a liability for the Company's guarantees under the RSAs at the **inception** of each RSA. However, Defendants did not disclose a liability for the guarantees until February 24, 2012, when the Company first disclosed in its 2011 Form 10-K that its "recorded liability for [the RSAs] was approximately $36.0 million." Even then, ITT did not disclose how this liability was allocated among the three RSAs, and continued to materially understate the actual amounts needed in the reserve.

106.   GAAP reiterates the requirement that a loss contingency, which includes the guarantee of indebtedness of others, must be recorded by a charge to income if (1) information available prior to issuance of the financial statements indicates that it is probable that a liability had been incurred at the date of the financial statements, and (2) the amount of loss can be

---

[9] FIN 45 was the authoritative GAAP literature at the beginning of the Class Period, but the accounting standards were later codified into the Accounting Standards Codification ("ASC") by the Financial Accounting Standards Board. FIN 45 became part of ASC 460. The new codification of the accounting standards was effective for interim and annual periods ending after September 15, 2009. There were no substantial differences between FIN 45 and ASC 460. References to GAAP in this Complaint are to the authoritative literature during each specific period addressed.

[10] The language in ASC 460 is identical in all material respects. *See* FIN 45 ¶ 9, available at http://www fasb.org and ASC 460-10-25-4.

reasonably estimated.  *See* Statement of Financial Accounting Standards No. 5 ("FAS 5").[11]

GAAP defines "probable" as "the future event or events are likely to occur."

107.     Here, in blatant violation of GAAP, Defendants failed to record a loss

contingency during the Class Period even though they knew it was probable a loss would be

incurred and they could reasonably estimate the amount of that loss.  Defendants knew or

recklessly disregarded that a loss under the RSAs was probable given news reports of sky-

rocking student-loan default rates.  In 2009, for example, student loan default rates were at their

highest since 1998, and industry experts predicted they would increase.  Nearly 400,000 students

who entered repayment in 2007 defaulted on their student loans by 2009.  Nearly half, or 44%, of

those defaulters were for-profit students, even though only 1 in 14 students attended for-profit

institutions.  As student loan default rates increased Arne Duncan, the U.S. Secretary of

Education, explained ***"[t]he data . . . tells us that students attending for-profit schools are the***

***most likely to default***" and that "while for-profit schools have profited and prospered thanks to

federal dollars, some of their students have not.  Far too many for-profit schools are saddling

students with debt they cannot afford in exchange for degrees and certificates they cannot use."

108.     Moreover, ITT's own student-loan default rates, which were closely tracked by

Modany and Fitzpatrick, were rapidly increasing during the class period, growing from 21.1%

for students who entered repayment in 2005 to 26.3% for students who entered repayment in

2008.  For students entering repayment in 2009, the default rate was ***over 30%***.  The Company's

2009, 2010, 2011, and 2012 Form 10-Ks, which Modany and Fitzpatrick signed, acknowledged

that economic conditions in the United States "***could continue to contribute to higher default***

---

[11]   FAS 5 was the authoritative GAAP literature at the beginning of the Class Period, but was later codified and become part of ASC 450. There were no substantial differences between FAS 5 and ASC 450.   The wording in ASC 450-20-25-2 is identical in all material respects.

*rates on student loans*."   Given Defendants' knowledge of this information, as well as their access to information regarding when their guarantee obligations would be triggered under the RSAs, Defendants could have reasonably estimated the amount of any loss under the RSAs.  As a result, Defendants should have recorded an adequate reserve or loss contingency by making a charge to income as required by GAAP.

109.    Similarly, GAAP also requires the disclosure of the maximum potential amount of future payments that the guarantor could be required to make under the guarantee.  *See* FIN 45 ¶ 13; ASC 460-10-50-4.  Throughout the Class Period, Defendants represented that because their guarantee obligations under the RSAs were affected by "various factors," they were unable to estimate the maximum potential future payments that the Company could be required to make under the RSAs.  However, Defendants could have reasonably estimated the maximum potential future payments, given that they had sufficient information regarding the declining economy, increasing student-loan default rates, the total principal amount of loans outstanding under the RSAs, and the circumstances under which ITT's repayment obligations under the guarantees would be triggered.  Accordingly, Defendants failure to disclose the maximum potential amount of future payments was yet another violation of GAAP.

110.    Because Defendants knowingly or recklessly failed to follow the applicable GAAP provisions during the Class Period, their financial statements are *presumed* to be misleading or inaccurate under SEC Regulations.  17 C.F.R. § 2.10.4-01(a)(1).  SEC Regulation S-X provides "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  *Id.*  The SEC's Division of Corporation Finance Manual reiterates that "regulation S-X and U.S. GAAP must be followed by domestic issuers."  *See* § 140 SEC Division of

Corporate Finance Manual.   Violations of GAAP, therefore, equate to violations of SEC Regulations for publically traded companies.

111.   Here, Defendants' failure to make adequate disclosures in relation to the Company's obligations under the RSA guarantees ran afoul of GAAP.   Defendants knowingly and or recklessly failed to disclose the terms of the guarantee, knowing that disclosure of the terms would have allowed a reader of ITT's consolidated financial statements to evaluate the risk inherent under the guarantees.

112.   Finally, according to the SEC Division of Corporate Finance Manual, a Company's Management Discussion & Analysis ("MD&A") should "provide a narrative explanation of a company's financial statements that enables investors *to see the company through the eyes of management*."   SEC Division of Corporate Finance Manual § 9110.1a (emphasis added).   Here, ITT's MD&A did not provide sufficient information for investors to understand the magnitude of the guarantees under the 2007 and 2009 RSAs.   An investor reading the Company's Forms 10-Ks or 10-Qs would not be able to determine the maximum potential exposure ITT could face since the remaining principal of the student loans under the 2007 and 2009 RSAs, the loan default threshold levels at which the guarantee became effective, the current level of loan defaults, and the accrued interest were not disclosed.   Had these items been disclosed, investors could have determined a range of potential cash outflows and charges to earnings.

113.   Defendant's blatant disregard of applicable accounting rules provided the Company with short term, although ultimately unsustainable, benefits.   First, by failing to properly account for its guarantees under the RSAs, ITT was able to vastly overstate its financial results and financial condition during the Class Period.   According to an analyst at PAA, ITT's

failure to account for its actual liability under the 2007 RSA alone caused it to effectively overstate its earnings by $0.06-$0.08 per share each quarter for the previous two years. The amount of this overstatement does not take into account ITT's failure to reserve for the 2009 RSA and the PEAKS Program, which the Company has recently admitted required **additional reserves of $71.1 million**. *See* Bradley Safalow, *ESI: 10-K Highlights – the SEC Subpoena Is Not the Sole Cause for Concern*, PAA Research LLC, Feb. 25, 2013. A Wells Fargo analyst predicted that Company's additional liability under the 2009 RSA and PEAKS Program could be as high as $270 million. Wells Fargo Analyst Report, Jan. 7, 2013.

114. Additionally, by under-reserving for its guarantees, ITT was able to maintain its required Financial Responsibility Composite Score under the DOE's financial responsibility standards ("Composite Score"). Both for-profit and non-profit educational institutions are required to submit annually audited financial statements to the DOE to determine whether they are maintaining the standards of responsibility necessary to participate in Title IV programs. One of the standards used to determine the financial responsibility of an institution is a composite of three ratios derived from an institution's audited financial statements. The three ratios are a primary reserve ratio, an equity ratio, and a net income ratio. The composite score reflects the overall financial health of an institution on a scale from 1.0 to 3.0. A composite score of 1.5 indicates that the institution is considered financially responsible. Schools with a score of less than 1.5 but greater than 1.0 are considered financially responsible, but are subject to additional oversight including, but not limited to, cash monitoring. Institutions with scores below 1.0 are considered not financially responsible and are subject to Title IV penalties, as well as cash monitoring. Schools with a score of less than 1.0 are also required to post a letter of

credit equal to a minimum of 10% of the Title IV aid received in the institution's most recent fiscal year.

115.     According to PAA, had ITT booked just $25 million more worth of reserves for its 2009 RSA and the PEAKS Program in 2012, its Composite Score would have dropped below 1.5 in 2012, and the Company would have been subject to additional monitoring.  *See* Bradley Safalow, *ESI: And so it Begins*  . . . *What do you Believe*, PAA Research, LLC, Jan. 24, 2013. Thus, by under-reserving for its liabilities under the RSAs, ITT was able to avoid additional monitoring and to continue using improper accounting techniques to inflate its balance sheet and financial results.

### E.     Defendants Ignore Relevant SEC Regulations

116.     Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303].

117.     In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

> The instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .

118.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

119.    Nonetheless, ITT's Class Period Forms 10-K and 10-Q failed to disclose that the Company's obligations under the RSAs would be triggered given that students were defaulting on their loans at incredibly high and increasing rates.  This was reasonably likely to have a material adverse effect on ITT's operating results, and the disclosure of such was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.  Indeed, not until February 24, 2012, did the Company disclose a liability for the guarantees when it disclosed in its 2011 Form 10-K that its "recorded liability for [the RSAs] was approximately $36.0 million."

120.    Moreover, ITT knew that the PEAKS program was ending and, as a result, the Company's bad debt expenses, related allowance for doubtful accounts, reserves and liabilities would be increasing as the Company focused more heavily on direct financing of student tuition. Nonetheless, Defendants continued to assure investors that ITT was adequately reserved and omitted any information regarding the need for greater reserves associated with direct financing.

121.    Item 303 also requires that companies "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will *result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way*"  (emphasis added).

49

122.    Despite the requirements of Item 303, Defendants did not disclose the significant liability under the RSAs or the direct financing that took its place in 2012, nor did the Company disclose the impact on the Company's liquidity until July 26, 2012 when ITT announced that it was increasing its use of internal financing.  In response to these disclosures, Bradley Safalow, an analyst at PAA wrote that these risks were so serious that it urged management to act immediately in order to solidify the Company's capital position. The report noted "[g]iven how quickly the company's liquidity position has deteriorated and the likelihood that the earnings power of the company will erode further, a 'death spiral' is no longer out of the question."  A Credit Suisse analyst cautioned "we continue to worry declining upfront payments on Title IV student aid and increased balance sheet lending may cause free cash flow/share to fall well below earnings in [fiscal year] 2012 and beyond."  Credit Suisse Analyst Report, July 26, 2012.

123.    Additionally, Item 303 requires companies to discuss the company's "off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors."

124.    In pertinent part, Item 303 states that companies are required to disclose "the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the registrant arising from such [off-balance sheet] arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise . . . ."

125.    Here, ITT failed to timely disclose the nature or amount of any potential liabilities associated with its off balance-sheet arrangements.  Indeed, ITT did not disclose a liability for the guarantees under the RSA until it filed its Form 10-K for 2011 on February 24, 2012.  Even

then, it failed to disclose how the liabilities were distributed among the three RSAs. Additionally, the Company failed to disclose the threshold percentage of charge-offs that would trigger the Company's obligations under the RSAs.

126.    Further, in connection with ITT settling with Sallie Mae for $46 million, PAA stated that the settlement announcement "raises significant concerns in our view about [ITT's] existing reserves for its off-balance sheet liabilities and ultimately the company's ability to meet those obligations."

127.    Moreover, Defendants failed to disclose that the Company's obligations under the RSAs would be triggered given that the economy was deteriorating, unemployment was increasing, and students were defaulting on their loans at incredibly high rates.

### F.    ITT's Lending Practices and Accounting Methods Subject It to Extensive Scrutiny from Regulators and the Senate HELP Committee

128.    ITT's lending practices and questionable accounting methods subjected it to extensive scrutiny from regulators and the Senate HELP Committee throughout the Class Period. For example, as early as 2010, the SEC began questioning ITT's off-balance treatment of the PEAKS Program and the 2007 and 2009 RSAs.  On May 7, 2010, the SEC Division of Corporate Finance sent ITT a letter demanding, among other things, that ITT explain how it applied ASC 25-38A "in reaching your conclusions that you are not the primary beneficiary" of the PEAKS Trust, or the 2007 and 2009 RSAs.  On June 28, 2010, the SEC provided ITT with oral comments during a telephone discussion, and requested additional information on the PEAKS Program, including the amount of equity the Trust Equity Holder initially provided to the PEAKS Trust – the key aspects of the servicing arrangement under the PEAKS Program, information regarding the analysis ITT performed to determine the potential risks involved in the PEAKS transaction, including ratios, default rates, term of loans, and other potential risks and

51

the average amount of a loan made under the PEAKS Program, as well as the percentage of tuition that average amount represents.  The SEC pressed for even more information on the PEAKS Program in a subsequent letter dated August 4, 2010.  The SEC demanded that ITT explain, among other things, how "you considered your involvement in both the design and entity and rights afforded through related contractual agreements in evaluation of your power over each of the activities that most significantly impact the entity's economic performance considering ITT's seemingly disproportionate exposure to risk of loss compared with its stated power."

129.    On July 30, 2012, the Senate HELP Committee published the Senate Report, a comprehensive report that summarized a two-year in depth Senate investigation focusing exclusively on the for-profit sector of education.  The report, titled "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," was a scathing indictment of the for-profit education industry.  The report highlighted the sector's high tuition rates, high rates of student loan defaults, low levels of employment, and aggressive recruiting tactics that often target low-income students who are eligible for the maximum in student aid. The report included a section that focused exclusively on ITT's revenue, spending, executive compensation, financial aid practices, recruiting tactics, student loan defaults, and aggressive default management practices, and ultimately concluded:

> ***ITT is one of the most expensive companies examined by the committee,*** *and it is not clear that the value of the education justifies the cost.*  ***The cost of attending ITT is so high that the company has created its own loan program to enable students to borrow money in excess of Federal lending limits***.   While the retention rates for both the Associates and Bachelor's program are slightly better than average, ***the company has a high rate of student loan default***, with 26 percent of students defaulting within 3 years of entering repayment. ***This likely reflects the high cost of the programs offered, and an inability on the part of some***

*students to find jobs that allow them to repay the debt they incur*. *The company makes this work by utilizing some of the most disturbing recruiting tactics among the companies examined*, and by taking very creative approaches to complying with the 90/10 limitation on revenue received from Federal financial aid programs. *Meanwhile, the company devotes the largest share of revenue to profit of any company analyzed at 37 percent. Taken together, these issues cast serious doubt on the notion that ITT's students are receiving an education that affords them adequate value relative to the cost*, and calls into question the $1.1 billion investment American taxpayers made in the company in 2010. (emphasis added)

130.   Then, on February 22, 2013, the Company disclosed in its 2012 Form 10-K, that it has received a CID from the Massachusetts Office of the Attorney General ("MAG") on October 30, 2012.  The MAG is investigating whether ITT violated Massachusetts law by "engaging in unfair or deceptive practices in connection with marketing and advertising job placement and student outcomes, the recruitment of students, and the financing of education."  The CID requested documents related to ITT's Massachusetts students, including "the financial aid available to those students, our recruitment of those students, the career services that we offer to those students, our marketing and advertising, the retention and graduation rates of those students and many other aspects of our business."

131.   On February 22, 2013, ITT disclosed in its 2012 Form 10-K that the Company had received a subpoena from the SEC two weeks earlier February 8, 2013. The subpoena requested the production of documents relating to ITT's accounting for the 2009 RSA and PEAKS Program.

132.   ITT's loan origination practices also drew the attention of the U.S. Consumer Financial Protection Bureau (the "CFPB").  On May 22, 2012, ITT filed a Form 8-K with the SEC disclosing that it received a Civil Investigative Demand ("CID") from the CFPB. According to the CID, the purpose of the investigation is "to determine whether for-profit post-

secondary companies, student loan origination and servicing providers, or other unnamed persons have engaged in or are engaging in unlawful acts or practices relating to the advertising, marketing, or origination of private student loans."   The CFPB eventually withdrew the May 2012 CID, and replaced it with a September 2013 CID, the purpose of which was identical to the May 2012 CID.  According to a December 27, 2013 8-K filing by the Company, ITT received a CFPB early warning letter (the "Letter"), stating that CFPB's Enforcement Office is considering recommending that the CFPB take legal action against ITT.   The Letter states that the staff of the CFPB's Office of Enforcement expects to allege that the Company violated Section 1036 of the Dodd-Frank Act, the Truth in Lending Act, and Regulation Z.  The Letter also states that the CFPB Enforcement Office expects to recommend seeking remedies and penalties to the fullest extent of the law.

## VII.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

133.  On April 24, 2008, the first day of the Class Period, ITT issued a press release with its results for the first quarter of 2008.  The Company announced that its diluted earnings per share ("EPS") increased 63.6% to $1.08 compared to $0.66 in the first quarter of 2007.

134.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2008 (the "1Q 2008 10-Q"), which included the same results previously reported in the Company's April 24, 2008 press release.  In the 1Q 2008 10-Q, ITT assured investors that its "*recorded liability related to the [2007] RSA as of March 31, 2008 was not material.*"   The 1Q 2008 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the 2007 RSA, the Company was "not able to estimate the undiscounted maximum potential future payments that we could be required to make under the [2007] RSA."   The 1Q 2008 10-Q was

signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick, who each certified:

> 1. I have reviewed this quarterly report on Form 10-Q of ITT Educational Services, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

135.    The statements made in Paragraph 134 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) improperly accounted for this loss contingency by not recording a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the 2007 RSA as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the

56

Company's liability for its guarantee under the 2007 RSA was, in fact, material; (4) omitted to disclose the Company's massive exposure under the 2007 RSA; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the 2007 RSA; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

136.    On July 24, 2008, ITT issued a press release with its results for the second quarter of 2008, ending June 30, 2008.  The Company announced that its diluted EPS increased 37.9% to $1.20 compared to $0.87 in the second quarter of 2007.

137.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2008 (the "2Q 2008 10-Q"), which included the same results previously reported in the Company's July 24, 2008 press release.  In the 2Q 2008 10-Q, *ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of June 30, 2008 was not material."*  The 2Q 2008 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the 2007 RSA, the Company was "not able to estimate the undiscounted maximum potential future payments that we could be required to make under the [2007] RSA."  The 2Q 2008 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick, substantially identical to that described in paragraph 134 that attested to the purported accuracy and completeness of the Company's 2Q 2008 10-Q.

138.    The statements made in Paragraph 137 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the

circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, even though GAAP required the Company to record a liability for the fair value of the guarantee at the ***inception*** of the RSA; (2) improperly accounted for this loss  contingency by  not recording a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the 2007 RSA as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the 2007 RSA was, in fact, material; (4) omitted to disclose the Company's massive exposure under the 2007 RSA; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSA; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

139.    On October 23, 2008, ITT issued a press release with its results for the third quarter of 2008, ending September 30, 2008.  The Company announced that its diluted EPS increased 30.6% to $1.28 compared to $0.98 in the third quarter of 2007.

140.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2008 (the "3Q 2008 10-Q"), which included the same results previously reported in the Company's October 23, 2008 press release.  In the 3Q 2008 10-Q*, **ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of September 30, 2008 was not material."***  The 3Q 2008 10-Q also explained that because various factors affected the

maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the 2007 RSA, the Company was "not able to estimate the undiscounted maximum potential future payments that we could be required to make under the [2007] RSA." The 3Q 2008 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134 that attested to the purported accuracy and completeness of the Company's 3Q 2008 10-Q.

141.    The statements made in Paragraph 140 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 even though GAAP required the Company to record a liability for the fair value of the guarantee at the ***inception*** of the RSA; (2) improperly accounted for this loss contingency by not recording a charge against income as required by  GAAP even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the 2007 RSA as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the 2007 RSA was, in fact, material; (4) omitted to disclose the Company's massive exposure under the 2007 RSA; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSA; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

142.    On January 22, 2009, ITT issued a press release announcing that its diluted EPS in the fourth quarter of 2008, increased 34.2% to $1.61 compared to $1.20 in the fourth quarter of 2007.

143.    On February 18, 2009, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2008 (the "2008 10-K"), which included the same results previously reported in the Company's January 22, 2009 press release.  In the 2008 10-K, *ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of December 31, 2008 was not material."*  The 2008 10-K also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the 2007 RSA, the Company was "not able to estimate the undiscounted maximum potential future payments that we could be required to make under the [2007] RSA." The 2008 10-K was signed by Modany and Fitzpatrick, along with members of ITT's board of directors, and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 2008 10-K.

144.    The statements made in Paragraph 143 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) improperly accounted for  this loss contingency by not recording a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the 2007 RSA as of the date of

the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions, that established that the Company's liability for its guarantee under the 2007 RSA was, in fact, material; (4) omitted to disclose the Company's massive exposure under the 2007 RSA; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSA; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

145.    On February 23, 2009, ITT executives spoke with analysts, media representatives, and investors at the Credit Suisse Group Global Services Conference.  During the conference, Fitzpatrick minimized the Company's exposure under the 2009 RSA, entered into the previous week, by representing to investors that:  "[I]n terms of the risk share, we would not expect that we would have any [profit and loss statement] implications relative to that risk share.  We don't expect that we'll have to book a reserve."

146.    The statements in Paragraph 145 were materially false and misleading when made and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Fitzpatrick knew or recklessly disregarded readily available information that established that the Company's obligations under the 2009 RSA would be triggered, including increasing cohort default rates at ITT, as well as declining economic conditions; and (2) Fitzpatrick omitted to disclose the Company's massive exposure under the 2009 RSA.

147.    On April 23, 2009, ITT issued a press release with its results for the first quarter of 2009.  The Company announced that its diluted EPS increased 47.2% to $1.59 compared to $1.08 in the first quarter of 2008.

148.    After releasing its first quarter 2009 results on April 23, 2009, ITT hosted a conference call for analysts, media representatives, and investors during which Modany represented to investors that, despite the poor condition of the economy, the Company's guarantee obligations under the 2009 RSA would not be triggered.  Specifically, Modany stated that under the 2009 RSA:  ***"[t]here is no reserve requirements [sic] on our part.  We have a risk-share arrangement, but the level or risk-share is . . .  much, much higher than historical rates such that we certainly do not anticipate that ever being triggered, even with consideration for the current economic environment.***"

149.    The statements in Paragraph 148 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Modany knew or recklessly disregarded readily available information that established that the Company's obligations under the 2009 RSA would be triggered, such as increasing cohort default rates at ITT specifically, and within the for-profit education sector generally, as well as declining economic conditions; and (2) Modany omitted to disclose the Company's massive exposure under the 2007 and 2009 RSAs.

150.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2009 (the "1Q 2009 10-Q"), which included the same results previously reported in the Company's April 23, 2009 press release.  In the 1Q 2009 10-Q, the Company downplayed its exposure under the RSAs.  For example, according to the 1Q 2009 Form 10-Q, "the undiscounted maximum potential future payments that [ITT] would be required to make under

the 2009 RSA and the amount of the liability as of March 31, 2009 were not material." The 1Q 2009 10-Q similarly assured investors that ITT's **"*recorded liability related to the 2007 RSA as of March 31, 2009 was not material.*"** The 1Q 2009 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the 2007 RSA, the Company was "not able to estimate the undiscounted maximum potential future payments that we could be required to make under the [2007] RSA." The 1Q 2009 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134 that attested to the purported accuracy and completeness of the Company's 1Q 2009 10-Q.

151.    The statements made in Paragraph 150 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) failed to record an adequate liability for the fair value of the guarantee under the 2009 RSA at the inception of the RSA, as required by GAAP (2) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (3) failed to record a loss contingency by making a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a liability had been incurred under the 2007 RSA as of the date of the SEC filing; (4) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the 2007 and 2009 RSAs was, in fact, material; (5) omitted to disclose the Company's massive exposure under the 2007 and 2009 RSAs; (6) could have estimated the maximum potential amount of future payments that the

63

Company could be required to make under the 2007 RSA, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSA; and (7) as a result of (1), (2), (3), (4), (5), and (6), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

152.    On July 23, 2009, ITT issued a press release with its results for the second quarter of 2009.  The Company announced that its diluted EPS increased 55.8% to $1.87 compared to $1.20 in the second quarter of 2008.

153.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2009 (the "2Q 2009 10-Q"), which included the same results previously reported in the Company's July 23, 2009 press release.  In the 2Q 2009 10-Q, the Company continued to assure investors that it "did not record a liability for our guarantee obligations under the 2009 RSA as of June 30, 2009, because we do not anticipate that the private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee."  The 2Q 2009 10-Q also assured investors that ITT's "recorded liability related to the 2007 RSA as of June 30, 2009 was not material."  The 2Q 2009 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the 2007 RSA, the Company was "not able to estimate the undiscounted maximum potential future payments that we could be required to make under the [2007] RSA."  The 2Q 2009 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 2Q 2009 10-Q.

154.   The statements made in Paragraph 153 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liabilities for the fair  value of the guarantee  under the 2007 and 2009 RSAs, even though GAAP required the Company to record a liability for the fair value of the guarantee at the **_inception_** of the RSA; (2) failed to record a loss contingency by making a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the 2007 RSA as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the 2007 RSA; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSA; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

155.   On October 22, 2009, ITT issued a press release with its results for the third quarter of 2009.   The Company announced that its diluted EPS increased 56.3% to $2.00 compared to $1.28 in the third quarter of 2008.

156.   Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2009 (the "3Q 2009 10-Q"), which included the same results previously reported in the Company's October 22, 2009 press release.  In the 3Q 2009 10-Q, Defendants continued

to minimize the Company's liability under the RSAs, once again representing that it "did not record a liability for our guarantee obligations under the 2009 RSA as of September 30, 2009, because we do not anticipate that the private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee." The Company also continued to assure investors that its "recorded liability related to the 2007 RSA as of September 30, 2009 was not material." The 3Q 2009 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the 2007 RSA, the Company was "not able to estimate the undiscounted maximum potential future payments that we could be required to make under the [2007] RSA." The 3Q 2009 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 3Q 2009 10-Q.

157.   The statements made in Paragraph 156 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 and 2009 RSAs, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) failed to record a loss contingency by making a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the 2007 and 2009 RSAs was, in fact, material; (4)

omitted to disclose the Company's massive exposure under the 2007 RSA; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSA; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

158.    On January 21, 2010, ITT issued a press release announcing that its diluted EPS for the fourth quarter of 2009 increased 59.0% to $2.56 compared to $1.61 in the fourth quarter of 2008.

159.    After releasing its fourth quarter 2009 results on January 21, 2010, ITT hosted a conference call for analysts, media representatives, and investors during which Fitzpatrick described the 2010 RSA, known as the PEAKS Program.  Fitzpatrick assured investors that "we do not believe that we will be required to make any material payments under our guarantee." Modany also stated that the Company would maintain an adequate reserve to meet any potential obligations under the PEAKS Program, telling investors that:

> [W]e've stressed this structure well beyond, and I mean well beyond historical performance that should provide for a very good result for us.  And all of that in terms of that reserving, that extra cushioning that we're talking about, it is reflected in those 2010 goals that we put out today.
>
>  "But what we can say fairly comfortably is that we're well within our reserve ranges and I know we've talked again before about the fact that we've been *as conservative with our reserve accounting as the regulations, as the pronouncements from an accounting perspective would allow us to be.* (emphasis added).

160.   The statements in Paragraph 159 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Fitzpatrick and Modany knew that the Company had not been conservative in booking reserves—in fact the Company had been continually under reserving in an effort to increase earnings and to, among other things, maintain its Composite Score with the DOE; (2) Fitzpatrick knew or recklessly disregarded readily available information that demonstrated that the Company's obligations under the PEAKS Program would be triggered, such as increasing cohort default rates at ITT specifically, as well as the declining economic conditions; and (3) Defendants omitted to disclose the Company's massive exposure under the PEAKS Program.

161.   On February 19, 2010, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2009 (the "2009 10-K"), which included the same results previously reported in the Company's January 21, 2010 press release.  With respect to the 2009 RSA, the Company continued to assure investors that it "did not record a liability for our guarantee obligations under the 2009 RSA as of December 31, 2009, because we do not anticipate that the amount of private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee."  In the 2009 10-K, the Company also continued to assure investors that its "recorded liability related to the 2007 RSA as of December 31, 2009 was not material."  The 2009 10-K further explained that "[t]he maximum potential future payments that we could be required to make pursuant to our guarantee obligations under the RSAs are affected by various factors. . . .  As a result, we are not able to estimate the maximum potential future payments that we could be required to make under the RSAs."  The 2009 10-K was signed by Modany and Fitzpatrick, along with other ITT executives, and contained certifications by Modany and

Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 2009 10-K.

162.    The statements made in Paragraph 161 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 and 2009 RSAs, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) failed to record this loss contingency by making a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a liability had been incurred under the 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the 2007 and 2009 RSAs; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the RSAs, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSAs; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

163.    On April 22, 2010, ITT issued a press release announcing its first quarter 2010 financial results.  The Company reported net income of $87.5 million, or $2.46 diluted EPS, and revenue of $384.0 million for the first quarter of 2010.

69

164.    Later that day, ITT filed with the SEC its quarterly report Form 10-Q for the first quarter of 2010 (the "1Q 2010 10-Q"), which included the same results previously reported in the Company's April 22, 2010 press release.  In the 1Q 2010 10-Q, the Company continued to downplay its liability under the RSAs by telling investors that "[a]s of March 31, 2010, we had not made any guarantee payments under the PEAKS Program, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."  The Company also stated "[b]ased on the prior repayment history of our students with respect to private education loans and the current economic conditions, we do not believe that our guarantee obligations under either RSA or the PEAKS Program will have a material adverse effect on our financial condition, results of operations or cash flows."  The 1Q 2010 10-Q further explained that because the maximum potential future payments that the Company could be required to make under the PEAKS Program and the 2007 RSA were affected by various factors "we are not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the [PEAKS] guarantee agreement" or "under the 2007 RSA."  The 1Q 2010 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 1Q 2010 10-Q.

165.    The statements made in Paragraph 164 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, 2009 RSA, and PEAKS Program, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) improperly accounted for this loss

contingency by not recording a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the PEAKS Program and 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the PEAKS Program and the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the PEAKS Program and 2007 and 2009 RSAs; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA and the PEAKS Program, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the 2007 RSA and the PEAKS Program; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

166.    On May 25, 2010, ITT executives spoke with analysts, media representatives, and investors at the Bank of America Merrill Lynch Services Conference.  During the conference, CEO Modany continued to assure investors of the Company's conservative approach toward calculating its exposure under the RSAs.  Specifically, Modany explained that the Company was "comfortable" with the PEAKS Program because:

> *[W]e look at the data that we have collected historically and we try to be ultraconservative relative to any down side associated with the performance of the portfolio, and be extremely conservative relative to that . . . .*  And we can't give you the numbers, but it is multiples of what we have experienced in terms of what this thing can handle before we would see any kind of modification to our financial results.

167.    The statements made in Paragraph 166 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Modany knew that the Company had not been conservative in booking reserves—in fact the Company had been continually under reserving in an effort to increase earnings and revenues, to, among other things, maintain its Composite Score with the DOE; (2) Modany knew or recklessly disregarded readily available information that demonstrated that the Company's obligations under the PEAKS Program would be triggered, such as increasing cohort default rates at ITT, as well as the declining economic conditions; and (3) Modany omitted to disclose the Company's massive exposure under the PEAKS Program.

168.    On July 22, 2010, ITT issued a press release announcing its second quarter 2010 financial results.  The Company reported net income of $96.0 million, or $2.78 in diluted EPS, and revenue of $401.8 million for the second quarter of 2010.

169.    On July 23, 2010, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2010 (the "2Q 2010 10-Q"), which included the same results previously reported in the Company's July 22, 2010 press release.  In the 2Q 2010 10-Q, the Company continued to downplay the Company's guarantee  liability under the RSAs, stating that "[a]s of June 30, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material." The Company also stated "[b]ased on the prior repayment history of our students with respect to private education loans and the current economic conditions, we do not believe that our guarantee obligations under either RSA or the PEAKS Program will have a material adverse effect on our financial condition, results of operations or

cash flows." The 2Q 2010 10-Q further explained that because the maximum potential future payments that the Company could be required to make under the PEAKS Program and the 2007 RSA were affected by various factors "we are not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the [PEAKS] guarantee agreement" or "under the 2007 RSA." The 2Q 2010 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 2Q 2010 10-Q.

170.    The statements made in Paragraph 169 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, 2009 RSA, and PEAKS Program, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) improperly accounted for this loss contingency by not recording a charge against income as required by GAAP even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the PEAKS Program and 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the PEAKS Program and the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the PEAKS Program and the 2007 and 2009 RSAs; (5) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA and the PEAKS Program, given

Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the 2007 RSA and the PEAKS Program; and (6) as a result of (1), (2), (3), (4), and (5), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

171.    On October 21, 2010, ITT issued a press release announcing its third quarter 2010 financial results.  The Company reported net income of $93.2 million, or $2.82 in diluted EPS, and revenue of $400.6 million for the third quarter of 2010.

172.    On October 22, 2010, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2010 (the "3Q 2010 10-Q"), which included the same results previously reported in the Company's October 21, 2010 press release.  In the 3Q 2010 10-Q, ITT assured investors that "[a]s of September 30, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."  The Company also stated "[b]ased on the prior repayment history of our students with respect to private education loans and the current economic conditions, we do not believe that our guarantee obligations under the either RSA or the PEAKS Program will have a material adverse effect on our financial condition, results of operations or cash flows." The 2Q 2010 10-Q further explained that because the maximum potential future payments that the Company could be required to make under the PEAKS Program and the 2007 RSA were affected by various factors "we are not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the [PEAKS] guarantee agreement" or "under the 2007 RSA."  The 3Q 2010 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially

identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 3Q 2010 10-Q.

173.    The statements made in Paragraph 172 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, 2009 RSA, and PEAKS Program, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) improperly accounted for this loss contingency by not recording a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the PEAKS Program and 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the PEAKS Program and the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the PEAKS Program and 2007 and 2009 RSAs; (5) omitted to disclose that in September 2010, Sallie Mae had notified ITT that the charge offs under the 2007 RSA were approaching the 24% loan-default threshold level, and it was probable that ITT would have to make payments under the 2007 RSA; (6) could have estimated the maximum potential amount of future payments that the Company could be required to make under the 2007 RSA and the PEAKS Program, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the 2007 RSA and the PEAKS Program; and (7) as a result of (1), (2),

(3), (4), (5), and (6), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

174.    On January 20, 2011, ITT issued a press release announcing its fourth quarter and full-year 2010 financial results.  The Company reported net income of $97.5 million, or $3.14 in diluted EPS, and revenue of $410.1 million for the fourth quarter of 2010.  The Company further reported net income of $374.2 million, or $11.17 in diluted EPS, and revenue of $1.6 billion for the full year of 2010.

175.    On February 18, 2011, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2010 (the "2010 10-K"), which included the same results previously reported in the Company's January 20, 2011 press release.  The 2010 10-K continued to downplay the Company's exposure under the RSAs, stating that "[a]s of December 31, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material." The 2010 10-K further explained that "[t]he maximum potential future payments that we could be required to make pursuant to our guarantee obligations under the RSAs are affected by various factors.  As a result, we are not able to estimate the maximum potential future payments that we could be required to make under the RSAs."  The 2010 10-K was signed by Defendants Modany and Fitzpatrick, along with other ITT executives.   The 2010 10-K also contained certifications by Defendants Modany and Fitzpatrick substantially identical to that described in paragraph 134,  that attested to the purported accuracy and completeness of the Company's 2010 10-K.

176.    The statements made in Paragraph 175 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the

circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, 2009 RSA, and PEAKS Program, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) improperly accounted for this loss contingency by not recording a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the PEAKS Program and 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the PEAKS Program and the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the PEAKS Program and 2007 and 2009 RSAs; (5) omitted to disclose that in September 2010, Sallie Mae had notified ITT that the charge offs under the 2007 RSA were approaching the student-loan default 24% threshold level, and it was probable that ITT would have to make payments under the 2007 RSA; 6) could have estimated the maximum potential amount of future payments that the Company could be required to make under the RSAs, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSAs; and (7) as a result of (1), (2), (3), (4), (5), and (6), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

177.   The 2010 10-K also assured the market that a new third-party lending program was in the works, stating "[w]e are pursuing arrangements with unaffiliated lenders for them to provide private education loans to our students and their parents who qualify."

77

178.    The statements in Paragraph 177 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

179.    On April 21, 2011, ITT issued a press release announcing its first quarter 2011 financial results.  The Company reported net income of $85.4 million, or $2.91 in diluted EPS, and revenue of $383.2 million for the first quarter of 2011.

180.    The same day, Modany and Fitzpatrick hosted an earnings calls with analysts, during which Fitzpatrick stated "[d]uring the first quarter of 2011 we made positive progress in our efforts to negotiate an additional third party private loan program for our students similar to the PEAKS Program."  On the same call Modany stated "[w]e are in the midst of negotiations with various parties relative to another program, or however you want to look at it, reloading the current program from the third-party providers.   Those discussions are ongoing, positive conversations there, and *we feel confident relative to the level of investor interest that we're*

*seeing there that they are interested parties to put together a third party loan program similar to the PEAKS program.*

181.    The statements in Paragraph 180 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

182.    On April 22, 2011, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2011 (the "1Q 2011 10-Q"), which included the same results previously reported in the Company's April 21, 2011 press release.  In the 1Q 2011 10-Q, the Company continued to downplay its exposure under the RSAs by stating that "[a]s of March 31, 2011, our recorded liability for the guarantee obligations related to those arrangements was not material." The 1Q 2011 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the PEAKS Program, the Company was "not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the PEAKS

Guarantee." The 1Q 2011 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 1Q 2011 10-Q.

183. The statements made in Paragraph 182 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, 2009 RSA, and PEAKS Program, even though GAAP required the Company to record a liability for the fair value of the guarantee at the ***inception*** of the RSA; (2) improperly accounted for this loss contingency by not recording a charge against income as required by GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the PEAKS Program and 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for its guarantee under the PEAKS Program and the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the PEAKS Program and 2007 and 2009 RSAs; (5) omitted to disclose that in September 2010, Sallie Mae had notified ITT that the charge offs under the 2007 RSA were approaching the 24% student loan-default threshold level, and it was probable that ITT would have to make payments under the 2007 RSA; (6) omitted to disclose that by March 10, 2011, ITT owed Sallie Mae over $3.5 million in guarantee payments under the 2007 RSA; (7) could have estimated the maximum potential amount of future payments that the Company could be required to make under the PEAKS Guarantee, given Defendants' access to information regarding the economy, increasing cohort default rates, and

the principal amount of loans outstanding under the PEAKS Program; and (8) as a result of (1), (2), (3), (4), (5), (6), and (7), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.  On July 21, 2011, ITT issued a press release announcing its second quarter 2011 financial results.  The Company reported net income of $79.0 million, or $2.85 in diluted EPS, and revenue of $387.9 million for the second quarter of 2011.

184.   After releasing its second quarter 2011 results on July 21, 2011, ITT hosted a conference call for analysts, media representatives, and investors during which Modany represented that the Company was booking adequate reserves.  Specifically, Modany stated: "With regard to the RSA programs of 2007, 2009, it's hard for us to say if there'll be any cash payments on that.  At this point in time we're not projecting any, but again, it's hard to say.  The trending is such that we're booking reserves accordingly based upon anticipated default rates.  And I would say we're in line with our expectations at this point . . . .  So at this point, we've got reserve books we had booked.  We adjust them every quarter, and we're accounting for that in accordance with our expectations.  So I don't see anything unusual there or anything to occur that were not accounting for in our expectations going forward."

185.   The statements made in Paragraph 184 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Modany knew that the Company had not been booking adequate reserves—in fact the Company had been continually under reserving in an effort to increase earnings, and to, among other things, maintain its Composite Score with the DOE; (2) Modany knew or recklessly disregarded readily available information that demonstrated that the Company's obligations under the 2007 and 2009 RSAs would be triggered,

81

given ITT's increasing cohort default rates and the ongoing economic crisis; (3) Modany omitted to disclose the Company's massive exposure under the 2007 and 2009 RSAs, and (4) Modany omitted to disclose that as of the time of the conference call, ITT owed Sallie Mae over $11 million in guarantee payments under the 2007 RSA.

186.   During the earnings call, Defendants again assured the market that they were *"cautiously optimistic"* about arranging new third-party financing.  Modany told analysts *"we continued our efforts to negotiate an additional third-party private education loan program for our student that is similar to the PEAKS program*.  We are cautiously optimistic regarding the prospects of a new third-party private education loan program being offered to our students in the third quarter of 2011."  Fitzpatrick echoed this statement, telling analysts that the Company was "cautiously optimistic we'll get another one [RSA] in place."

187.   The statements in Paragraph 186 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

188.    On July 25, 2011, ITT filed with the SEC its quarterly report Form 10-Q for the second quarter of 2011 (the "2Q 2011 10-Q"), which included the same results previously reported in the Company's July 21, 2011 press release.    In the 2Q 2011 10-Q, the Company continued to downplay its exposure under the RSAs by stating that "[a]s of June 30, 2011, our recorded liability for the guarantee obligations related to these arrangements was not material." The 2Q 2011 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the PEAKS Program, the Company was "not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the PEAKS Guarantee."   The 2Q 2011 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 2Q 2011 10-Q.

189.    The statements made in Paragraph 188 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) continued to understate the Company's liability for the fair value of the guarantee under the 2007 RSA, 2009 RSA, and PEAKS Program, even though GAAP required the Company to record a liability for the fair value of the guarantee at the *inception* of the RSA; (2) improperly accounted for this loss contingency by not recording a charge against income as required by  GAAP, even though Defendants knew or recklessly disregarded that it was probable that a significant liability had been incurred under the PEAKS Program and 2007 and 2009 RSAs as of the date of the SEC filing; (3) knew or recklessly disregarded readily available information such as increasing cohort default rates and declining economic conditions that established that the Company's liability for

its guarantee under the PEAKS Program and the 2007 and 2009 RSAs was, in fact, material; (4) omitted to disclose the Company's massive exposure under the PEAKS Program and 2007 and 2009 RSAs; (5) omitted to disclose that in September 2010, Sallie Mae had notified ITT that the charge offs under the 2007 RSA were approaching the 24% loan default threshold level, and it was probable that ITT would have to make payments under the 2007 RSA; (6) omitted to disclose that by June 30, 2011, ITT owed Sallie Mae over $9 million in guarantee payments under the 2007 RSA; (7) could have estimated the maximum potential amount of future payments that the Company could be required to make under the PEAKS Program, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the PEAKS Program; and (8) as a result of (1), (2), (3), (4), (5), (6), and (7), the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

190.    On October 20, 2011, ITT issued a press release announcing its third quarter 2011 financial results.  The Company reported net income of $67.3 million, or $2.48 in diluted EPS, and revenue of $360.6 million for the third quarter of 2011.

191.    During its third quarter 2011 earnings conference call on the same day Defendants continued to assure the market that new third-party lending program would materialize, stating "***discussions continue*** on pricing and execution of a new third-party private education loan program."  Modany also stated "if private lending comes through, and again, ***we're making progress there*** and hoping spreads come a little back down to earth."

192.    The statements in Paragraph 191 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was

substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

193.    Additionally, when asked on the call whether the Company would increase its direct lending if a new RSA was not secured, Modany responded "[w]ell, yeah.  Let me be very, very clear, so nobody gets confused.  That's the assumption.  That doesn't mean that's what we'll be doing, and I've tried to point that out in the comments that we've included fairly conservative scenarios.

194.    The statements in Paragraph 193 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Defendants knew that the Company was going to increase its direct lending students given its inability to secure a lender for a new third-party loan program, and (2) Defendants omitted to disclose that they knew that as a result of increasing the Company's direct lending to students the risks associated with such lending would actually materialize and bad debt expenses would skyrocket, earnings would plummet, and profits would drop.

195.     During the October 20, 2011 call, Modany also continued to assure investors that the Company was fully reserved against any liabilities it faced under the 2007 RSA, by explaining that "we feel like we're fully reserved for that at this particular point."

196.     The statements made in Paragraph 195 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Modany knew that the Company had not been booking adequate reserves—in fact the Company had been continually under reserving in an effort to increase earnings, and to, among other things, maintain its Composite Score with the DOE; (2) Modany omitted to disclose the Company's massive exposure under the 2007 RSA; and (3) Modany omitted to disclose that by October 2011, ITT owed Sallie Mae over $14 million in guarantee payments.

197.     Also during the October 20, 2011 earnings call, in response to a question regarding reserve rates used for loans issued pursuant to the PEAKS program, Modany explained that the PEAKS Program was "over-collateralized" with respect to its potential obligations under the RSAs.   In particular, Modany told investors that PEAKS "is a program that's over-collateralized in terms of the assets that are backing the notes associated with this program, and the performance on the loans has to be substantially worse than any historical experience we've seen for us to have exposure here."

198.     The statements made in Paragraph 197 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Modany knew that the PEAKS Program was not over-collateralized—in fact the Company had been continually under reserving in an effort to

increase earnings and to, among other things, maintain its Composite Score with the DOE; and (2) Modany omitted to disclose the Company's massive exposure under the PEAKS Program.

199.    On October 21, 2011, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2011 (the "3Q 2011 10-Q"), which included the same results previously reported in the Company's October 20, 2011 press release.  The 3Q 2011 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the PEAKS Program, the Company was "not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the PEAKS Guarantee."

200.    The statements made in Paragraph 199 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants could have estimated the maximum potential amount of future payments that the Company could be required to make under the PEAKS Guarantee, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the PEAKS Program.

201.    On January 26, 2012, ITT issued a press release reporting its fourth quarter and full-year 2011 financial results.  The Company reported net income of $76.0 million, or $2.87 in diluted EPS, and revenue of $368.3 million for the fourth quarter of 2011.  The Company further reported net income of $307.8 million, or $11.13 in diluted EPS, and revenue of $1.5 billion for the full-year 2011.

202.    On February 24, 2012, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2011 (the "2011 10-K"), which included the same results previously reported in the Company's January 26, 2012 press release.  The 2011 10-K continued to downplay the

Company's exposure under the RSAs by stating "based on the repayment history of our students with respect to private education loans, we do not believe our guarantee under the RSAs will have a material adverse effect on us."  The 2011 10-K also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to its obligations under the RSAs, "we are not able to estimate the maximum potential future payments that we could be required to make under the RSAs."  The 2011 10-K was signed by Modany and Fitzpatrick, along with other ITT executives.  The 2011 10-K also contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134,  that attested to the purported accuracy and completeness of the Company's 2011 10-K.

203.    The statements made in Paragraph 202 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because Defendants (1) knew that it was likely that the Company's guarantees under the RSAs would have a material adverse effect on the Company given the ongoing economic conditions, and increasing cohort default rates; and (2) could have estimated the maximum potential amount of future payments that the Company could be required to make under the RSAs, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the RSAs.

204.    The 2011 10-K also assured the market that a new RSA program was forthcoming, stating "[w]e are pursuing arrangements with unaffiliated lenders for them to provide private education loans to our students and their parents who qualify."

205.    The statements in Paragraph 204 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the

circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults, and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

206.    On March 13, 2012, ITT executives spoke with analysts, media representatives, and investors at the Credit Suisse Global Services Conference, during which CEO Modany continued to downplay ITT's exposure under the RSAs.  Specifically, Modany told investors that there is a "lack of understanding" among investors as to the Company's risk under the PEAKS Program and assured investors that "we have excessive collateralization in that portfolio such that there really isn't any expectation from our perspective that we would ever have to provide any additional funding to support that program.  Modany again insisted the Company was being conservative, claiming that the PEAKS Program was over-collateralized. In particular, Modany stated that:

> *[T]here's a level of conservatism* there that there is some expectation that there will be funds that come back to the Company, i.e., *we have more than enough excessive collateralization in there*, but we've not recorded that amount as an asset on our books.  So we have this sort of contingent asset, which goes above and beyond exposure that might be there again, a conservative way to report this and account for it.

207.    The statements made in Paragraph 206 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Modany knew that the ITT had not properly reserved for losses associated with its liability on the PEAKS program-- in fact the Company had been continually under-reserving in an effort to increase earnings and to, among other things, maintain its Composite Score with the DOE; (2) Modany omitted to disclose the Company's massive exposure under the PEAKS Program; and (3) omitted the known trend that was occurring as a result of the expiration of the PEAKS program and the lack of a new RSA in place, forcing ITT to increase its bad debt expense to account for losses that had surpassed the Company's reserves.

208.    On April 26, 2012, ITT issued a press release reporting its first quarter 2012 financial results.  The Company reported net income of $61.1 million, or $2.38 in diluted EPS, and revenue of $341.8 million for the first quarter of 2012.

209.    During an earnings call with analysts on the same day, April 26, 2012, Defendants continued to assure the market they would secure a lender for a new third-party loan program, noting "[i]n the first quarter of 2012, *we made additional progress* in our efforts to facilitate the availability of new third-party private education loan programs to our students to help them meet their gap financing needs."  Modany expressed even greater optimism than he had in previous quarters, even though he knew no lender was willing to work with the Company, explaining "***we have made progress this quarter towards working out with third parties private lending options for our students***.  And there were a number of variables we were still working on.  We've certainly reduced those numbers ***and I would say the confidence level, in terms of our perspective on the ability to get a private lending program has certainly increased since the***

90

*last time we talked."*  Modany continued, *"[s]o we're cautiously optimistic.  I used the same terms last time, but a little more positively inclined than we were last time.  I will say that much."*

210.   The statements in Paragraph 209 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

211.   Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2012 (the "1Q 2012 10-Q"), which included the same results previously reported in the Company's April 26, 2012 press release.  In the 1Q 2012 10-Q, the Company continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated," that ITT's "recorded liability for these claims and contingencies was approximately $37.5 million," and that "the substantial majority of this amount pertains to our guarantee arrangements under the RSAs."  The 1Q 2012 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the

91

guarantee obligation under the PEAKS Program, the Company was "not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the PEAKS Guarantee."  The 1Q 2012 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134,  that attested to the purported accuracy and completeness of the Company's 1Q 2012 10-Q.

212.    The statements made in Paragraph 211 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Defendants knew that the Company's reserves were not "reasonably estimated"—in fact the Company had been continually under reserving in an effort to increase earnings and to maintain its Composite Score with the DOE; (2) Defendants could have estimated the maximum potential amount of future payments that the Company could be required to make under the PEAKS Guarantee, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the PEAKS Program; and (3) as a result of (1) and (2), the Company's financial statements, including its reported equity, earnings and total liabilities were materially false and misleading.

213.    On July 26, 2012, ITT issued a press release reporting its second quarter 2012 financial results.  The Company reported net income of $46.0 million, or $2.38 in diluted EPS, and revenue of $329.8 million for the first quarter of 2012.

214.    That same day, the Company hosted an earnings call with analysts, during which Defendants continued to assure investors that a lender for a new third-party loan program would be secured, stating, "[d]uring the second quarter of 2012, we made additional progress in our efforts to facilitate the availability of new third-party private education loan programs to our

students to help them meet their gap financing needs.  ***On July 13, 2012, we came to a preliminary understanding for the creation of a new $100 million third-party private loan program to be offered to our students.***"   Modany explained that "[w]ith regard to the loan program, basically what we have is we've executed a terms sheet.  The term sheet includes a number of, if not all of, the material provisions of an agreement, so we've spend [sic] a lot of time on this negotiating all the details of the transaction that previously we would not have had document and again, executed a term sheet.  ***So I think we've made substantial progress there***."  Modany told analysts that the Company was "***hopeful that the program actually will go into place in 2012, not 2013***.  Obviously there's work to be done to dot a few Is and cross a few Ts.  But we have had a substantial amount of work that has gone into identifying all the material terms of the arrangement.  So again, hopeful that we'll see that happens in 2012."

215.   The statements in Paragraph 214 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

216.   On July 27, 2012, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2012 (the "2Q 2012 10-Q"), which included the same results previously reported in the Company's July 26, 2012 press release.  In the 2Q 2012 10-Q the Company continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $41.6 million, the substantial majority of which pertained to our guarantee arrangements under the RSAs."  The 2Q 2012 10-Q also explained that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the PEAKS Program, the Company was "not able to estimate the undiscounted maximum potential amount of future payments that we could be required to make under the PEAKS Guarantee."  The 2Q 2012 10-Q was signed by CFO Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 2Q 2012 10-Q.

217.   The statements made in Paragraph 216 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Defendants knew that the Company's reserves were not "reasonably estimated"—in fact the Company had been continually under reserving in an effort to increase earnings and to maintain its Composite Score with the DOE; (2) Defendants could have estimated the maximum potential amount of future payments that the Company could be required to make under the PEAKS Guarantee, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the PEAKS Program; and (3) as a result of (1) and (2) the Company's

consolidated financial statements, including its reported earnings, equity and liabilities were materially false and misleading.

218.    The 2Q 2012 10-Q also continued to assure the market that a new third-party lending program was forthcoming, stating **"[w]e are pursuing arrangements with unaffiliated lenders** for them to provide private education loans to our students and their parents who qualify."

219.    The statements in Paragraph 218 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

220.    On October 25, 2012, ITT issued a press release reporting its third quarter 2012 financial results.  The Company reported net income of $42.9 million, or $1.83 in diluted EPS, and revenue of $314.7 million for the third quarter of 2012.

221.    The Company hosted an earnings call with analysts that same day, during which they continued to assure the market a new third-party lending program was forthcoming, stating

"***conversations are ongoing*** with regard to the creation of a new third-party private student loan program for our students."

222.    The statements in Paragraph 221 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

223.    On October 29, 2012, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2012 (the "3Q 2012 10-Q"), which included the same results previously reported in the Company's October 25, 2012 press release.  In the 3Q 2012 10-Q, the Company also continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $44.3 million, the substantial majority of which pertained to our guarantee arrangements under the RSAs." The 3Q 2012 10-Q also claimed that because various factors affected the maximum potential future payments the Company could be required to make pursuant to the guarantee obligation under the PEAKS Program, the Company was "not able to

estimate the undiscounted maximum potential amount of future payments that we could be required to make under the PEAKS Guarantee." The 3Q 2012 10-Q was signed by Fitzpatrick and contained certifications by Modany and Fitzpatrick substantially identical to that described in paragraph 134, that attested to the purported accuracy and completeness of the Company's 3Q 2012 10-Q.

224.    The statements made in Paragraph 223 were materially false and misleading when made, and/or omitted material information to make the statements not misleading under the circumstances in which they were made because (1) Defendants knew that the Company's reserves were not "reasonably estimated"—in fact the Company had been continually under reserving in an effort to increase earnings and to, among other things, maintain its Composite Score with the DOE; (2) Defendants could have estimated the maximum potential amount of future payments that the Company could be required to make under the PEAKS Guarantee, given Defendants' access to information regarding the economy, increasing cohort default rates, and the principal amount of loans outstanding under the PEAKS Program and (3) as a result of (1) and (2) the Company's consolidated financial statements, including its reported earnings, equity, and liabilities were materially false and misleading.

225.    The 3Q 2012 10-Q also continued to assure the market that a new third-party lending program was forthcoming, stating "*we are evaluating programs with unaffiliated lenders* for them to provide private education loans to our students and their parents who qualify."

226.    The statements in Paragraph 225 were materially false and misleading when made, and/or omitted material information to make the statement not misleading under the circumstances in which they were made because (1) Defendants omitted to disclose that it was

substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults and (2) Defendants continued to assure the market a new third-party lender program was forthcoming even though they knew or recklessly disregarded that it was substantially unlikely that ITT would be able to secure a lender for a new third-party loan program because lenders were not willing to work with the Company given the high risk associated with lending to ITT's high credit risk students and the Company's high rate of student-loan defaults.

227.   Finally, contrary to Modany's and Fitzpatrick's certifications discussed in the above paragraphs, ITT's financial statements filed during the Class Period did not comply with GAAP for the reasons stated above, and accordingly were false and misleading for this additional reason.

## VIII.   <u>THE TRUTH BEGINS TO EMERGE</u>

228.   The truth regarding ITT's significant liability under the RSAs first began to emerge on July 26, 2012, when, as a result of its inability to find unaffiliated lenders to fund a new RSA, the Company reported in a press release that it had begun lending to students directly and, as a result, had to increase its allowance for doubtful accounts and increase its bad debt expense.   The series of partial disclosures that started with July 26, 2012, finally clued the market into the series of misstatements and omissions that ITT had made concerning its true business model and its desire to keep liabilities off of its books and limit the associated expenses with loan-defaults on its income statement.

229.    These disclosures were the first time the Defendants revealed that the Company's liability under the RSAs was more significant than ITT had previously represented.  Indeed, in response to these disclosures, an analyst at PAA wrote that ITT faced significant risks from its contingent liabilities under the RSAs—far greater exposure than the negligible risks the Company had described to investors.  *See* Bradley Safalow*, ESI: Where Did the Cash Go? ESI's Leverage Looms Large as Prospective FCF Generation Dwindles, Reducing Target to $30*, PAA Research LLC, July 26, 2012.  According to PAA, these risks were so serious that it urged management to act immediately in order to solidify the Company's capital position. The report noted "[g]iven how quickly the company's liquidity position has deteriorated and the likelihood that the earnings power of the company will erode further, a 'death spiral' is no longer out of the question."  A Credit Suisse analyst further cautioned "we continue to worry declining upfront payments on Title IV student aid and increased balance sheet lending may cause free cash flow/share to fall well below earnings in [fiscal year] 2012 and beyond."  Credit Suisse Analyst Report, July 26, 2012.

230.    Following these disclosures the Company's stock declined $7.65 per share, or 15.2%, on large trading volume of more than 1.8 million shares, or approximately 2 times the average trading volume of ITT stock during the Class Period, to close at $42.78 per share on July 26, 2012, representing a market capitalization loss of approximately $180 million.

231.    Nonetheless, Defendants continued to conceal the true extent of its RSA liabilities and continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $41.6 million, the substantial majority of which pertained to our guarantee arrangements under the RSAs."

232.   A few days after ITT's press release, at some point on July 30, 2012, the Senate HELP Committee published the Senate HELP Committee Report focusing exclusively on the for-profit educational industry.   The report further revealed the true nature of ITT's business model that remained hidden behind Defendants' false and misleading statements concerning the Company's business model and liabilities.

> ***ITT is one of the most expensive companies examined by the committee,*** *and it is not clear that the value of the education justifies the cost.* ***The cost of attending ITT is so high that the company has created its own loan program to enable students to borrow money in excess of Federal lending limits*** .   While the retention rates for both the Associates and Bachelor's program are slightly better than average, ***the company has a high rate of student loan default*** , with 26 percent of students defaulting within 3 years of entering repayment. ***This likely reflects the high cost of the programs offered, and an inability on the part of some students to find jobs that allow them to repay the debt they incur*** . ***The company makes this work*** by utilizing some of the most disturbing recruiting tactics among the companies examined, and ***by taking very creative approaches to complying with the 90/10 limitation on revenue received from Federal financial aid programs.   Meanwhile, the company devotes the largest share of revenue to profit of any company analyzed at 37 percent.   Taken together, these issues cast serious doubt on the notion that ITT's students are receiving an education that affords them adequate value relative to the cost*** , and calls into question the $1.1 billion investment American taxpayers made in the company in 2010. (emphasis added)

233.   As the market absorbed and digested the significance of the Senate Report and ITT's true business model, the Company's stock declined sharply, closing at $39.99 on July 30, 2012, a 7.92% drop from the prior trading day's closing of $43.43.   On July 31, 2012 ITT closed at $38.82, representing a drop of 2.93% from the prior day's close.   Between the close of the stock price on July 27, 2012 at $43.43 and the closing stock price on July 31, 2012 at $38.82,

ITT's stock fell a total of 10.61% representing a total market capitalization drop of $107.5 million.

234.    On the same day as the Senate Report, Blum Capital filed an SEC Form 13D/A amending its prior Form 13D/A filed on February 28, 2012. The report amended Blum Capital's earlier filing to reflect changes in the number of outstanding ITT shares, based on ITT's Quarterly Report for the second quarter of 2012, filed with the SEC on Form 10Q on July 27, 2012 and removed the language found in its prior SEC 13D/A which disclosed among other things that it might assist ITT in locating new credit or financing partners.

235.    Less than three months later, October 25, 2012, before the market opened, Defendants again disclosed more partial truths concerning the nature of ITT's financial health and business model when it disclosed that the Company's revenues for the third quarter of 2012 were down 12.7% as a result of sharp decreases in student enrollment. In the 8-K filed before the market opened for trading, ITT reported that its bad debt expense had increased by 350 basis points. This unprecedented increase in bad debt expense shocked the market. One analyst's evaluation put it very clearly:

> Investors should be increasingly concerned about the company's ability to meet is rapidly growing financial obligations (RSA's PEAKS, credit facility) over the next 3 years. As the company's earnings base retrenches, we think ESI's ability to generate cash on a sustained basis will be severely limited in the absence of some sort of third party financing for its students.

PAA Research LLC Analyst Report, October 25, 2012.

236.    Following the disclosure of the Company's increased bad debt expense as a result of its recently disclosed substantial increase in direct student-lending and the materialization of the risk of exposure to student lending losses, the price of ITT stock dropped $2.42 per share, to

close at $22.69 per share on October 25, 2012, representing a market capitalization loss of approximately $56.4 million.

237.   An analyst from JP Morgan made a similar observation, noting that "FCF [free cash flow] almost fully disappeared . . . coming down from $272mln in the first three quarters of 2011 to $4mln in the first three quarters of 2012.  ESI's free cash conversion ratio . . . has declined from 120% in 4Q11 to 41% in 3Q12, reflecting the challenges of generating cash flow from accounting earnings in the absence of a third party financing vehicle for student funding."  JP Morgan Analyst Report, *Challenging 3q12, More Uncertainty About Institutional Loans and Timing of Start Inflection*, October 26, 2012.

238.   As a result of the market's further digestgsting the Company's announcement of its increased exposure to bad debt as a result of mounting student loan defaults, ITT stock dropped $1.20 per share, to close at $21.49 per share on October 26, 2012, representing a market capitalization loss of approximately $28 million.  Following the disclosures of October 25th and 26th 2012, ITT incurred a market capitalization loss of $84.4 million.

239.   On the same day, in the conference call discussing the Company's third quarter 2012 financial results, Modany continued to reassure investors that the Company's liabilities under the RSAs were limited.  Specifically, Modany stated that with respect to the Company's private lending, he "wouldn't say that we've seen any material degradation in that.  It hasn't really changed materially."

240.   Then, on January 4, 2013, ITT filed a current report on Form 8-K disclosing that it had settled an action brought by Sallie Mae relating to ITT's obligations under the 2007 RSA.  The 2012 Form 10-K disclosed that ITT agreed to pay Sallie Mae $46 million –nearly double the amount Sallie Mae requested in order to "absolve [the Company] from any further obligations

with respect to our guarantee under the 2007 RSA." In connection with this settlement, ITT also took an after-tax charge of $13.2 million, or $0.56 per share in connection with the settlement. The Company took an additional $71.1 million charge related to the 2009 RSA and PEAKS Program in the quarter ended December 31, 2012.

241. According to PAA, the Company's failure to account for its actual liability under the 2007 RSA caused ITT to effectively overstate its earnings by $0.06-$0.08 per share each quarter for the previous two years. Bradley Safalow, *ESI: The True Nature of ESI's Educational Outcomes Finally Coming to Light, Liquidity Position Looks Tenuous, Taking Price Target to $10*, Jan. 6, 2013. PAA also stated that the settlement announcement "raises significant concerns in our view about [ITT's] existing reserves for its off-balance sheet liabilities and ultimately the company's ability to meet those obligations." PAA predicted that it was highly likely that loans issued under the 2009 RSA and the PEAKS Program would experience larger losses than the 2007 RSA, and that ITT could "be on the hook for $100's of millions of payments [on the 2009 RSA and PEAKS Program] over the next 2-3 years" and noted that the Sallie Mae settlement suggested that the cumulative loss rates on ITT's 2009 and 2010 RSAs could be as high as 80%. Credit Suisse analysts also predicted additional losses, explaining "we believe that ITT had reserved something, but not enough, related to this lawsuit. Management believes ~180M of loans were made under the 2007 RSA; we estimate that ITT had already expensed 35%+ reserves on these loans and that actual defaults were significantly higher." *Student Loan Charge/Payment A Negative; Reduce Target to $14*, January 7, 2013.

242. Following the disclosure of the Sallie Mae settlement and the implications for the Company's cumulative liability under all of the RSAs, the price of ITT stock dropped $3.72 per

share, or **19.2%,** to close at $15.57 per share on January 7, 2013, resulting in a market capitalization drop of $86.77 million.

243.    Later that month, on January 24, 2013, ITT released its results for the fourth quarter and year ended December 31, 2012.  The Company reported a fourth quarter loss of $0.41 per share.  The Company's fourth quarter results were negatively impacted by $103 million in charges related to the Sallie Mae Settlement, the 2009 and the PEAKS Program, which added approximately $88 million of additional reserves for the 2007 RSA, 2009 RSA, and the PEAKS Program.  Defendants said the increase in the contingency liability reserve to $78 million reflected an approximately ***60% default rate*** on the combined loan portfolios associated with the 2009 RSA and the PEAKS program.

244.    Finally, after the market closed on February 22, 2013, ITT filed an annual report on Form 10-K in which it disclosed that it had received a subpoena from the SEC on February 8, 2013 that requested the production of document and communications that, among other things, "relate to our actions and accounting with; (a) agreements that we entered into with the 2009 Entity to create the 2009 Loan Program, including, without limitation, the 2009 RSA; and (b) agreements that we entered into to create the PEAKS Program."  The Company also disclosed that it had received a CID from the MAG. The MAG is investigating whether ITT violated Massachusetts law by "engaging in unfair or deceptive practices in connection with marketing and advertising job placement and student outcomes, the recruitment of students, and the financing of education."

245.    During the Class Period, Defendants remained steadfast in their position that the Company was not required to include the liabilities from the 2009 RSA or the PEAKS Program on its consolidated balance sheet.  By refusing to include liabilities related to the RSAs on its

consolidated balance sheet, the Company improperly understated its assets and liabilities and overstated its financial strength.  PAA analyst Bradley Safalow was "stunned" to learn that the liabilities under the PEAKS Program had not already been consolidated onto ITT's balance sheet, and went on to summarize the ramifications of improperly excluding the PEAKS Trust from the Company's consolidated financial statements as follows:

> . . . **If ESI is deemed the sole economic beneficiary, PEAKS would lose its off-balance sheet treatment**.  The company has always argued that the equity holder in the PEAKS trust (originally the Access Group) was an economic beneficiary of the trust.  Unfortunately for ESI, the Access Group wrote down the value of its equity stake in the PEAKS trust to zero last year and the company has already written down the carrying value of the Subordinated Notes purchased from the trust.  At this stage, we're hard pressed to identify another economic beneficiary of the PEAKS trust aside from ESI. . . . **We are stunned that the PEAKS trust was not consolidated onto ESI's balance sheet. Based on the decision to issue a subpoena related to PEAKS and the 2009 RSA, perhaps the SEC is too.** (emphasis added)

246.    Following the announcement of the SEC subpoena, ITT's stock price fell $3.10 per share, or **16.6%,** to close at $15.53 per share on February 25, 2013, resulting in a market capitalization drop of $72.45 million.

247.    The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the Company had tremendous liabilities under the RSAs;

(b)     the Company continually downplayed its risks associated with the RSAs and assured investors that it had properly set aside adequate and conservative reserves to meet its liabilities under the RSAs;

(c)     the Company was improperly accounting for the guarantees under the  RSAs;

(d)      the Company knew or recklessly disregarded that it would be unable to secure a

new lender for alternative third-party lending programs once the existing RSAs expired; and

(e)      that by failing to book adequate reserves for its liabilities under the RSAs, the

Company misrepresented its earnings and financial position throughout the Class Period.

248.   As a result of Defendants' false and misleading statements, ITT common stock

traded at artificially inflated levels during the Class Period.  When Defendants revealed that ITT

had not been booking adequate reserves, and that it was exposed to massive liabilities under the

RSAs, the price of ITT common stock fell more than 85% from its Class Period high.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

249.   During the Class Period, Defendants had both the motive and opportunity to

commit fraud.  They also had actual knowledge of the false and misleading statements they made

and the material information they omitted to disclose, or acted with reckless disregard for the

true information known to them at the time.   In so doing, Defendants committed acts, and

practices and participated in a course of business that operated as a fraud or deceit on purchasers

of ITT common stock during the Class Period.

### A.   The Facts Give Rise to a Strong Inference that Defendants Acted with Scienter

250.   The facts, viewed collectively, give rise to a strong inference that Defendants

acted knowingly, or at least recklessly, when they (1) downplayed the Company's massive risk

posed by the RSAs, (2) materially misrepresented that the Company was booking adequate

reserves to meet any potential liabilities, and (3) materially misrepresented the Company's

financial condition by blatantly disregarding the applicable GAAP provisions, and (4) omitted to

disclose that it was substantially unlikely that the the Company could secure a lender for a new

third party lending program.

251.   Defendants' scienter is demonstrated by the facts that (1) the Individual Defendants are both CPAs and financial and accounting experts with many years of experience as CFOs and working with technical and complicated accounting rules; (2) Defendants closely monitored student-loan default rates, even contracting with GRC to lower their reportable default rate, as well as the ongoing economic conditions and knew or recklessly disregarded that ITT's student-loan default rates were continually increasing to the point where ITT's obligations under the RSAs would be triggered and the Company would be unable to secure a lender for a new third party lending program; (3) Defendants had the motive and opportunity to commit fraud; (4) insider trading sales made during the Class Period were highly unusual in scope and timing; and (5) Modany and Fitzpatrick were micromanagers who were known throughout the Company for their focus on and interest in financial metrics.

### 1.   The Individual Defendants Had Extensive Accounting Knowledge and were Familiar with GAAP

252.   Both Modany and Fitzpatrick were aware of, and understood, the applicable GAAP provisions that applied to the RSAs, as both are CPAs with years of accounting and financial experience.  Modany has been the CFO of three Companies, including ITT.  He has a bachelor's degree in Accounting with an additional program focus in Finance.  Prior to becoming ITT's CEO, he held numerous accounting and finance-oriented positions within the Company including CFO, Director of Finance, and COO.  Before his employment at ITT, Modany was the CFO and COO of Cerebellum Software Co., a software development and professional services company.  Modany was also the CFO, Executive Vice President, Director of Finance, and Controller of a food distribution and retail merchandising company known as Consolidated Products System, Inc.  Modany began his career at Arthur Anderson in the audit/financial consulting division where he "served as the S[enior] Auditor In-Charge for the two largest audit

engagements of the Pittsburgh office." Likewise, Fitzpatrick also has extensive experience in the field of accounting and finance. In addition to being the CFO at ITT, Fitzpatrick has been the Company's Principal Accounting Officer since 2005. Prior to joining ITT, he was a Senior Vice President and Controller at Education Management Company. Like Modany, Fitzpatrick worked at Arthur Andersen early in his career as a senior manager, where he provided audit, accounting, and business advisory services to clients.

253.   Modany's and Fitzpatrick's financial and accounting expertise is further demonstrated by the ease with which they answered questions about the Company's financials and accounting practices during quarterly earnings calls. The Individual Defendants were also sophisticated enough to sign and certify the accuracy of the Company's financial statements during the Class Period. Further, Fitzpatrick signed the Company's correspondence with the SEC, which discussed the application of GAAP's complex and technical variable interest entity ("VIE") rules to the PEAKS Trust and the 2009 RSA.

254.   Given Modany's and Fitzpatrick's extensive professional experience in accounting and finance, and their demonstrated continued sophistication in these fields during the Class Period, it is not plausible that they misunderstood or were unaware of the relevant GAAP provisions, nor is it plausible that they would not have been aware of the Company's repeated and blatant violations of those provisions.

2.      **Defendants Closely Monitored Student-Loan Default Rates as well as Ongoing Economic Conditions and Therefore Knew or Recklessly Disregarded that ITT's Obligations Under the RSAs Would Be Triggered and the Company Would Be Unable to Secure a Lender for a New Third Party Lending Program**

255.    As set forth herein, Defendants closely tracked, through the Default Management Group and monthly OR meetings, the performance of the Company's student lending division, including student-loan default rates and their effects on the Company's financial performance.

256.    Defendants also had access to monthly reports provided by the servicer and the trust regarding loans issued under the PEAKS Program, as evidenced by an August 18, 2010 response to an SEC Comment letter (signed by Fitzpatrick), which stated the following:

> The Servicer provides monthly reports to the Trust and the Company, which reports provide loan disbursement and repayment (including delinquency) . . . .  The Company also receives monthly reports from the Trust that contain information related to the Trust's assets and liabilities, as well as loan repayment performance information . . . .  The Company utilizes both types of reports to monitor the loan repayment performance in order to assess and make any modifications to its accounting for its guarantee and subordinated note in connection with the preparation of its financial statements.

257.    Moreover, Defendants closely tracked the ongoing economic conditions and admitted that the deteriorating economy was negatively impacting the Company's student-loan default rates.  The Company's 2009, 2010, 2011, and 2012 Form 10-Ks, signed by Modany and Fitzpatrick, clearly state ***"[c]urrent and future economic conditions in the United States could also adversely affect our cohort default rates.***  Increases in interest rates, declines in individuals' incomes, and job losses for our students and graduates or their parents ***have contributed to, and could continue to contribute to, higher default rates on student loans***"  (emphasis added).

258.    However, these boiler plate "risk factors" failed to disclose what Modany and Fitzpatrick were most assuredly aware of or recklessly disregarded, that as a result of rising

default rates, ITT could not and would not find a lender for a new third-party loan program to replace the PEAKS program and would be forced to rely on direct student lending in hopes of keeping up student enrollment.

259.    Defendants also closely tracked the Company's student-loan cohort default rates in order to ensure ITT remained eligible for Title IV Federal student aid—a critical element of ITT's revenue stream.  Tracking was done by the Default Management Group, and the Group's findings were reported to Modany and Fitzpatrick during monthly OR meetings, as discussed in Paragraphs 16 and 100-102. Additionally, the Risk Factors section of each Form 10-K filed during the Class Period included a table illustrating the increase in two-year cohort default rates, and a discussion regarding how the Company could lose its eligibility to participate in Title IV Programs if its student-loan default rates are too high.   Both Modany and Fitzpatrick signed the Form 10-Ks and attested to their accuracy, and therefore either knew or recklessly disregarded that ITT's student-loan default rates were rapidly increasing and that the Company's obligations under the RSAs would be triggered and the Company would be unable to secure a new third party lender.

260.    Moreover, as discussed in Paragraph 73, starting this year, the DOE will determine eligibility for Title IV funds based on three-year cohort default rates, as opposed to the current two-year cohort default rate metric.  Although the rule did not go into effect until this year, the DOE started publishing three-year cohort default rates in 2009. Accordingly, Defendants began to closely monitor and estimate the Company's three-year cohort default rates. The 2011 and 2012 Form 10-Ks specifically acknowledge that ITT's "Three-Year CDRs [cohort default rates] will likely be higher than our institutions Two-Year CDRs [cohort default rates] because of longer repayment and default histories, among other factors."   Modany and

110

Fitzpatrick signed the Form 10-Ks and attested to their accuracy, and therefore either knew or recklessly disregarded that given the high rate of student loan defaults, the Company's obligations under the RSAs would be triggered and the Company would be unable to secure a new third party lender.

261.   Modany in particular was known for tracking all company financial statistics. According to CW#4, Modany was an excessive tracker, whose business approach was to track and quantify everything.  CW#4 explained that if something was not quantifiable, Modany did not think it was worth any value.  CW#6 described Modany as a "numbers guy" who was extremely focused and reliant on data and numbers, and always asking "what is the data telling us?"

262.   Given the Defendants' monthly review of student-loan performance, and their constant tracking and monitoring of all data, specifically ongoing economic conditions and cohort default rates, they either knew or recklessly disregarded that the Company's obligations under the RSAs would be triggered, and the Company would be unable to secure a lender for a new third-party loan program.

### 3.      Defendants Had the Motive and Opportunity to Commit Fraud

263.   In addition to the foregoing facts, all of which support a strong inference of scienter, the Individual Defendants also had the motive and opportunity to conceal the Company's significant and growing liabilities under the RSAs.  By refusing to follow applicable GAAP rules and concealing the Company's massive and mounting exposure under the RSAs, Defendants were able to materially overstate the Company's financial health by overstating the Company's earnings.

264.    Defendants Modany and Fitzpatrick directly benefitted from the Company overstating its financial position.  By using the RSAs to falsely inflate ITT's balance sheet, the Company was able to record large revenues during the Class Period.  As discussed in Paragraph 67, ITT devotes a significant portion of its revenue to executive compensation.  Without the RSAs, ITT would not have been able to record the high revenues, cash flow, and false earnings that ultimately resulted in Modany and Fitzpatrick's exorbitant compensation packages.

265.    Moreover, as discussed in Paragraphs 114-15, Defendants were motivated to under-reserve in order to maintain the Company's Composite Score with the DOE.  Had ITT booked appropriate reserves in 2012, its composite score would have fallen below 1.5, and it would have been subjected to additional oversight from the DOE, including cash monitoring.  In order to avoid this oversight and to continue to conceal its improper accounting tactics, Defendants knowingly, or at least recklessly, failed to record an adequate reserve for the Company's growing liabilities under the RSAs.

### 4.    Insider Trading Sales by Modany and Fitzpatrick During the Class Period Were Highly Unusual in Scope and Timing, and Raise a Strong Inference that They Had Knowledge of the Company's Actual Risk Under the RSAs

266.    In the year leading up to the SEC subpoena, Defendants Modany and Fitzpatrick sold more than $2 million worth of ITT common stock pursuant to two 10b5-1 Plans adopted during the Class Period.  Although sales pursuant to 10b5-1 Plans are permitted under SEC rules, abuses of such plans are pervasive.  A recent investigation by the Wall Street Journal found that many executives at public companies have misused these plans to gain or avoid millions of dollars in losses while in possession of material nonpublic information.  As a result, the SEC and certain U.S. Attorney's Offices have launched investigations into the potential abuses of these plans.

112

267.    The timing under which the 10b5-1 Plans ("Plans") were adopted and the timing of the Individual Defendants' sales under those plans is suspicious and supports the fact that the Plans were enacted in order to allow the Individual Defendants to take advantage of material non-public information.  Specifically, the Plans were adopted to allow the Individual Defendants to make trades while ITT's common stock was artificially inflated and before Defendants publicly disclosed that, unknown to the investing public, ITT was subject to massive liabilities under the RSAs and that the Company had failed to book adequate reserves for those liabilities— facts which were known to or recklessly disregarded by the Individual Defendants when they entered into the Plans.  In fact, the first 10b5-1 Plan was adopted on November 8, 2011 – *just one day after ITT received a $2 million dollar claim from Sallie Mae* for amounts due under the 2007 RSA—bringing the Company's total amount due to Sallie Mae under the 2007 RSA to $18 million dollars.  The second 10b5-1 Plan was adopted on February 7, 2012 – just *one day after ITT received a $1.6 million dollar claim from Sallie Mae* for amounts due under the 2007 RSA—bringing the Company's total amount due to Sallie Mae under the 2007 RSA, which had been steadily increasing, to $23.6 million.  Additionally, Modany's sales pursuant to the 10b5-1 Plans were the *first two insider sales he ever made, even though he had been an insider since 2005*.  Modany's sales pursuant to these 10b5-1 Plans resulted in net proceeds of $1.6 million, while Fitzpatrick's sales resulted in net proceeds of $426,000.  The adoption of the 10b5-1 Plans, and the sales pursuant to those plans were highly unusual in scope and timing and raise a strong inference of scienter.

268.    Additionally, on February 13, 2013, *five days after ITT received the SEC subpoena, but eight days before the Company disclosed the subpoena to the public* in its 2012 Form 10-K, Modany disposed of 2,331 shares at $18.25, for $42,540 in gross sales.  Fitzpatrick

disposed of 431 shares at $18.25, for $7,861 in gross sales.  Upon disclosure of the subpoena, ITT's stock price fell $3.10 per share, or 16.6%.  Defendants unambiguously disposed of these shares while in possession of material, non-public information, that they knew would cause their stock to drop once disclosed to the public.

### 5.   Modany and Fitzpatrick Were Micromanagers

269.   Defendant Modany had a reputation as a micromanager who, according to CW#2, was "pretty much into everything" at the Company, including interviewing campus level employees with whom he would ultimately have little to no contact with.  For example, much to CW #2's surprise, she was flown to headquarters just to interview with Modany before being offered a position on an ITT campus in Fresno, California.  According to CW#3, Modany was "the most, biggest micromanager [CW#3] had ever seen."  CW#3, who worked as a Benefits Administrator, explained that Modany would review every possible medical plan that was under consideration, rather than waiting for top choices selected by the benefits department.  CW#1 also described Defendant Modany as a "micromanager" who was "very hands on" and was involved in even the most minor details of the Company.  According to CW#1, "we could not even move our cubicles without his permission." CW#5 stated that he had never been so tightly managed in his life.

270.   Several CWs noted that Modany and Fitzpatrick ran ITT in an extremely centralized manner.  According to CW#7 Modany and Fitzpatrick's management style was "leave your brain at the door," meaning they wanted no input on policy direction, strategy, or design from lower-level employees, leading to incredibly scripted roles for employees.

271.   CW#5 characterized the Company as very isolated.  He explained that Modany tightly managed the Company and dealt with his direct reports in a very isolated manner.

Likewise, CW#6 described the Company as "siloed," explaining that there was very little communication between different departments.   CW#7 described Modany as a very controlling individual, who made it clear that he did not want staff asking questions about issues not directly within their purview.   This micromanagement style extended to ITT's loan default tracking.  As explained by CW#7, Modany and Fitzpatrick had regular meetings with Greg Wallis and the Default Management Group which CW#7 was aware of based on written agendas that he had seen.

272.   Given Modany and Fitzpatrick's involvement in Company minutia, including the Default Management Group, and their fixation on tracking Company statistics, it belies logic to believe that they were not aware of the Company's increasing student-loan default rates or that they was not directly involved in the decision-making surrounding the accounting for the RSAs.

## X.   <u>LOSS CAUSATION</u>

273.   During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of ITT's common stock, and operated as a fraud or deceit on class-period purchasers of ITT common stock by materially misrepresenting and concealing the Company's massive risk under the RSAs, materially misrepresenting that the Company was booking adequate reserves to meet any potential liabilities, and materially misrepresenting the Company's financial condition by purposefully disregarding applicable GAAP provisions.   As a result, Lead Plaintiffs and members of the Class purchased ITT common stock at artificially-inflated prices and were damaged when the artificial inflation gradually dissipated as a series of disclosures entered the market concerning the Company's failure to adequately record reserves for its obligations under the RSAs and reserves for potential defaults for lending to students directly.

274.   Specifically, on July 26, 2012, ITT issued a press release with its results for the second quarter of 2012.  As discussed in Paragraphs 18 and 228-230 above, the Company was forced to disclose to investors the poor performance of loans it made <u>directly</u> to students after the Company was unable to secure lenders to fund a new RSA following the PEAKS Program expiration.  By disclosing the poor performance of the direct loans, the Company implicitly revealed to investors for the first time that the loans previously issued through the RSAs had performed so poorly that the Company was forced to increase its allowance for doubtful accounts and its bad debt expense.  Following this disclosure, ITT's stock price dropped $7.65 per share, or 15.1%, to close at $42.78 per share on July 26, 2012, representing a market capitalization loss of approximately $180 million.

275.   A few days after ITT's press release, on July 30, 2012, the Senate HELP Committee published the Senate HELP Committee Report focusing exclusively on the for-profit educational industry.  The report further revealed the true nature of ITT's business model that remained hidden behind Defendants' false and misleading statements concerning the Company's business model and liabilities.

276.   As the market absorbed and digested the significance of the Senate Report and ITT's true business model, the Company's stock declined sharply, closing at $39.99 on July 30, 2012, a 7.92% drop from the prior trading day's closing of $43.43.  On July 31, 2012 ITT closed at $38.82, representing a drop of 2.93% from the prior day's close.  Between the close of the stock price on July 27, 2012 at $43.43 and the closing stock price on July 31, 2012 at $38.82, ITT's stock fell a total of 10.61% representing a total market capitalization drop of $107.5 million.

277.   On October 25, 2012, before the market opened, the Company disclosed that its revenues for the third quarter of 2012 were down 12.7% as a result of sharp decreases in student enrollment.   In the 8-K filed before the market opened on that date, ITT reported that their bad debt expense increased by 350 basis points.   This unprecedented increase in bad debt expense shocked the market.   Following the disclosure of the Company's increase in its bad debt expense as a result of the increase in direct financing and the materialization of risks associated with direct financing, the price of ITT stock dropped $2.42 per share, to close at $22.69 per share on October 25, 2012, representing a market capitalization loss of approximately $56.4 million.   As the markets further absorbed the Company's announcement of its increased exposure to bad debt as a result of mounting student loan defaults, ITT stock dropped and additional $1.20 per share, to close at $21.49 per share on October 26, 2012, representing a market capitalization loss of approximately $28.0 million.   Following the disclosures of October 25 and 26, ITT incurred a market capitalization loss of $84.4 million.

278.   Almost six months later, on January 7, 2013, the Company announced that it had settled an action brought by Sallie Mae arising out of the Company's guarantee obligations under the 2007 RSA for $46 million.   In connection with the settlement, ITT took a $13.2 million after-tax charge for the 2007 RSA, as well as an additional $71.1 million charge to establish a reserve for the 2009 and 2010 RSAs.   This disclosure finally corrected the Company's previous statements, as described herein, that ITT was conservatively reserved for losses under the RSA's Following this disclosure, the price of ITT stock dropped $3.72 per share, or 19.2%, to close at $15.57 per share on January 7, 2013.

279.   Finally, ITT disclosed in its Form 10-K filed with the SEC after the close of market on February 22, 2013, that it had received a subpoena from the SEC on February 8, 2013.

The subpoena requested the production of documents relating to ITT's accounting for the 2009 and 2010 RSAs.  Following this disclosure, ITT's stock fell $3.10 per share, or 16.6%, to close at $15.53 per share on February 25, 2013, representing a market capitalization loss of $72.45 million.

280.    In sum, as news leaked into the market concerning the truth about ITT's financial condition and liabilities, the Company's stock price fell by more than 88%, causing a loss of more than $4.795 billion in market capitalization from its height of $5.175 billion in February 2009 to $362.23 million at the close of the Class Period.

281.    As set forth above, each of these stock price declines was caused by the disclosure of previously concealed information relating to the material misstatements and omissions alleged herein.

282.    Had Lead Plaintiffs and the Class known of the material adverse information alleged herein, they would not have purchased ITT common stock at artificially-inflated prices and they proximately suffered losses as the previously withheld information was revealed to the market.

## XI.   **APPLICABILITY OF PRESUMPTION OF RELIANCE - FRAUD ON THE MARKET DOCTRINE**

283.    At all relevant times, the market for ITT common stock was an efficient market for the following reasons, among others:

   a.      As a regulated issuer, ITT filed periodic public reports with the SEC;

   b.      ITT regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.   ITT was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

d.   ITT common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "ESI."

284.   As a result of the foregoing, the market for ITT common stock promptly digested current information regarding ITT from all publically available sources and reflected such information in ITT's stock price.  Under these circumstances, all purchasers of ITT common stock during the Class Period suffered similar injury through their purchase of ITT common stock at artificially inflated prices and a presumption of reliance applies to Lead Plaintiff's Exchange Act Claims.

## XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE – AFFILIATED UTE DOCTRINE

285.   Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon the omission of material facts that defendants had a duty to disclose namely, the substantial likelihood that ITT would not be able to secure a lender to fund a new third party lending program after the expiration of the PEAKS program and the actual negative impact direct lending would have on ITT's financial health once the Company had to use direct financing to make up the shortfall created by the expiration of the RSAs.

## XIII.   **NO SAFE HARBOR**

286.    The statutory safe harbor applicable to forward looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Second Consolidated Amended Complaint.

287.    Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward looking statements, ITT's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

288.    Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as ITT's Forms 10-K and 10-Q issued throughout the Class Period.

289.    To the extent that any of the false and misleading statements alleged herein can be construed as forward looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

290.    To the extent that any of the false and misleading statements alleged herein can be construed as forward looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward looking statement was false or misleading and the forward looking statement was authorized and/or approved by an executive officer of ITT who knew that the forward looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as

they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XIV.  COUNT I: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

291.   Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

292.   This Count is asserted on behalf of all members of the Class against the Defendants for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

293.   During the Class Period, Defendants disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

294.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of ITT common stock during the Class Period.   As detailed herein, the misrepresentations contained in, or the material facts

omitted from, those statements include, but were not limited to, the Company's publicly reported earnings figures, the Company's liabilities, and the Company's overall financial strength.

295.   The Defendants, individually and in concert, directly and indirectly, by the use or means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of ITT common stock, which were intended to and did: (a) deceive the investing public, including Lead Plaintiffs and the class, regarding, among other things, ITT's artificially inflated statements of its financial strength and understated liabilities; (b) artificially inflate and maintain the market price of ITT common stock; and (c) cause Lead Plaintiffs and other members of the class to purchase ITT common stock at artificially inflated prices and suffer losses when the true facts became known.

296.   Lead Plaintiffs and the Class have suffered damages in that, in either in direct reliance on the integrity of the market, or direct reliance on the Defendants' material omissions, they paid artificially inflated prices for ITT common stock, which inflation was removed from the stock when the true facts became known.  Lead Plaintiffs and the Class would not have purchased ITT common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Exchange Act Defendants' misleading statements.

297.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of ITT common stock during the Class Period.

## XV.    COUNT II: FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

298.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

299.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

300.    The Individual Defendants acted as controlling persons of ITT within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about ITT, the Individual Defendants had the power and ability to direct the management and activities of the Company and its employees and to cause the Company to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by ITT during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

301.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false and misleading statements disseminated by ITT during the

Class Period.  As a result of the foregoing, the Individual Defendants were controlling persons of

ITT within the meaning of Section 20(a) of the Exchange Act.

302.    As a direct and proximate result of the Individual Defendants' conduct, Lead

Plaintiffs and the other members of the Class suffered damages in connection with their purchase

or acquisition of ITT common stock.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

a.    Declaring this action to be a proper class action pursuant to Federal Rule
of Civil Procedure 23;

b.    Awarding compensatory damages in favor of Lead Plaintiffs and other
Class members against all defendants, jointly and severally, for all
damages sustained as a result of defendants' wrongdoing, in an amount to
be proven at trial, including interest thereon;

c.    Award Lead Plaintiffs and the Class their reasonable costs and expenses
incurred in this action, including counsel fees and expert fees;

d.    Such equitable/injunctive or other relief as deemed appropriate by the
Court.

## XVII.  JURY TRIAL DEMANDED

Lead Plaintiffs demand a trial by jury.

Dated: January 15, 2014

Respectfully submitted,

COHEN MILSTEIN SELLERS AND TOLL
PLLC

*Carol V. Gilden*

Carol V. Gilden (*pro hac vice*)
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel: (312) 357-0370
Fax: (312) 357-0369

Kenneth M. Rehns (#KR-9822)
88 Pine Street
14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
krehns@cohenmilstein.com

Steven J. Toll
Elizabeth Aniskevich (*pro hac vice*)
1100 New York Avenue, N.W.
Suite 500 West
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

O'DONOGHUE & O'DONOGHUE LLP
James R. O'Connell
Mark W. Kunst
4748 Wisconsin Avenue, N.W.
Washington, D.C. 20016
Tel: (202) 362-0041
Fax: (202) 362-2640

*Attorneys for Lead Plaintiff Plumbers and
Pipefitters National Pension Fund*

## CERTIFICATION

Robert H. Cooke, Director of Contributions and Pensions, for the Plumbers & Pipefitters National Pension Fund ("Plumbers National Pension Fund"), declares, as to the claims asserted under the federal securities laws, that:

1. I am authorized to make this certification on behalf of Plumbers National Pension Fund.

2. The Plumbers National Pension Fund has reviewed a complaint filed in this matter and wishes to serve as a lead plaintiff.

3. Plumbers National Pension Fund did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this action.

4. Plumbers National Pension Fund is willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial if necessary.

5. Plumbers National Pension Fund's transactions in the securities of ITT Educational Services, Inc. that are the subject of this action are set forth in Schedule A, attached hereto.

6. During the three years prior to the date of this Certification, Plumbers National Pension Fund sought to serve as a representative party for a class under the federal securities laws in the following cases:

   *In re Goldman Sachs Group, Inc. Sec. Litig.*, Civ. No. 10-3461 (S.D.N.Y.); *Lenartz v. Am. Superconductor Corp.*, Civ. No. 11-10582-WGY (D. Mass); *Wallace v. IntraLinks Holdings, Inc.*, Civ. No. 11-8861-TPG (S.D.N.Y.); and *In re Questcor Sec. Litig.*, Civ. No. 12-1623-DMG (C.D. Cal).

7. Plumbers National Pension Fund will not accept any payment for serving as a class representative on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of May 2013.

*Robert N. Cooke*

Robert H. Cooke
Director of Contributions and Pensions
*Plumbers & Pipefitters National Pension Fund*

| Trade Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 9/17/2008 | Purchase | 1,700 | $ 91.843 |
| 9/18/2008 | Purchase | 1,000 | $ 92.787 |
| 9/22/2008 | Purchase | 500 | $ 92.106 |
| 9/23/2008 | Purchase | 500 | $ 90.347 |
| 9/25/2008 | Purchase | 500 | $ 89.844 |
| 9/26/2008 | Purchase | 600 | $ 87.060 |
| 10/2/2008 | Purchase | 600 | $ 81.659 |
| 10/3/2008 | Purchase | 500 | $ 79.344 |
| 10/8/2008 | Purchase | 500 | $ 71.507 |
| 10/28/2008 | Purchase | 600 | $ 75.846 |
| 11/4/2008 | Purchase | 500 | $ 87.817 |
| 1/6/2009 | Purchase | 400 | $ 91.995 |
| 1/26/2009 | Sale | 600 | $ 114.622 |
| 2/10/2009 | Sale | 300 | $ 127.756 |
| 2/11/2009 | Sale | 300 | $ 127.073 |
| 2/13/2009 | Sale | 300 | $ 124.168 |
| 2/19/2009 | Sale | 300 | $ 112.793 |
| 2/24/2009 | Sale | 200 | $ 113.411 |
| 3/4/2009 | Sale | 200 | $ 108.855 |
| 3/20/2009 | Purchase | 300 | $ 112.042 |
| 3/24/2009 | Purchase | 300 | $ 118.051 |
| 3/25/2009 | Purchase | 200 | $ 121.104 |
| 5/14/2009 | Purchase | 355 | $ 102.010 |
| 5/15/2009 | Purchase | 351 | $ 102.410 |
| 5/18/2009 | Purchase | 348 | $ 99.118 |
| 6/22/2009 | Purchase | 397 | $ 95.698 |
| 6/23/2009 | Purchase | 531 | $ 92.076 |
| 9/16/2009 | Purchase | 264 | $ 92.827 |
| 6/29/2009 | Purchase | 383 | $ 97.364 |
| 7/2/2009 | Purchase | 263 | $ 96.672 |
| 7/2/2009 | Purchase | 390 | $ 96.567 |
| 7/6/2009 | Purchase | 390 | $ 91.938 |
| 7/7/2009 | Purchase | 397 | $ 91.579 |
| 8/27/2009 | Purchase | 250 | $ 108.804 |
| 9/11/2009 | Sale | 420 | $ 100.873 |
| 9/15/2009 | Sale | 200 | $ 99.604 |
| 9/16/2009 | Sale | 439 | $ 99.223 |
| 9/16/2009 | Sale | 230 | $ 99.144 |
| 9/17/2009 | Purchase | 22,700 | $ 102.100 |
| 9/17/2009 | Sale | 440 | $ 99.077 |
| 9/21/2009 | Purchase | 10,400 | $ 109.434 |
| 10/21/2009 | Sale | 200 | $ 113.343 |
| 10/21/2009 | Sale | 200 | $ 112.825 |

| Trade Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 10/22/2009 | Sale | 440 | $ 102.042 |
| 10/26/2009 | Sale | 750 | $ 100.260 |
| 10/26/2009 | Sale | 300 | $ 99.867 |
| 10/27/2009 | Sale | 300 | $ 99.545 |
| 10/28/2009 | Sale | 470 | $ 93.372 |
| 10/29/2009 | Sale | 450 | $ 94.794 |
| 11/5/2009 | Sale | 470 | $ 92.570 |
| 11/13/2009 | Sale | 491 | $ 92.380 |
| 1/22/2010 | Purchase | 430 | $ 108.025 |
| 1/25/2010 | Purchase | 280 | $ 106.743 |
| 1/25/2010 | Purchase | 420 | $ 109.302 |
| 1/26/2010 | Purchase | 420 | $ 107.798 |
| 1/26/2010 | Purchase | 7,600 | $ 107.345 |
| 1/27/2010 | Purchase | 410 | $ 112.918 |
| 1/28/2010 | Purchase | 420 | $ 107.452 |
| 2/2/2010 | Sale | 8,300 | $ 95.343 |
| 2/4/2010 | Purchase | 480 | $ 95.391 |
| 2/8/2010 | Purchase | 310 | $ 93.689 |
| 2/9/2010 | Purchase | 310 | $ 93.815 |
| 2/10/2010 | Purchase | 318 | $ 94.000 |
| 2/11/2010 | Purchase | 310 | $ 94.632 |
| 2/12/2010 | Purchase | 310 | $ 96.396 |
| 2/16/2010 | Purchase | 310 | $ 97.691 |
| 2/26/2010 | Purchase | 360 | $ 108.816 |
| 3/18/2010 | Purchase | 290 | $ 117.591 |
| 3/19/2010 | Purchase | 147 | $ 116.580 |
| 3/22/2010 | Purchase | 148 | $ 115.045 |
| 3/23/2010 | Purchase | 140 | $ 114.899 |
| 3/24/2010 | Purchase | 150 | $ 114.909 |
| 3/25/2010 | Purchase | 150 | $ 113.929 |
| 3/26/2010 | Purchase | 150 | $ 114.493 |
| 3/29/2010 | Purchase | 150 | $ 113.500 |
| 4/22/2010 | Purchase | 150 | $ 119.589 |
| 4/23/2010 | Purchase | 160 | $ 111.255 |
| 4/23/2010 | Purchase | 160 | $ 110.504 |
| 4/26/2010 | Purchase | 160 | $ 108.533 |
| 4/26/2010 | Purchase | 170 | $ 107.670 |
| 4/27/2010 | Purchase | 160 | $ 111.366 |
| 4/27/2010 | Purchase | 5,200 | $ 110.595 |
| 4/28/2010 | Purchase | 160 | $ 111.470 |
| 4/28/2010 | Purchase | 160 | $ 110.850 |
| 4/28/2010 | Purchase | 160 | $ 111.410 |
| 4/29/2010 | Purchase | 160 | $ 105.970 |

| Trade Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 4/30/2010 | Purchase | 170 | $ 103.240 |
| 5/3/2010 | Purchase | 170 | $ 102.070 |
| 5/3/2010 | Purchase | 170 | $ 101.700 |
| 5/5/2010 | Purchase | 5,200 | $ 101.140 |
| 5/6/2010 | Sale | 24,800 | $ 101.820 |
| 5/21/2010 | Purchase | 140 | $ 109.110 |
| 5/25/2010 | Purchase | 140 | $ 106.070 |
| 5/28/2010 | Purchase | 160 | $ 102.100 |
| 6/10/2010 | Sale | 160 | $ 95.910 |
| 6/10/2010 | Sale | 160 | $ 96.290 |
| 8/24/2010 | Purchase | 9,000 | $ 52.660 |
| 8/26/2010 | Purchase | 570 | $ 53.940 |
| 8/31/2010 | Purchase | 290 | $ 53.170 |
| 9/16/2010 | Purchase | 282 | $ 60.330 |
| 9/16/2010 | Purchase | 290 | $ 59.650 |
| 9/17/2010 | Purchase | 265 | $ 63.350 |
| 9/17/2010 | Purchase | 271 | $ 62.040 |
| 9/17/2010 | Purchase | 533 | $ 63.100 |
| 10/15/2010 | Purchase | 311 | $ 56.680 |
| 10/22/2010 | Purchase | 400 | $ 61.110 |
| 10/22/2010 | Purchase | 476 | $ 61.180 |
| 10/25/2010 | Purchase | 284 | $ 63.310 |
| 10/26/2010 | Purchase | 287 | $ 62.680 |
| 11/1/2010 | Purchase | 282 | $ 64.420 |
| 11/3/2010 | Purchase | 292 | $ 62.580 |
| 11/15/2010 | Purchase | 307 | $ 60.490 |
| 11/24/2010 | Purchase | 305 | $ 59.910 |
| 12/1/2010 | Purchase | 313 | $ 58.280 |
| 12/13/2010 | Purchase | 312 | $ 63.000 |
| 12/20/2010 | Purchase | 306 | $ 63.700 |
| 1/14/2011 | Purchase | 2,000 | $ 64.490 |
| 1/18/2011 | Purchase | 1,300 | $ 64.780 |
| 1/25/2011 | Sale | 5,600 | $ 71.240 |
| 1/26/2011 | Sale | 7,900 | $ 71.850 |
| 1/27/2011 | Sale | 4,700 | $ 69.470 |
| 1/28/2011 | Sale | 8,800 | $ 66.290 |
| 1/31/2011 | Purchase | 359 | $ 65.760 |
| 1/31/2011 | Purchase | 720 | $ 66.440 |
| 2/1/2011 | Purchase | 66 | $ 65.900 |
| 2/1/2011 | Purchase | 300 | $ 65.670 |
| 2/2/2011 | Purchase | 360 | $ 67.030 |
| 2/3/2011 | Purchase | 364 | $ 66.620 |
| 2/7/2011 | Purchase | 363 | $ 66.600 |

1732462.1

| Trade Date | Transaction Type | Quantity | Trade Price |
|------------|------------------|----------|-------------|
| 2/8/2011 | Purchase | 378 | $ 65.420 |
| 2/9/2011 | Purchase | 377 | $ 65.590 |
| 2/9/2011 | Purchase | 379 | $ 65.260 |
| 2/10/2011 | Purchase | 62 | $ 68.910 |
| 2/10/2011 | Purchase | 300 | $ 68.390 |
| 2/10/2011 | Purchase | 373 | $ 66.460 |
| 2/11/2011 | Purchase | 359 | $ 68.110 |
| 2/11/2011 | Purchase | 360 | $ 68.370 |
| 2/17/2011 | Purchase | 358 | $ 70.340 |
| 2/23/2011 | Purchase | 659 | $ 73.100 |
| 2/24/2011 | Purchase | 324 | $ 74.500 |
| 2/24/2011 | Purchase | 330 | $ 73.380 |
| 2/25/2011 | Purchase | 21 | $ 76.050 |
| 2/25/2011 | Purchase | 300 | $ 75.280 |
| 2/25/2011 | Purchase | 317 | $ 75.420 |
| 2/28/2011 | Purchase | 323 | $ 76.460 |
| 3/1/2011 | Purchase | 324 | $ 75.590 |
| 3/2/2011 | Purchase | 325 | $ 74.860 |
| 3/3/2011 | Purchase | 326 | $ 75.130 |
| 3/4/2011 | Purchase | 31 | $ 74.610 |
| 3/4/2011 | Purchase | 300 | $ 74.570 |
| 3/8/2011 | Purchase | 328 | $ 73.470 |
| 3/11/2011 | Purchase | 333 | $ 71.620 |
| 3/11/2011 | Purchase | 337 | $ 71.070 |
| 7/12/2011 | Purchase | 1,200 | $ 88.200 |
| 7/13/2011 | Purchase | 1,700 | $ 90.550 |
| 7/14/2011 | Purchase | 3,400 | $ 91.540 |
| 7/15/2011 | Purchase | 1,700 | $ 91.520 |
| 7/18/2011 | Purchase | 1,700 | $ 90.720 |
| 7/19/2011 | Purchase | 1,100 | $ 93.090 |
| 9/23/2011 | Sale | 2,312 | $ 60.360 |
| 12/13/2011 | Sale | 1,300 | $ 54.010 |
| 12/13/2011 | Sale | 1,000 | $ 52.040 |
| 12/14/2011 | Sale | 1,800 | $ 51.280 |
| 12/15/2011 | Sale | 1,100 | $ 51.600 |
| 12/16/2011 | Sale | 1,900 | $ 51.880 |
| 12/19/2011 | Sale | 400 | $ 51.160 |
| 12/20/2011 | Sale | 3,300 | $ 50.290 |
| 4/26/2012 | Sale | 345 | $ 65.790 |
| 7/25/2012 | Sale | 5,704 | $ 50.970 |
| 10/25/2012 | Sale | 2,074 | $ 22.560 |
| 10/25/2012 | Sale | 1,100 | $ 22.600 |
| 10/26/2012 | Sale | 825 | $ 21.610 |

| Trade Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 10/26/2012 | Sale | 791 | $ 21.920 |
| 10/31/2012 | Sale | 836 | $ 21.490 |
| 11/1/2012 | Sale | 834 | $ 21.250 |
| 11/7/2012 | Sale | 870 | $ 18.560 |
| 11/8/2012 | Sale | 910 | $ 19.060 |
| 11/9/2012 | Sale | 962 | $ 17.660 |
| 11/12/2012 | Sale | 1,005 | $ 17.580 |
| 11/13/2012 | Sale | 996 | $ 17.180 |
| 11/14/2012 | Sale | 1,042 | $ 16.770 |
| 11/15/2012 | Sale | 1,042 | $ 16.920 |
| 11/16/2012 | Sale | 1,025 | $ 16.720 |
| 11/19/2012 | Sale | 1,000 | $ 17.310 |
| 11/20/2012 | Sale | 1,029 | $ 16.610 |
| 11/26/2012 | Sale | 1,029 | $ 17.150 |
| 12/3/2012 | Sale | 975 | $ 17.320 |

## CERTIFICATION

Susan A. Boutin, Executive Director of the Metropolitan Water Reclamation District Retirement Fund ("Metropolitan Water Fund"), declares, as to the claims asserted under the federal securities laws, that:

1. I am authorized to make this certification on behalf of Metropolitan Water Fund.

2. I have reviewed a complaint filed in this matter and Metropolitan Water Fund wishes to serve as a lead plaintiff.

3. Metropolitan Water Fund did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this action.

4. Metropolitan Water Fund is willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial if necessary.

5. Metropolitan Water Fund's transactions in the securities of ITT Educational Services, Inc. that are the subject of this action are set forth in Schedule A, attached hereto.

6. During the three years prior to the date of this Certification, Metropolitan Water Fund sought to serve as a representative party for a class under the federal securities laws in the following cases:

   *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-cv-4665 (S.D.N.Y.); *In re Gentiva Sec. Litig.*, No. 10-cv-5064 (E.D.N.Y.); and *Bristol Co. Ret. Sys. v. Allscripts Healthcare Solutions, Inc.*, No. 12-cv-1397 (N.D. Ill.)

7. Metropolitan Water Fund will not accept any payment for serving as a class representative on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

   I declare under penalty of perjury that the foregoing is true and correct. Executed this 10 TH day of May 2013.

   *Susan A. Boutin*
   Susan A. Boutin
   Executive Director
   *Metropolitan Water Reclamation District Retirement Fund*

| Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 7/11/2008 | Purchase | 5,635 | $ 83.590 |
| 7/30/2008 | Sale | 5,635 | $ 90.664 |
| 9/9/2008 | Purchase | 2,050 | $ 89.996 |
| 10/22/2008 | Purchase | 800 | $ 73.600 |
| 11/6/2008 | Purchase | 1,500 | $ 85.138 |
| 12/19/2008 | Purchase | 1,090 | $ 90.276 |
| 1/22/2009 | Purchase | 400 | $ 128.762 |
| 1/23/2009 | Purchase | 200 | $ 126.590 |
| 1/26/2009 | Purchase | 200 | $ 111.793 |
| 1/29/2009 | Purchase | 100 | $ 124.559 |
| 2/10/2009 | Sale | 580 | $ 128.725 |
| 2/12/2009 | Purchase | 100 | $ 120.438 |
| 2/19/2009 | Purchase | 300 | $ 108.839 |
| 3/4/2009 | Sale | 200 | $ 109.504 |
| 3/5/2009 | Sale | 70 | $ 102.428 |
| 3/16/2009 | Purchase | 100 | $ 99.855 |
| 3/30/2009 | Sale | 100 | $ 123.801 |
| 4/7/2009 | Purchase | 200 | $ 104.469 |
| 4/13/2009 | Purchase | 300 | $ 98.989 |
| 4/14/2009 | Purchase | 200 | $ 102.180 |
| 4/21/2009 | Purchase | 200 | $ 97.966 |
| 4/23/2009 | Purchase | 400 | $ 99.042 |
| 4/29/2009 | Purchase | 200 | $ 98.236 |
| 5/1/2009 | Purchase | 300 | $ 96.682 |
| 5/4/2009 | Purchase | 100 | $ 93.210 |
| 5/7/2009 | Purchase | 100 | $ 93.244 |
| 5/11/2009 | Purchase | 300 | $ 96.711 |
| 5/12/2009 | Purchase | 100 | $ 98.193 |
| 6/11/2009 | Purchase | 200 | $ 94.867 |
| 6/17/2009 | Purchase | 300 | $ 97.567 |
| 7/17/2009 | Purchase | 300 | $ 97.409 |
| 7/20/2009 | Purchase | 200 | $ 96.675 |
| 7/28/2009 | Purchase | 300 | $ 96.956 |
| 8/3/2009 | Purchase | 300 | $ 100.329 |
| 8/18/2009 | Purchase | 200 | $ 104.381 |
| 8/25/2009 | Purchase | 200 | $ 107.468 |
| 9/9/2009 | Purchase | 200 | $ 103.294 |
| 9/18/2009 | Purchase | 300 | $ 102.934 |
| 9/29/2009 | Purchase | 200 | $ 111.101 |
| 10/12/2009 | Purchase | 400 | $ 112.517 |
| 10/22/2009 | Purchase | 400 | $ 98.865 |
| 10/28/2009 | Purchase | 400 | $ 93.000 |

| Date | Transaction Type | Quantity | Trade Price |
|------|------------------|----------|-------------|
| 10/29/2009 | Purchase | 300 | $ 92.239 |
| 11/2/2009 | Purchase | 200 | $ 92.130 |
| 12/8/2009 | Purchase | 500 | $ 87.849 |
| 12/14/2009 | Sale | 200 | $ 96.095 |
| 12/15/2009 | Sale | 300 | $ 97.217 |
| 12/18/2009 | Purchase | 400 | $ 89.246 |
| 12/22/2009 | Purchase | 200 | $ 93.510 |
| 12/24/2009 | Purchase | 200 | $ 93.688 |
| 12/28/2009 | Purchase | 400 | $ 96.238 |
| 1/7/2010 | Sale | 200 | $ 102.018 |
| 1/21/2010 | Purchase | 200 | $ 104.232 |
| 1/22/2010 | Sale | 200 | $ 109.118 |
| 1/22/2010 | Sale | 100 | $ 109.869 |
| 1/22/2010 | Sale | 100 | $ 109.852 |
| 1/26/2010 | Sale | 200 | $ 110.005 |
| 1/27/2010 | Sale | 200 | $ 113.260 |
| 1/28/2010 | Purchase | 300 | $ 107.786 |
| 1/28/2010 | Purchase | 300 | $ 106.260 |
| 1/29/2010 | Purchase | 400 | $ 100.873 |
| 2/1/2010 | Purchase | 300 | $ 94.911 |
| 2/2/2010 | Purchase | 200 | $ 95.829 |
| 2/3/2010 | Purchase | 300 | $ 98.832 |
| 2/10/2010 | Purchase | 100 | $ 93.905 |
| 2/11/2010 | Purchase | 600 | $ 93.522 |
| 2/26/2010 | Sale | 300 | $ 109.940 |
| 3/2/2010 | Purchase | 300 | $ 106.260 |
| 3/18/2010 | Sale | 200 | $ 115.350 |
| 3/18/2010 | Sale | 200 | $ 118.023 |
| 3/29/2010 | Purchase | 300 | $ 113.091 |
| 4/6/2010 | Purchase | 400 | $ 114.630 |
| 4/7/2010 | Sale | 300 | $ 113.810 |
| 4/7/2010 | Sale | 100 | $ 114.370 |
| 4/13/2010 | Sale | 400 | $ 118.903 |
| 4/13/2010 | Sale | 400 | $ 119.146 |
| 4/13/2010 | Sale | 300 | $ 117.983 |
| 4/13/2010 | Sale | 300 | $ 118.730 |
| 4/13/2010 | Sale | 100 | $ 117.403 |
| 4/13/2010 | Sale | 100 | $ 118.400 |
| 4/14/2010 | Sale | 200 | $ 116.898 |
| 4/14/2010 | Sale | 200 | $ 115.617 |
| 4/16/2010 | Purchase | 300 | $ 113.997 |
| 4/19/2010 | Purchase | 200 | $ 112.945 |

| Date | Transaction Type | Quantity | Trade Price |
|------|------------------|----------|-------------|
| 4/19/2010 | Sale | 300 | $ 113.151 |
| 4/20/2010 | Purchase | 100 | $ 111.072 |
| 4/22/2010 | Purchase | 200 | $ 111.475 |
| 4/23/2010 | Purchase | 200 | $ 111.161 |
| 4/23/2010 | Purchase | 200 | $ 109.999 |
| 4/26/2010 | Purchase | 100 | $ 108.533 |
| 4/28/2010 | Purchase | 400 | $ 110.460 |
| 4/29/2010 | Purchase | 1,000 | $ 103.719 |
| 5/3/2010 | Purchase | 500 | $ 103.803 |
| 5/4/2010 | Purchase | 300 | $ 99.736 |
| 5/12/2010 | Sale | 400 | $ 105.928 |
| 5/12/2010 | Sale | 100 | $ 106.100 |
| 5/13/2010 | Sale | 100 | $ 107.204 |
| 5/17/2010 | Sale | 300 | $ 109.991 |
| 5/17/2010 | Sale | 200 | $ 110.195 |
| 5/18/2010 | Sale | 300 | $ 111.201 |
| 5/18/2010 | Sale | 200 | $ 108.740 |
| 5/19/2010 | Sale | 200 | $ 111.470 |
| 5/20/2010 | Sale | 300 | $ 110.391 |
| 5/20/2010 | Sale | 100 | $ 112.650 |
| 5/26/2010 | Purchase | 200 | $ 104.757 |
| 5/27/2010 | Purchase | 100 | $ 104.470 |
| 6/4/2010 | Purchase | 900 | $ 99.718 |
| 6/11/2010 | Purchase | 200 | $ 96.982 |
| 6/11/2010 | Purchase | 200 | $ 96.850 |
| 6/17/2010 | Purchase | 200 | $ 96.330 |
| 6/18/2010 | Purchase | 200 | $ 95.869 |
| 6/22/2010 | Purchase | 300 | $ 91.269 |
| 6/29/2010 | Purchase | 400 | $ 85.540 |
| 7/2/2010 | Purchase | 700 | $ 79.420 |
| 7/7/2010 | Purchase | 200 | $ 81.100 |
| 7/19/2010 | Sale | 900 | $ 94.505 |
| 7/19/2010 | Sale | 400 | $ 92.791 |
| 7/19/2010 | Sale | 300 | $ 94.220 |
| 7/20/2010 | Purchase | 200 | $ 87.500 |
| 7/22/2010 | Purchase | 400 | $ 86.500 |
| 7/23/2010 | Purchase | 300 | $ 86.250 |
| 7/23/2010 | Purchase | 400 | $ 86.771 |
| 7/26/2010 | Purchase | 300 | $ 83.427 |
| 7/27/2010 | Purchase | 300 | $ 81.822 |
| 7/29/2010 | Purchase | 400 | $ 79.886 |
| 7/30/2010 | Purchase | 2,710 | $ 79.722 |

| Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 8/3/2010 | Purchase | 300 | $ 79.563 |
| 8/6/2010 | Purchase | 200 | $ 70.572 |
| 8/16/2010 | Purchase | 300 | $ 56.982 |
| 8/16/2010 | Sale | 800 | $ 56.810 |
| 8/17/2010 | Sale | 800 | $ 54.199 |
| 8/17/2010 | Sale | 400 | $ 54.524 |
| 8/19/2010 | Purchase | 400 | $ 52.654 |
| 8/31/2010 | Purchase | 500 | $ 53.715 |
| 9/8/2010 | Purchase | 200 | $ 54.931 |
| 9/13/2010 | Purchase | 300 | $ 57.570 |
| 9/16/2010 | Sale | 200 | $ 59.720 |
| 9/17/2010 | Sale | 500 | $ 61.516 |
| 9/20/2010 | Sale | 300 | $ 65.190 |
| 9/23/2010 | Sale | 400 | $ 68.753 |
| 9/23/2010 | Sale | 200 | $ 69.839 |
| 9/23/2010 | Sale | 200 | $ 69.578 |
| 9/27/2010 | Purchase | 600 | $ 63.753 |
| 9/30/2010 | Purchase | 500 | $ 66.000 |
| 9/30/2010 | Sale | 400 | $ 71.000 |
| 9/30/2010 | Sale | 200 | $ 71.664 |
| 10/1/2010 | Sale | 200 | $ 71.774 |
| 10/7/2010 | Purchase | 300 | $ 67.628 |
| 10/8/2010 | Purchase | 300 | $ 67.486 |
| 10/13/2010 | Purchase | 300 | $ 66.189 |
| 10/14/2010 | Purchase | 700 | $ 53.990 |
| 10/20/2010 | Sale | 500 | $ 59.411 |
| 10/21/2010 | Purchase | 700 | $ 56.984 |
| 10/25/2010 | Sale | 200 | $ 63.480 |
| 10/26/2010 | Sale | 300 | $ 62.753 |
| 11/2/2010 | Purchase | 300 | $ 65.240 |
| 11/3/2010 | Purchase | 400 | $ 61.701 |
| 11/8/2010 | Purchase | 500 | $ 61.566 |
| 11/9/2010 | Purchase | 500 | $ 61.222 |
| 11/16/2010 | Purchase | 200 | $ 62.130 |
| 11/18/2010 | Purchase | 700 | $ 61.771 |
| 11/22/2010 | Purchase | 400 | $ 61.223 |
| 11/23/2010 | Purchase | 100 | $ 61.183 |
| 11/24/2010 | Purchase | 500 | $ 60.498 |
| 11/26/2010 | Purchase | 600 | $ 59.969 |
| 11/29/2010 | Purchase | 100 | $ 59.921 |
| 12/8/2010 | Purchase | 300 | $ 62.827 |
| 12/9/2010 | Purchase | 400 | $ 60.321 |

| Date | Transaction Type | Quantity | Trade Price |
|------|------------------|----------|-------------|
| 12/14/2010 | Purchase | 900 | $ 62.223 |
| 12/16/2010 | Purchase | 500 | $ 61.080 |
| 12/17/2010 | Purchase | 400 | $ 62.603 |
| 12/20/2010 | Purchase | 300 | $ 64.198 |
| 12/21/2010 | Purchase | 400 | $ 62.459 |
| 12/22/2010 | Purchase | 300 | $ 63.552 |
| 12/23/2010 | Purchase | 100 | $ 63.600 |
| 1/7/2011 | Purchase | 400 | $ 64.887 |
| 1/13/2011 | Purchase | 300 | $ 63.945 |
| 1/20/2011 | Sale | 400 | $ 69.794 |
| 1/20/2011 | Sale | 100 | $ 68.458 |
| 1/21/2011 | Sale | 300 | $ 70.657 |
| 1/21/2011 | Sale | 200 | $ 70.720 |
| 1/21/2011 | Sale | 200 | $ 71.202 |
| 1/24/2011 | Sale | 300 | $ 72.509 |
| 1/24/2011 | Sale | 300 | $ 73.518 |
| 1/25/2011 | Sale | 200 | $ 71.266 |
| 1/28/2011 | Purchase | 300 | $ 66.289 |
| 1/28/2011 | Purchase | 700 | $ 67.132 |
| 1/31/2011 | Sale | 500 | $ 65.782 |
| 2/1/2011 | Purchase | 400 | $ 66.589 |
| 2/1/2011 | Sale | 1,000 | $ 65.869 |
| 2/2/2011 | Sale | 400 | $ 67.063 |
| 2/2/2011 | Sale | 300 | $ 67.229 |
| 2/3/2011 | Sale | 500 | $ 66.996 |
| 2/4/2011 | Purchase | 500 | $ 64.947 |
| 2/4/2011 | Sale | 600 | $ 65.012 |
| 2/7/2011 | Sale | 800 | $ 66.527 |
| 2/8/2011 | Purchase | 300 | $ 64.716 |
| 2/8/2011 | Sale | 500 | $ 64.579 |
| 2/9/2011 | Purchase | 300 | $ 64.928 |
| 2/14/2011 | Purchase | 300 | $ 68.272 |
| 2/15/2011 | Purchase | 200 | $ 67.580 |
| 2/18/2011 | Sale | 300 | $ 72.810 |
| 2/22/2011 | Sale | 200 | $ 73.297 |
| 2/22/2011 | Sale | 100 | $ 73.267 |
| 2/24/2011 | Sale | 100 | $ 73.307 |
| 2/25/2011 | Sale | 200 | $ 75.259 |
| 3/15/2011 | Purchase | 500 | $ 69.256 |
| 3/17/2011 | Purchase | 500 | $ 67.478 |
| 3/22/2011 | Purchase | 500 | $ 69.862 |
| 4/4/2011 | Sale | 200 | $ 73.420 |

| Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 4/6/2011 | Sale | 100 | $ 78.131 |
| 4/6/2011 | Sale | 100 | $ 78.805 |
| 6/2/2011 | Sale | 200 | $ 85.881 |
| 6/2/2011 | Sale | 100 | $ 89.864 |
| 6/3/2011 | Sale | 100 | $ 86.350 |
| 6/16/2011 | Purchase | 1,300 | $ 77.390 |
| 7/1/2011 | Sale | 200 | $ 80.574 |
| 7/1/2011 | Sale | 200 | $ 80.218 |
| 7/6/2011 | Sale | 200 | $ 84.480 |
| 7/6/2011 | Sale | 200 | $ 85.281 |
| 7/6/2011 | Sale | 100 | $ 81.905 |
| 7/7/2011 | Sale | 400 | $ 90.026 |
| 7/7/2011 | Sale | 200 | $ 91.186 |
| 7/7/2011 | Sale | 200 | $ 89.850 |
| 7/7/2011 | Sale | 100 | $ 89.060 |
| 7/7/2011 | Sale | 100 | $ 87.470 |
| 7/13/2011 | Sale | 200 | $ 91.520 |
| 7/14/2011 | Sale | 200 | $ 92.790 |
| 7/14/2011 | Sale | 200 | $ 92.950 |
| 7/19/2011 | Sale | 600 | $ 91.509 |
| 7/19/2011 | Sale | 200 | $ 94.420 |
| 7/20/2011 | Sale | 400 | $ 93.530 |
| 7/20/2011 | Sale | 200 | $ 93.782 |
| 7/20/2011 | Sale | 100 | $ 92.070 |
| 7/21/2011 | Purchase | 200 | $ 87.203 |
| 7/22/2011 | Purchase | 200 | $ 88.077 |
| 7/25/2011 | Sale | 100 | $ 90.865 |
| 8/1/2011 | Purchase | 200 | $ 85.460 |
| 8/16/2011 | Sale | 200 | $ 75.254 |
| 8/16/2011 | Sale | 100 | $ 76.020 |
| 8/16/2011 | Sale | 100 | $ 76.870 |
| 8/22/2011 | Purchase | 500 | $ 69.717 |
| 9/29/2011 | Purchase | 300 | $ 60.448 |
| 10/6/2011 | Sale | 300 | $ 63.773 |
| 10/18/2011 | Purchase | 400 | $ 59.670 |
| 10/20/2011 | Sale | 300 | $ 61.483 |
| 10/20/2011 | Sale | 300 | $ 62.268 |
| 10/21/2011 | Sale | 200 | $ 62.810 |
| 10/21/2011 | Sale | 200 | $ 63.870 |
| 10/24/2011 | Sale | 400 | $ 66.200 |
| 10/24/2011 | Sale | 200 | $ 65.600 |
| 10/24/2011 | Sale | 200 | $ 66.375 |

| Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 10/25/2011 | Sale | 200 | $ 66.900 |
| 10/27/2011 | Sale | 400 | $ 69.037 |
| 11/1/2011 | Purchase | 700 | $ 59.910 |
| 11/2/2011 | Purchase | 700 | $ 59.851 |
| 11/2/2011 | Purchase | 700 | $ 56.964 |
| 11/3/2011 | Purchase | 300 | $ 58.240 |
| 11/4/2011 | Purchase | 200 | $ 60.135 |
| 11/10/2011 | Purchase | 300 | $ 59.277 |
| 11/18/2011 | Purchase | 300 | $ 56.081 |
| 12/13/2011 | Purchase | 800 | $ 51.498 |
| 12/29/2011 | Sale | 5,000 | $ 57.340 |
| 1/5/2012 | Sale | 300 | $ 59.907 |
| 1/6/2012 | Sale | 700 | $ 62.660 |
| 1/6/2012 | Sale | 500 | $ 61.899 |
| 1/6/2012 | Sale | 400 | $ 64.628 |
| 1/6/2012 | Sale | 300 | $ 63.957 |
| 1/10/2012 | Sale | 100 | $ 64.250 |
| 1/12/2012 | Sale | 1,300 | $ 64.748 |
| 1/17/2012 | Sale | 500 | $ 65.164 |
| 1/18/2012 | Sale | 200 | $ 65.500 |
| 1/19/2012 | Sale | 400 | $ 66.785 |
| 1/19/2012 | Sale | 400 | $ 71.978 |
| 1/25/2012 | Sale | 200 | $ 68.535 |
| 1/25/2012 | Sale | 200 | $ 69.100 |
| 1/26/2012 | Purchase | 300 | $ 63.087 |
| 1/27/2012 | Sale | 500 | $ 67.158 |
| 2/1/2012 | Sale | 1,000 | $ 68.039 |
| 2/3/2012 | Sale | 1,100 | $ 69.122 |
| 2/9/2012 | Sale | 500 | $ 74.090 |
| 2/9/2012 | Sale | 200 | $ 73.500 |
| 2/23/2012 | Sale | 400 | $ 74.060 |
| 3/2/2012 | Purchase | 500 | $ 68.540 |
| 3/8/2012 | Purchase | 700 | $ 63.193 |
| 3/14/2012 | Purchase | 600 | $ 63.250 |
| 3/15/2012 | Purchase | 200 | $ 64.925 |
| 3/20/2012 | Sale | 300 | $ 67.010 |
| 3/26/2012 | Sale | 200 | $ 67.900 |
| 4/3/2012 | Sale | 300 | $ 70.220 |
| 4/10/2012 | Purchase | 200 | $ 62.999 |
| 4/11/2012 | Purchase | 300 | $ 63.446 |
| 4/16/2012 | Purchase | 300 | $ 61.702 |
| 4/24/2012 | Purchase | 400 | $ 60.828 |

| Date | Transaction Type | Quantity | Trade Price |
|---|---|---|---|
| 4/26/2012 | Sale | 200 | $ 66.010 |
| 5/1/2012 | Purchase | 200 | $ 65.194 |
| 5/2/2012 | Purchase | 200 | $ 66.225 |
| 5/3/2012 | Purchase | 300 | $ 62.812 |
| 5/31/2012 | Sale | 1,300 | $ 56.871 |
| 6/1/2012 | Purchase | 100 | $ 56.020 |
| 6/1/2012 | Purchase | 200 | $ 56.136 |
| 6/1/2012 | Purchase | 300 | $ 56.379 |
| 6/1/2012 | Purchase | 300 | $ 56.049 |
| 6/7/2012 | Purchase | 300 | $ 54.751 |
| 10/25/2012 | Sale | 600 | $ 22.562 |
| 12/12/2012 | Purchase | 600 | $ 19.495 |
| 1/3/2013 | Purchase | 700 | $ 17.970 |
| 1/4/2013 | Purchase | 600 | $ 19.323 |
| 1/7/2013 | Sale | 800 | $ 15.326 |
| 1/7/2013 | Sale | 800 | $ 15.856 |
| 1/7/2013 | Sale | 500 | $ 16.310 |
| 1/8/2013 | Sale | 900 | $ 15.110 |
| 1/8/2013 | Sale | 800 | $ 15.221 |
| 1/10/2013 | Sale | 1,100 | $ 14.309 |
| 1/16/2013 | Sale | 1,500 | $ 14.441 |
| 1/24/2013 | Sale | 1,500 | $ 12.268 |
| 1/24/2013 | Sale | 1,300 | $ 13.363 |
| 1/24/2013 | Sale | 800 | $ 15.558 |
| 1/24/2013 | Sale | 800 | $ 15.835 |
| 1/24/2013 | Sale | 700 | $ 14.078 |
| 1/24/2013 | Sale | 500 | $ 16.736 |
| 1/25/2013 | Sale | 700 | $ 15.855 |
| 2/19/2013 | Sale | 1,100 | $ 19.406 |

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2014, I filed the *Second Consolidated Amended Class Action Complaint* by hand with the Clerk of the Court and served a copy of this document on all counsel of record by first class and electronic mail.

Dated:     January 15, 2014

Kenneth M. Rehns