```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
IN RE ITT EDUCATIONAL SERVICES, INC.   :    13-CV-1620 (JPO)
SECURITIES LITIGATION                  :
                                                            :    OPINION AND ORDER
------------------------------------------------------------X
```

J. PAUL OETKEN, District Judge:

Plaintiffs bring this putative class action against Defendants ITT Educational Services, Inc. (ITT); its CEO, Kevin M. Modany; and its CFO and Executive Vice President, Daniel M. Fitzpatrick. Plaintiffs allege violations of § 10(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. They also allege that Defendants Modany and Fitzpatrick were "control persons" within the meaning of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs allege that Defendants misled the investing public about various issues relating to Defendants' student loan programs. Defendants have moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted in part and denied in part.[1]

I.   Background[2]

ITT is a for-profit college with campuses all over the country. Its business model depends on the availability of student loans. In the years leading up to the putative class period—which runs from April 24, 2008, to February 25, 2013—its students began to default on

---

[1] Courts in this district have granted motions to dismiss with respect to some allegedly misleading statements while allowing claims as to other statements to proceed. *Cf. In re Bank of Am. Corp. Securities, Derivative, & Employee Ret. Income Sec. Act (ERISA) Litigation*, 757 F. Supp. 2d 260, 288 (S.D.N.Y. 2010) (partially granting motion to dismiss).

[2] The following facts are taken from the Plaintiffs' Second Consolidated Class Action Complaint (SCCAC), Dkt. No. 37. All citations are to the Complaint unless specified otherwise.

1

their loans at a rapidly increasing rate. As a result, many private lenders cut back lending to ITT students.

### A. Risk Sharing Agreements

To maintain its students' ongoing access to credit, ITT entered into three risk sharing agreements (RSAs): one with Sallie Mae, and the other two with as-yet unnamed private lenders. Under the RSAs, the lenders would make loans to ITT students for the purpose of paying tuition and expenses, but if the overall default rate on the loans exceeded a threshold percentage, ITT itself would cover all losses above the threshold. Each RSA was a "short-term agreement[]" with set expiration terms. (¶ 13.) The Sallie Mae RSA had a threshold of 24%. The threshold under the other two RSAs remains unknown, at least to Plaintiffs and the public. Sallie Mae lent ITT students $180 million; the other two lenders lent a combined $487 million.

Throughout the class period, default rates increased. By September 2010, Sallie Mae warned Defendants that defaults were approaching the threshold of 24%. By February 2011, Sallie Mae informed the Defendants that the default rate had exceeded 24%. Beginning in March 2011, Sallie Mae began making regular demands for increasingly large sums of money. Sallie Mae ultimately sued Defendants for payment under its RSA, resulting in a $46 million settlement, announced in January 2013.

Meanwhile, as the expiration date of the RSAs neared, ITT struggled to find new sources of credit for its students. By July 26, 2012, it became clear that ITT would not find new private lenders for its students, so it started lending directly. This required ITT to set aside substantial loan-loss reserves to cover defaults and ultimately resulted in a serious hit to its business.

### B. The Alleged False or Misleading Statements

Plaintiffs allege, in essence, three sets of misleading statements or omissions that Defendants made throughout the class period. First, Defendants assured investors that no

payments would be due under the Sallie Mae RSA even after Sallie Mae had demanded payment. Second, Defendants repeatedly said that their expected liabilities under the RSAs would be immaterial, and that ITT was adequately reserved for any payments that might come due, even though it was woefully under-reserved according to Generally Accepted Accounting Principles (GAAP), and even though Defendants knew that default rates were increasing rapidly and that this would almost certainly result in substantial liability. Finally, as the RSAs were approaching expiration, Defendants told investors that they were hopeful that they would secure another RSA deal when, in reality, there was no appreciable chance that this would happen.

### 1.  ITT Was Not Expecting to Make Any Payments

After releasing its second quarter 2011 results, ITT hosted a conference call on July 21, 2011, for investment analysts and media representatives. Defendant Modany said that "with regard to the RSA programs of 2007 [made with Sallie Mae] . . . it's hard for us to say if there'll be any cash payments on that. At this point in time we're not projecting any, but again, it's hard to say. The trending is such that we're booking reserves accordingly based on anticipated default rates." (¶ 184.)

Before the conference call, on March 10, 2011 (¶ 183), Sallie Mae had notified ITT that it owed at least $11 million under the RSA.

### 2.  Liabilities Under the RSAs Would be Immaterial

In its first quarter required disclosure statement for 2008 ("1Q 2008 10-Q"), ITT told investors that its "recorded liability related to the [2007] RSA . . . was not material" (¶ 134), and that it was "not able to estimate the undiscounted maximum potential future payments that [it] could be required to make under the 2008 RSA." *Id.* ITT repeated these two statements in its required quarterly and yearly disclosures through the second quarter of 2011. (¶ 188.)

3

In the second quarter of 2009, ITT added a statement about its second RSA. In its 2Q 2009 10-Q, ITT said that it "did not record a liability for [its] guarantee obligations under the [second] RSA . . . because [it did] not anticipate that private education loans charged off will exceed the percentage that would require it to make a payment under its guarantee." (¶ 153.) This statement was repeated in ITT's quarterly and yearly disclosures until the third quarter of 2011. (*See* ¶ 199.)

In the first quarter of 2010, ITT reported that it had "not made any guarantee payments under [the third RSA] . . . and our recorded liability for the guarantee obligations related to [that] arrangement was not material." (¶ 164.) ITT repeated these statements through the second quarter of 2011.

Throughout the class period, Defendants Modany and Fitzpatrick held several conference calls with investment analysts at which they repeated many of the statements made in the 10-K and 10-Q disclosures. Pursuant to the Sarbanes-Oxley Act, all of ITT's required disclosure statements were certified as true and complete by Defendants Modany and Fitzpatrick above their signatures.

Plaintiffs allege that all these statements were knowingly or recklessly false because Defendants had access to information that student loan default rates were skyrocketing and that this would almost certainly result in substantial payments under the RSAs. Plaintiffs also allege that Defendants could have estimated ITT's maximum future payments under the RSAs because Defendants had extensive knowledge of student loan default rates.

### 3. The Possibility of a New RSA

ITT's 2011 required annual disclosure said that ITT was "pursuing arrangements with unaffiliated lenders for them to provide private education loans to our students and their parents who qualify." (¶ 204.) ITT repeated this statement through the second quarter of 2012. In its

4

third quarter 2012 mandatory disclosure, ITT stated that it was "continuing to evaluate programs with unaffiliated lenders for them to provide private education loans to our students and their parents who qualify." (¶ 223.)

On April 21, 2011, Defendants Modany and Fitzpatrick hosted a conference call for investment analysts. Fitzpatrick said that ITT "made positive progress in [its] efforts to negotiate an additional third party private loan program for [its] students . . . ." (¶ 180.) On July 21, 2011, they hosted another call at which Modany said that he was "cautiously optimistic" about securing new third party financing. (¶ 186.) He stated that ITT had "continued its efforts to negotiate an additional third-party private education loan program for our student [*sic*] that is similar to the [third RSA]." *Id.* (emphasis removed). On October 20, 2011, ITT hosted a third call at which Modany said that "discussions continue on pricing and execution of a new third-party private education loan program." (¶ 191) (emphasis removed). On April 26, 2012, Defendant Modany told analysts that ITT had "made additional progress in [its] efforts to facilitate the availability of new third-party private education loan programs . . . ." (¶ 209) (emphasis removed). He then stated:

> We have made progress this quarter towards working out with third parties private lending options for our students. And there were a number of variables we were still working on. We've certainly reduced those numbers and I would say the confidence level, in terms of our perspective on the ability to get a private lending program has certainly increased since the last time we talked . . . so we're cautiously optimistic. I used the same terms last time, but a little more positively inclined than we were last time. I will say that much.

*Id.* (emphasis removed). On a July 26, 2012, conference call, Modany said:

> On July 13, 2012, we came to a preliminary understanding for the creation of a new $100 million third-party private loan program to be offered to our students . . . . . [W]ith regard to the loan program, basically what we have is we've executed a terms sheet. The term sheet includes a number of, if not all of, the material provisions of an agreement, so we've spend [*sic*] a lot of time on this negotiating all the details of the transaction . . . [and] executed a term sheet. So I think we've made substantial progress there.

5

(¶ 214.)  Modany told analysts that the Company was "hopeful that the program actually will go into place in 2012, not 2013.  Obviously there's work to be done to dot a few Is and cross a few Ts.  But we have had a substantial amount of work that has gone into identifying all the material terms of the arrangement.  So again, hopeful that we'll see that happens [*sic*] in 2012."  *Id.*

Plaintiffs allege that all of these statements were false because Defendants were aware of substantially increasing default rates which would preclude the possibility of reaching a deal for a new private financing scheme.

## II.     Discussion

### A.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006) (quotation marks omitted).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citation omitted).

A complaint alleging securities fraud is subject to two heightened pleading standards: Rule 9(b) of the Federal Rules of Civil Procedure, which requires that allegations of fraud be pleaded with specificity, and the Private Securities Litigation Reform Act (PSLRA), which requires the plaintiff "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or

defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation marks omitted). Plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

To state a violation of § 10(b)(5) and Rule 10b-5, a plaintiff must plead a misstatement of material fact (or an omission of a material fact that the defendant has a duty to disclose), made using an instrumentality of interstate commerce, with scienter (at least as high as recklessness), on which the plaintiff relied to her detriment in connection with the purchase or sale of a security. *E.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). The PSLRA provides a safe harbor for statements that would otherwise violate § 10(b)(5) where those statements are forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z–2(c)(1)(A)(i). The safe harbor, though, is dependent on what the defendant knows at the time of the statement; cautionary language is meaningful only when it discloses the *known* risks of the statement's falsity and statements are forward-looking only if they are not false when made. *E.g.*, *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004) (Easterbrook, J.).

### B. The July 21, 2011, Call

Plaintiffs' strongest allegations stem from the July 21, 2011, conference call. On that call, Defendant Modany stated that "with regard to the RSA programs of 2007 [made with Sallie

7

Mae] . . . it's hard for us to say if there'll be any cash payments on that.  At this point in time we're not projecting any, but again, it's hard to say." (¶ 184.)  Plaintiffs allege that at the time this statement was made, not only were Defendants projecting cash payments on the 2007 RSA, but cash payments were *already due* on the 2007 RSA.  (¶ 85).  Defendants counter that Sallie Mae had only requested the money—meaning that the money was not yet owed—and that, either way, the amount requested was quite small.  (*See* Dkt. No. 46, Defendants' Reply Memorandum of Law, at 6.)  This, Defendants argue, defeats the inference that they knew the statement was false, and, thus, any inference that they acted with scienter.  Defendants appear to concede that the statement satisfies all other requirements for § 10(b)(5) liability.  They contest only scienter.

      Securities plaintiffs need not plead facts "of the smoking-gun genre" to be entitled to relief.  *Tellabs*, 551 U.S. at 324.  But Plaintiffs here have done just that.  They allege that ITT, through its CEO, told investors that it did not expect to make any payments on the Sallie Mae RSA all the while knowing that it already needed to make such payments.  The only remaining argument Defendants offer is that the money was not quite yet due—or, perhaps, that Defendants thought there was some as-yet unspecified reason why it might not become due.  They do not appear to argue that Modany was unaware of Sallie Mae's demand for money at the time of the conference call.  Even if they did make that argument, that inference would be substantially weaker than the inference that Modany did know of the demand.  Further, the mere fact that Defendants might have had some colorable ground to believe that they might not have needed to pay the demanded sums is insufficient to render the statement non-culpable, as Defendants appear to concede.

      Finally, Defendants' papers seem to contend that the statements fall into the PSLRA's safe harbor.  This argument is not persuasive.  The word "projecting" (¶ 184) does suggest a forward-looking statement and, perhaps, "it's hard to say" is sufficient cautionary language.  *Id.*

8

But even if this were the case, Plaintiffs have alleged that, at the time the statement was made, it was *already* untrue. *See Asher*, 377 F.3d at 733. Plaintiffs' claim regarding this statement survives the Defendants' motion to dismiss.

### C. General Statements about RSA Liability

Throughout the class period, Defendants told the market that they were not expecting any significant liability under the RSAs and that they could not predict the maximum potential liability to which they were exposed. It turned out they had significant liability under the RSAs, but this alone is not enough to state a claim for securities fraud. The mere fact that the Defendants turned out to be wrong does not make their statements false when made. Long before the PSLRA, the Second Circuit made clear that complaints cannot survive by pleading "fraud by hindsight." *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.). The PSLRA's safe harbor for forward-looking statements such as these further reinforced that rule. *E.g.*, *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). But the safe harbor does not cover claims that were "made or approved by an executive officer with actual knowledge by that officer that the statement was false or misleading," *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 762 (2d Cir. 2010) (internal quotation marks and citations omitted), and cautionary language of the type required by the PSLRA is not "meaningful" if it fails to address risks known to the defendants at the time the statement was made. *Asher*, 377 F.3d at 733. Thus, in this context, both the safe harbor and the scienter requirement will hinge on what the Defendants knew at the time of each statement.

To state a claim on which relief can be granted, Plaintiffs must plead facts sufficient to raise a strong inference that forward-looking statements were knowingly false when they were made and statements of present fact were at least recklessly false when made. "[T]he scienter requirement for forward-looking statements is stricter than that for statements of current fact.

9

Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 772 (citing *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)). Recklessness, in the § 10(b)(5) context, means "conduct that 'at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citing *In re Carter-Wallace, Inc. Securities Litigation*, 220 F.3d 36, 39 (2d Cir. 2000)). Scienter can be successfully pleaded in two ways: by pleading facts sufficient to raise a "strong circumstantial" case of conscious misbehavior, or by pleading "facts demonstrating that defendants had both the motive and an opportunity to commit fraud . . . ." *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 74 (2d Cir. 2001). Where the statement is one of belief, it is actionable only if it is both false and not sincerely believed by its maker. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092 (1991).

Plaintiffs offer several allegations that Defendants knew that their liability under the RSAs would be substantial. First, Plaintiffs argue that Defendants "had access to detailed information establishing an adverse trend in student loan default rates . . . and therefore knew or recklessly disregarded that their obligations under the RSAs would be triggered . . . ." (Dkt. No. 43, Plaintiffs' Memorandum of Law, at 13.) Second, Plaintiffs argue that Defendants violated GAAP by failing to book a loss contingency with respect to the RSAs. Finally, Plaintiffs allege that numerous pending investigations of ITT's loan programs by state and federal regulators raise a strong inference that Defendants knew or recklessly disregarded their potential liability. In the alternative, Plaintiffs argue that Defendants' personal stock sales demonstrate "motive" to defraud the public, which would allow them to survive a motion to dismiss without alleging

10

circumstantial evidence of knowing or reckless falsehood.  *Compare id.*, at 23, *with Scholastic*, 252 F.3d at 75; *see also S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (discussing the proper motive and opportunity inquiry after the PSLRA); *Novak*, 216 F.3d at 311.  Because the Court ultimately concludes that Plaintiffs have successfully pleaded a circumstantial case of knowing falsity, Plaintiffs' motive-and-opportunity argument need not be addressed.

By the time of Sallie Mae's demand letter, Defendants knew that, at the very least, the loans were not performing as well as they had expected and that they should record a liability for their expected losses.  But before that point, the situation is murkier.  Student loan default rates, Plaintiffs allege, were increasing throughout the class period.  Negative information about student loan defaults was consistently trickling in.  The point at which Defendants' statements become actionable is the point at which Defendants had enough bad information about student loan default rates to render the inference that they were being deceptive more plausible than the inference that they were ignorant of the shaky foundation of their statements.  *See Tellabs*, 551 U.S. at 323.  Only then is the circumstantial case of knowing falsity "strong" within the meaning of the PSLRA.

### 1. Access to Student Loan Data

Plaintiffs allege that Defendants "were aware of, and had access to, detailed information regarding adverse student loan default trends among ITT students . . . ." (Dkt. No. 43, Plaintiffs' Memorandum of Law, at 15-16.)  This is because, according to Plaintiffs, (1) Defendants were required by the Department of Education to gather detailed data on student loan default rates, (2) confidential witnesses confirm that Defendants Modany and Fitzpatrick routinely attended meetings at which student loan default rates were discussed, and (3) Defendants aggressively

used "default management tactics," through which they manipulated the true rate of student loan defaults.

The Department of Education requires educational institutions to report student loan default data with respect to *federal* loans. (¶ 37, 259-60). Over the class period, ITT's students' default rates on federal loans increased 30%. *Id.* In fact, ITT reported this data on its annual 10-K forms throughout the class period.[3] Modany and Fitzpatrick both signed the 10-K forms so, Plaintiffs argue, they must have known about the rising default rates.

Defendants Modany and Fitzpatrick attended regular meetings with the "default management group," which ITT established to—unsurprisingly—manage defaults. (¶¶ 15, 102-105.) Plaintiffs have not pleaded any facts regarding what happened during these meetings, but they argue that the group must have discussed rising student loan defaults with Modany and Fitzpatrick. Plaintiffs, through the reports of various confidential sources, allege that Modany and Fitzpatrick are "hands-on" managers, whose consistent involvement in the day-to-day management of the affairs of the business buttresses the inference that they knew that defaults were on the rise and that liability was imminent. (¶¶ 15-16, 261, 269-71.)

Finally, the Defendants' "default management tactics" (¶ 75-78) allegedly evince Defendants' knowledge of rising defaults. In order to manage their reported default rate, the Defendants allegedly offered students deferments and forebearances until the deadline for reporting defaults to DOE had passed—presumably knowing that the students would eventually

---

[3] This could mean that the information was sufficiently public to render the rest of Defendants' statements not misleading. Two points suffice to dismiss this objection. First, Defendants have not argued it. And, second, because the threshold rates at which ITT would sustain liability on private loans were unknown to the market—indeed, two of the threshold rates are unknown to the Court—the market could not have used the disclosed information to accurately extrapolate ITT's potential liability.

default anyway.  *Id.*  This kind of intimate involvement with the business of student loans, Plaintiffs argue, contributes to an inference of scienter.

Each of these facts suggests scienter, though none is independently sufficient to establish a strong inference.  Courts, though, are not to consider the facts individually, but rather to evaluate them as a whole.  "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Slayton*, 604 F.3d at 774 (quoting *Tellabs*, 551 U.S. at 314).  These facts will be considered with the rest.

### 2. GAAP

Plaintiffs allege that Defendants violated GAAP by failing to book a loss at the inception of their obligations under the RSAs.  (¶¶ 11, 103-15.)  According to the complaint, GAAP require that a loss contingency—including a debt—must be recorded by a charge to income if (1) information available prior to the issuance of the financial statements indicates that it is probable that a liability has been incurred when the financial statement was issued, and (2) the amount of the loss can be reasonably estimated.  (¶ 106.)

Plaintiffs claim that Defendants violated GAAP when they failed to take a charge to income in each of their financials during the class period.  This, Plaintiffs allege, evinces scienter because, essentially, it is a departure from what an honest and non-reckless executive would do.  (*See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 19 (citing *Varghese v. China Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) ("[A]lthough GAAP violations do not independently sustain an inference of scienter, they may contribute to that inference.")).)

The problem with this argument is that it is entirely reliant on the conclusion for which it is offered.  Plaintiffs are trying to argue that Defendants were dishonest when they said they were "not able to estimate the undiscounted maximum potential future payments that [ITT] could

13

be required to make under the 2008 RSA." (¶ 134.) But the Defendants violated GAAP only if they were, in fact, able to estimate the quantity of the liability at the time they signed the RSAs. The Plaintiffs' GAAP argument assumes its own conclusion. It will not be considered in evaluating scienter for that reason.[4]

### 3. Pending Investigations

According to Plaintiffs, by the time of the complaint, ITT was under investigation by (1) the SEC for its accounting practices relating to the last two RSAs; (2) the Massachusetts Attorney General for unfair and deceptive practices relating to student loans; and (3) the Consumer Financial Protection Bureau for "potential unlawful acts or practices" in connection with student loans. (Dkt. No. 43, Plaintiff's Memorandum of Law, at 21-22.) Since the filing of the complaint, ITT has received subpoenas from Arkansas, Arizona, Connecticut, Idaho, Iowa, Kentucky, Missouri, Nebraska, North Carolina, Oregon, Pennsylvania, and Washington. *Id.* at 22.

Plaintiffs cite several cases for the proposition that government investigations can contribute to an inference of scienter. *In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008); *In re Oxford Health Plans, Inc., Securities Litigation*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999); *In re Gentiva Securities Litigation*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter.") (internal quotation marks omitted). Defendants cite one case for the proposition that investigations are irrelevant. *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, No. 11 Civ. 2890 (GBD), 2013 WL

---

[4] Because the Court has determined that the alleged GAAP violations will not be considered evidence of scienter, there is no need to address Defendants' argument that GAAP violations of the kind alleged here cannot be actionable or are not probative of scienter. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011).

2154381 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations . . . provides no evidence of scienter.").

The Court is of the opinion that, given the directive to consider *all* evidence of scienter, these investigations are not categorically irrelevant. But they are not tremendously probative. It is not clear whether, or how much, each investigation hinged on the Defendants' states of mind—which is the key issue—and, either way, none has yet been resolved. The Court will consider the pending investigations as evidence of scienter.

### 4. The Circumstantial Case as a Whole

Two inferences compete for the Court's credence. The innocent inference is that Defendants did not expect the unprecedented level of student loan defaults and, instead, were "overly optimistic" throughout the class period. (Dkt. No. 42, Defendants' Memorandum of Law, at 1.) The culpable inference is that, at some point during the class period, Defendants knew that student loan defaults were going to be a serious problem and yet continued to assure investors that they would not be. The Court's task is to determine which of these two inferences, in light of all the information available, is more reasonable than the other—with a tie going to Plaintiffs. *Tellabs*, 551 U.S. at 314.

Plaintiffs allege that Defendants had access to detailed data about student loan defaults throughout the class period and that they closely monitored that data. Similarly, they allege that pending investigations contribute to the inference that Defendants were behaving fraudulently. Accepting the well-pleaded facts as true, the question becomes: at what point did the data become bad enough to render Defendants' statements knowingly false? Student loan default rates were increasing throughout the class period. While it must be true that, by the time Sallie Mae demanded payments on its RSA, Defendants crossed the threshold at which the inference that they knew defaults would be a problem becomes more reasonable than the inference that

they did not, the Court does not need to identify the precise moment at which the culpable inference overtook the innocent one. Because it is clear that the culpable inference eventually won out, the Court can allow these claims to proceed for now. When the precise moment at which liability attached becomes clear, the Court can limit the class period accordingly.

### D. The Possibility of a New RSA

Plaintiffs claim that Defendants misled the investing public by saying that they were optimistic about making new RSA deals when, in fact, that prospect was very unlikely. The problem with these allegations is that they fail to plead that these statements were false when made. Even granting that Defendants (1) knew student loan default rates were rapidly rising, (2) *knew* they would assume cash liability on their existing RSAs at some point, and (3) knew that the market for educational credit was drying up, it does not follow that they could not make another RSA. Defendants did not claim that the new RSA they were negotiating would be a stupendous deal, or that it would completely solve all of ITT's educational credit problems. Rather, they said that they were very close to signing a deal for a new RSA. Plaintiffs have not alleged that this was not true. Indeed, Plaintiffs have not alleged that Defendants did not, in fact, sign a "term sheet" that incorporated the majority of the important terms of the erstwhile RSA. Plaintiffs have not alleged that, at the time Defendants discussed the possibility of signing a new RSA, anything they said about that process was untrue.

Because Plaintiffs have not pleaded that the statements were false, they, *a fortiori*, have not pleaded that the statements were knowingly false. As such, the portion of Plaintiffs' complaint that is reliant on this line of allegation is dismissed.

### E. Loss Causation

To survive a motion to dismiss, a §10(b)(5) plaintiff must sufficiently allege that the defendant's fraudulent statements or omissions caused the plaintiff economic loss. This cannot

16

be done merely by pleading that when the plaintiffs bought the securities they were trading at an inflated price. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 340 (2005). Rather, the plaintiff must plead economic loss that is proximately caused by the information concealed. The misstatement or omission is the "proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). Causation of this kind can be shown by proving that "when the truth became known . . . the stock price fell." *Dura*, 544 U.S. at 347.

Here, Plaintiffs pleaded five allegedly corrective disclosures. Each of these disclosures, Plaintiffs allege, corrected an actionable misstatement or omission, and was followed shortly by a significant drop in ITT's stock price.[5]

On January 4, 2013, ITT announced that it had agreed to pay Sallie Mae $46 million under the first RSA and that it had taken a $71 million charge to income on the other two RSAs. This flatly contradicts Defendants' earlier assertions that *nothing* would be due on the Sallie Mae RSA. As a result of the disclosure, Plaintiffs allege, ITT shares dropped 19.2%, representing an $86.77 million loss in market capitalization. (¶¶ 240, 242.) These allegations are clearly sufficient to plead loss causation with respect to Defendants' July 21, 2011, statement.

On October 25, 2013, ITT announced that its bad-debt expenses had increased by "350 basis points" (¶ 235), or 3.5%. Upon this disclosure, ITT stock dropped 16%, resulting in a $56.4 million loss of market capitalization. This disclosure contradicts Defendants' prior statements that they had no material exposure to liability under the RSA agreements. Therefore, Plaintiffs have adequately pleaded loss causation with respect to the general statements about

---

[5] Because Defendants' statements with respect to the possibility of a new RSA are not actionable as pleaded, any corrective disclosures relating to those statements need not be addressed.

17

RSA liability that are actionable. Because these two disclosures are sufficient to plead loss-causation for the actionable misstatements that have survived the motion to dismiss, the Court need not address the remaining two.

### F.     Control Person Liability

Defendants' only substantive objection to control person liability under § 20(a) is that Plaintiffs have failed to state an underlying violation. (*See* Dkt. No. 42, Defendant's Memorandum of Law, at 35.) Because the Court has found Plaintiffs' allegations sufficient—at least with respect to some of the Defendants' statements—the Court concludes that Plaintiffs have stated a claim for control person liability against Defendants Modany and Fitzpatrick. Even if Defendants had thoroughly objected to control person liability, that objection would fail. To the extent that fraud was committed at ITT, Modany and Fitzpatrick are alleged to have participated.

## III.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. The motion is granted with respect to (and Plaintiffs will not have access to discovery for the purpose of challenging) Defendants' statements regarding the prospects of securing a new RSA.

The Clerk of Court is directed to close the motion at Docket Number 40.

SO ORDERED.

Dated: July 22, 2014
       New York, New York

_____
J. PAUL OETKEN
United States District Judge